# EXHIBIT 2

*(Redacted - Public Filing)*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 7:25-cv-01760-PMH

| | | |
|---|---|---|
| JEFFREY THOMAS PIRZINGER, | : | |
| Plaintiff, | : | DEPOSITION UPON ORAL EXAMINATION OF JEFFREY PIRZINGER |
| v. | : | |
| TRANS UNION LLC, | : | |
| Defendant. | : | |
| ------------------------ | X | |

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before ELLEN J. GODINO, CCR, RPR, CRCR, held via ZOOM VIDEOCONFERENCE from various locations, with the witness located at [redacted], Mamaroneck, New York, 10543, on Monday, June 8, 2026, commencing at 9:01 a.m.

APPEARANCES:

JEFFREY T. PIRZINGER, Pro Se Plaintiff

BUCHANAN, INGERSOLL & ROONEY PC
BY: ANDREW G. HOPE, ESQ.
2200 Renaissance Boulevard
Suite 350
King of Prussia, Pennsylvania 19406
610-407-0700
Andrew.hope@bipc.com
Attorneys for Defendant Trans Union

# I N D E X


| Examinations | Page |
|---|---|
| JEFFREY THOMAS PIRZINGER | 6 |
| EXAMINATION BY MR. HOPE | 6 |


## EXHIBITS


| Number | Description | Page |
|---|---|---|
| Exhibit 1 | Passport of Jeffrey Thomas Pirzinger issued 16 November 2022, Bates Pirzinger_TransUnion_Discovery_001351 | 15 |
| Exhibit 2 | Dispute Letter dated November 8, 2024 to Trans Union with Attachments, Bates Pirzinger_TransUnion_Discovery_001344 through 1352 | 17 |
| Exhibit 3 | Second Amended Complaint, Claims Upon Which Relief Can Be Granted, Filed 12/9/2025, 15 Pages | 43 |
| Exhibit 4 | Plaintiff's Responses to Trans Union LLC's First Interrogatories, Sixteen Pages | 53 |

E X H I B I T S (Continued)

| Number | Description | Page |
|---|---|---|
| Exhibit 5 | Letter dated December 26, 2024 in Re "Revocation of Consent, Cancellation of Agreements, Notification Requirements Under Applicable Laws, Bates Pirzinger_TransUnion_ Discovery_001465 through 1476 | 55 |
| Exhibit 6 | Letter from Trans Union dated 1/8/2025 with Attached Disclosure Form, Bates Pirzinger_TransUnion_Discovery_001499 through 1500 | 61 |
| Exhibit 7 | Letter to Trans Union dated January 2, 2025 in Re: 35 Disputed Inaccurate Items of Information, Bates Pirzinger_TransUnion_Discovery_001501 through 1515 | 64 |
| Exhibit 8 | Letter from Trans Union dated 11/16/2024, Bates Pirzinger_TransUnion _Discovery_001369 through 1388 | 109 |
| Exhibit 9 | Denial Letter from Mercedes Benz of New Rochelle dated 2/22/2025, No Bates, 15 Pages | 121 |
| Exhibit 10 | Affidavit of Jeffrey Thomas Pirzinger dated March 15, 2026, Eight Pages | 153 |

REQUESTS

| | Page | Line |
|---|---|---|
| .............................. | 35 | 11 |
| .............................. | 36 | 2 |
| .............................. | 65 | 22 |
| .............................. | 132 | 1 |

QUESTIONS MARKED FOR A RULING

| | Page | Line |
|---|---|---|
| .............................. | 8 | 4 |
| .............................. | 26 | 16 |
| .............................. | 27 | 14 |
| .............................. | 28 | 2 |
| .............................. | 28 | 9 |
| .............................. | 28 | 14 |
| .............................. | 28 | 18 |
| .............................. | 29 | 12 |
| .............................. | 29 | 23 |

JEFFREY THOMAS PIRZINGER, 135 Beechwood Drive, Mamaroneck, New York, having been duly sworn, testified as follows:

EXAMINATION BY MR. HOPE:

Q. Good morning, Mr. Pirzinger. My name is Andrew Hope. I'm one of the lawyers who represents Trans Union in this lawsuit, and I'll be asking you some questions today.

So just a few quick things before we get started. The court reporter is attempting to transcribe both my questions and your answers. So the fact that we're doing this via Zoom makes that task even more difficult. In a normal conversation, sometimes people talk over one another, but here it's important that each of us waits for the other to finish, before the other begins to speak.

Does that make sense?

A. That makes sense.

Q. Okay. If you are confused by a question, please let me know and I will try to clarify. That said, if you do answer a question, I'm going to assume that you understood its meaning. Okay?

A. Sure.

Q. Are you currently taking any medication

that may interfere with your ability to testify fully and truthfully today?
A. No.
Q. Is there any other reason why you cannot testify fully and truthfully today?
A. No.
Q. Please state your full name for the record.
A. Jeffrey Thomas Pirzinger. I'm here with explicit reservations for all my rights and privileges, not waiving anything, without prejudice.
Q. And what is your current home address?
A. [redacted], Mamaroneck, New York, 10543.
Q. How long have you lived there?
A. Oh, it's about six years.
Q. And do you own that home, or do you rent?
A. Own.
Q. I'm sorry, you own?
A. Own.
Q. Okay. And where did you live prior to that?
MR. PIRZINGER PRO SE: Objection, not relevant.

A. Yonkers.
Q. What is your current telephone number?
A. [redacted].
Q. And what is your current email address?
MR. PIRZINGER PRO SE: Objection, not relevant.
A. You have it on record. I don't want to provide it in this public forum.
Q. Okay. So you're refusing to answer?
A. Yes.
Q. Okay.
A. I think that will prejudice the case.
Q. Okay. So let me ask you, Mr. Pirzinger, have you read the pro se materials that the pro se office provides to litigants like yourself?
A. I believe I did, way back when.
Q. Okay. So we noticed discovery materials. You understand that there are two bases to refuse to answer questions in a deposition. One is attorney-client privilege, and the other is doctor-patient privilege. Right?
A. I'm aware of the procedures.
Q. Okay.
A. If you want me to provide it, submit a motion to compel for an email address, I mean, go for

it.

(Court Stenographer clarification.)

THE WITNESS: Myself? If I said, if you want to file a motion to compel for an email address, go for it.

Q. So Mr. Pirzinger, other than the email address that you've provided to Trans Union, do you have any other email addresses that you use?

A. No.

Q. Okay. Have you ever been deposed before?

A. No.

Q. Have you ever testified under oath, either in court, or at some other type of hearing or proceeding?

A. I think so, yeah.

Q. Okay. What was the context of that testimony?

A. Traffic cases.

Q. Traffic cases. So were you a defendant in the traffic case?

A. Yes.

Q. Okay. Anything besides the traffic cases?

A. Not that I can recall.

Q. Okay. Do you recall how many?
A. I'm sorry, there was a -- there was a civil case, yes.
Q. Okay. Were you the plaintiff or the defendant in that case?
A. Defendant.
Q. And what was the nature of that case?
A. It was actually a case, TD Bank versus Pirzinger.
Q. Okay. And was that a collections action?
A. It was; it got dismissed.
Q. Okay. What was the nature of the dismissal?
A. The nature of the dismissal was, the accommodation for liable for payment, and I guess they decided to perform.
Q. I'm sorry. So you were the defendant, and you decided to perform?
A. I performed through my acceptance, and the prosecutor was the accommodation party, who was liable for the payment. And I guess he decided to perform, because the case was dismissed.
Q. Okay. So was there -- was there a settlement in that action?

A. I did settle and close the matter.
Q. You settled and closed the matter.
And did you pay any money in connection with that settlement?
A. Define "money"?
Q. What we use as currency to satisfy obligations. Paper money, dollars?
A. I provided my acceptance. That was satisfactory, according to public policy.
Q. I'm sorry, I don't follow.
Did you pay any dollars to plaintiff in that action, to settle?
A. I remitted the full amount.
Q. In dollars?
A. The equivalent of U.S. dollars, correct, through my acceptance.
Q. Did you pay in Bitcoin?
A. No.
Q. Okay. So I guess I'm just not following. When you say you remitted the full amount, what was the currency in which you remitted the full amount?
A. I returned the instrument to the accommodation party, with my acceptance on it for settlement and closure. And they accepted the value

received from me, the drawee.
(Court Stenographer clarification.)
A. From myself, the drawee.
Q. All right. So -- the drawee. So are you saying you paid via check?
A. I did not say that.
Q. Okay.
(Cross-talk.)
A. No, I'm giving you a straight and forward answer. I'm sorry, maybe we're on two different planes, which is understandable. We're not here for an education session. You asked a question; I answered it.
Q. Sure. So my question, again, to the extent that it has been misunderstood: Did you forward any dollars, paper money or the equivalent via check, to the plaintiff in that action as part of the settlement?
A. Not via check. It was an equivalent, via public policy through my acceptance, as returning the instrument for settlement and closure, which is accepted widely through the Courts, the prosecute -- the judge, the prosecutor, and public policy. That's my answer.
Q. Were -- did you --

A. Federal Reserve notes --
(Court Stenographer clarification.)
A. Federal Reserve notes was not transferred from myself. I am not sure what the prosecutor did on their end, but the matter was settled, it's dismissed, it's a closed matter.
Q. Okay. And that's fine. Do you understand -- and let me ask you this, to backup.
Do you understand the concept of money?
A. I do. It's a medium of exchange.
Q. Okay. And how do you usually purchase things?
A. I exchange property for property.
Q. Okay. So do you exchange paper money for property?
A. Sometimes.
Q. Okay. How else do you exchange property for property? What is the most common way for you to operate?
A. Commercial property -- it could be commercial property -- it could be commercial paper, it could be digital currency, it could be book entries, it could be credit. I mean, everything. There's a conglomerate of mediums of exchange out there, currency, what we use in --

(Court Stenographer clarification.)

Q. What medium of exchange did you use to settle the matter with TD?

A. I used the instrument that they offered to me.

Q. And was that a promise to pay?

A. It was not a promise to pay. It was a straightforward banker's acceptance. As the drawee, my obligation was satisfied.

Q. Okay. We'll move on.

A. Okay.

Q. So did you admit in that settlement that you were liable for the debt that the plaintiff was seeking to collect on?

A. I did not testify during that proceeding.

Q. Did you acknowledge in the settlement agreement that you were liable for the debt for which you were sued?

A. I did not. I did not testify.

Q. I didn't say if you testified. I said in the settlement, did you accept that you are liable for the debt for which TD was seeking collection?

A. No, because I was not liable. The accommodation party was liable, the prosecutor.

Q. Okay. I'm going to share some documents with you today. This first one will be Exhibit 1.

(Exhibit 1, Passport of Jeffrey Thomas Pirzinger issued 16 November 2022, Bates Pirzinger_TransUnion_Discovery_001351, was received and marked for identification.)

Q. Let me know when you can see that.

A. I see it.

Q. Okay. Let me scroll down a bit.

Do you recognize this document?

A. I do.

Q. Okay. Is this your passport?

A. It appears to be.

Q. Okay. So on your passport, it looks as though there is some handwriting that says, "Pirzinger, Jeffrey Thomas, d/b/a Jeffrey Thomas Pirzinger."

Did you write that?

A. I did, many years ago.

Q. And was does that mean?

A. It meant -- which is kind of out of the context of this realm -- that the man was doing business as Jeffrey Thomas Pirzinger, the entity created by the State of New York upon birth. The "Entity I.D." was the d/b/a registered with the

Minnesota Secretary of State. That's what that means.
Q. Okay.
A. That's what that was intended to mean at the time that that handwriting was effectuated on the document.
Q. And who effectuated the handwriting on that document?
A. I did.
Q. Were you born in Minnesota?
A. I was not.
Q. Did you create an entity in Minnesota with that Entity ID?
A. I registered a name, I didn't create an entity. The entity was created by the State of New York.
Q. And what -- when you say "the entity was created," what did that mean?
A. It means it was established, it was -- it was put forth, it was put into an existence -- put into existence. That's what "created" means: Put into existence.
Q. And when you say the entity was "put into existence," do you mean via human birth, or some other means?

A. No, the State put in the name in their registry upon my birth. My creation by God.

Anyway, this is like kind of irrelevant. I'm objecting to all this, because this has nothing to do with how Trans Union failed or didn't fail to do a reasonable re-investigation or mail the results of the alleged reinvestigation.

So can we move on to the substance of the case here?

Q. So that will be marked Exhibit 1. I'm going to show you another document that I'll mark Exhibit 2. Let me know if you can see this.

(Exhibit 2, Dispute Letter dated November 8, 2024 to Trans Union with Attachments, Bates Pirzinger_TransUnion_Discovery_001344 through 1352, was received and marked for identification.)

A. I see it.

Q. Okay. Let me scroll down here a bit. This is just the first page.

Do you recognize this document?

A. Yes.

Q. Okay. And did you submit this document to Trans Union?

A. I did, they ignored it.

Q. Now, in the first full paragraph, it

says, "Jeffrey Pirzinger is an ens legis entity, a Consumer and a Person."
Do you see that?
A. I do.
Q. What does that mean?
A. It means the name in capital letters there, JEFFREY PIRZINGER, was a fictitious entity, which is also defined as a consumer under Congress, and is also a person, also defined by Congress, and in the Fair Credit Reporting Act.
That's what that means.
Q. And then in the next sentence, it says, "Consumer JEFFREY PIRZINGER does not own these accounts now or in the past."
Do you see that?
A. I do.
Q. Okay. And what does that mean?
A. Exactly what it states. The consumer, the protected party, Jeffrey Pirzinger, the entity that was created, does not own these accounts, now or in the past. What is confusing about that?
Q. Okay. So is Consumer Jeffrey Pirzinger different from the Jeffrey Pirzinger that is the ens legis entity?
A. It is not.

Q. Which Jeffrey Pirzinger is appearing at the deposition today?
A. The living man speaking to you today.
Q. So is that living man different from the entity and the consumer?
A. The consumer and the entity are the same man. I am acting as surety and principal for the name on the paper. I am not dead, I am alive, representing here the man, or the name on the paper. The name on that paper, it's dead; it's fictitious, just like your name on the paper. You're appearing in place of the name on the paper.
If that clears the record up.
Q. And who is the person that is suing Trans Union in this case?
A. That is the name on the paper, Jeffrey Thomas Pirzinger. That is the entity that was created by New York State. Fictitious entities can only deal with fictitious entities, such as Trans Union.
Q. So --
A. There needs to be a -- there needs to be a man or a woman to speak for the entity. Just like you are the attorney of record for Trans Union, I am the principal of record for the plaintiff, Jeffrey

Thomas Pirzinger. There needs to be someone to speak for the entities. And everybody knows this.

Q. Okay. So just briefly, I want to make sure I have this correct.

Jeffrey Pirzinger, the entity, is suing Trans Union in this case?

A. That's correct.

Q. Okay. And Jeffrey Pirzinger, the person, the human, is the person who is appearing at this deposition today?

A. That's correct.

Q. Do I have that right? Okay.

The letter further states, "Consumer JEFFREY PIRZINGER is not an agent of Elan FIN SVCS/FIDELITY."

Do you see that?

A. I do.

Q. "And thus Consumer JEFFREY PIRZINGER was not authorized to open these accounts."

Do you see that?

A. Yes.

Q. Okay. What does that mean?

A. Well, it means -- it means that the fictitious person -- these accounts allegedly reside in Elan Financial Corporation entity, and only they

have control and power to make changes into their records.

The name "Jeffrey Pirzinger" is not an agent for Elan Financial Fidelity. They have no power, no control, no authority, no nothing. So the name Jeffrey Pirzinger, or the entity Jeffrey Pirzinger, is not authorized to push buttons, create cell entries in databases on their end, to click an "Open" button; to create anything to exist in their system. That's what that is meant to -- that's what that sentence is intended to mean.

Therefore, the statement, "The name Jeffrey Pirzinger did not open these accounts," it's an impossibility for Jeffrey Pirzinger to open the account, if they don't have access or control to their systems, books, ledgers, computers. It's an impossibility.

Q. Okay.

(Cross-talk.)

Q. Okay, I'm sorry. Have you completed your answer?

A. I did, yes.

Q. Okay. At the bottom, below the signature, it says, "Autograph of Jeffrey Thomas, Agent, (Date of Birth of Living Man: [redacted])".

Do you see that?

A. I do, that's correct.

Q. Okay. And below that, it says, "For JEFFREY PIRZINGER, Consumer (Date Entity Created/Filed December 12th -- sorry -- [redacted])."

Do you see that?

A. I do.

Q. And what is the disparity in these dates? There's a date of birth, and then there's an "entity creation date" that is seven days later.

Could you explain that?

A. 100 percent. So God brought me into this world on [redacted]. The State of New York brought Jeffrey Pirzinger, that name right there, as the consumer, into existence on [redacted], which is effectuated by the birth certificate, which is the registration of the name into their computer system. That's when that entity, the all capital letters there, "JEFFREY THOMAS PIRZINGER," was created by the fictitious system.

Q. And does that entity have the same Entity ID, [redacted], that you wrote on the passport?

A. Well, it's the same person, but it's a different ID. The -- I mean, each document or

certificate has its own ID. So that number on the passport was the ID generated by the Secretary of State of Minnesota. The Jeffrey Pirzinger that was created [redacted], that has a different ID, which was created by the State of New York.

Q. Okay. And when was the Entity ID created by the state of Minnesota?

A. I think in 2021, I believe. '21 or '22.

Q. Did you ever visit or reside in Minnesota?

A. No.

Q. Could you explain the connection of the state of Minnesota to the person that I'm speaking with today?

A. Yes, because the State of Minnesota is, I believe, the only state that permits an agent to be a name holder for the "doing business as" entity. All the other states of the Union require the agent to be an owner of the name, or to take ownership of the name. So I am merely -- I was merely the name holder only, and not a name owner.

Q. And is this Jeffrey Pirzinger Consumer entity listed here the same as the entity that is registered in Minnesota?

A. Well, the name appears the same, but

they're -- like I said, each -- each registrant generates their own ID. So the name appears the same on paper, but they have different IDs. You know, just like John Smith; there's a million John Smiths; they're all different. Same name, but they're all different. Anyway, what are we getting at here?

Q. I'm just trying to understand your disputes.

And when it says "Jeffrey Thomas," is that Jeffrey Thomas Pirzinger, or some other person or entity?

A. That's my given name.

Q. Okay. Should it have said "Autograph of Jeffrey Thomas Pirzinger"?

A. Well, Pirzinger would be the surname. I mean, should it have said? I mean --

Q. No? Okay.

A. Not necessarily.

Q. I didn't mean -- okay. Regardless of whether it should or should not have, did you intend to omit "Pirzinger" from that line of text?

A. I did.

Q. And is the basis for your dispute here that the Elan account is inaccurate, because it belongs to Jeffrey Pirzinger the consumer entity, and

not Jeffrey Pirzinger the person?

A. At the date of this document here, the basis for this was I believe an identity theft claim. If you scroll up a little bit, I can't see the top of this document.

Q. Okay. What it says here, and I'll read from it --

A. Okay. So right there. So -- right. This was -- right.

So the whole basis was Trans Union accepted and, quote, "verified" information that furnisher Elan Financial Services distributed to Trans Union. And at this time, I disputed this with an FTC identity theft report --

(Court Stenographer clarification.)

A. FTC, Federal Trade Commission, identity theft report. Under the basis of Elan Financial is alleging -- or Elan Financial was alleging that Jeffrey Thomas Pirzinger opened this set account in question, and distributed the information to Trans Union. This was further disputed to Trans Union, saying that Jeffrey Thomas Pirzinger didn't open the account, never had authority to open the account in Elan's system.

If anyone opened the account, it was

Elan Financial. Therefore, the theory was that Elan Financial was stealing the identity of Jeffrey Thomas Pirzinger, and distributing the information to Trans Union, which is an inaccuracy, because Jeffrey Thomas Pirzinger, or Jeffrey Pirzinger here, could not have opened the account on Elan Financial's books.

And apparently, Trans Union, I believe they did, they denied this dispute, which means they verified that Jeffrey Pirzinger opened the account.

Yeah. And I didn't press this issue further, the record speaks for itself, and, you know, there's a whole lot of holes in the discovery that we've accumulated thus far, showing many things not to be accurate.

But what's the next question?

Q. Mr. Pirzinger, have you exchanged any documents, or engaged in any communications, with ChatGPT, Claude, Gemini, or any other artificial agent regarding the underlying disputes with Trans Union that formed the basis of your lawsuit?

A. I object. You're seeking disclosure of my legally privileged information, my mental impressions, legal theories, and litigation strategy.

Q. Okay. So Mr. Pirzinger, are you an attorney?

A. Thankfully no.
Q. Have you engaged an attorney in this lawsuit?
A. No.
Q. Have you consulted with an attorney in connection with this lawsuit?
A. Not directly, just whatever appears on YouTube.
Q. Okay. So I'm going to mark the transcript here. I can't make you answer the questions, but what I can do is make a record of all the questions you refuse to answer, and go to the Judge and ask that you come back to answer them.
Mr. Pirzinger, have you had any communications with, or made prompts to, an AI agent related to the litigation in this matter? And by that, I mean have you utilized AI to draft or respond to correspondence with counsel for Trans Union, or any pleadings or submissions to the Court?
MR. PIRZINGER PRO SE: I object to your seeking legally privileged information.
MR. HOPE: Please mark the transcript.
Q. Have you attempted to record conversations with Trans Union's counsel?
A. No, you've made it clear that it didn't

authorize.
Q. Did you upload any documents or communications you received from Trans Union or its attorneys to an AI platform?
MR. PIRZINGER PRO SE: Again, objection, you're offering -- you're asking legally privileged information.
MR. HOPE: Please mark the transcript.
Q. What AI platform did you use?
MR. PIRZINGER PRO SE: Objection, legally privileged information, mental impressions, legal theory and litigation strategy.
MR. HOPE: Please mark the transcript.
Q. What documents did you upload?
MR. PIRZINGER PRO SE: Objection, legally privileged information.
MR. HOPE: Please mark the transcript.
Q. What was the topic of your communications or prompts to the AI agent?
MR. PIRZINGER PRO SE: Objection. You're seeking disclosure of my mental impressions, legal theories and litigation strategy. It's privileged information.
MR. HOPE: Please mark the transcript.
Q. Are all of those communications and

prompts saved in your chat history?

MR. PIRZINGER PRO SE: Objection. I'm not waiving work product section. You're asking for legally privileged information.

Q. And when you say "work product," you mean attorney work product?

A. No, I did not say that. No, I did not mention anywhere, in any of my submissions, the word "attorney work product." It's work product, protected under 26(b)(3), Federal Rules of Civil Procedure.

Q. Have you produced copies of the documents that you've -- and communications that you've exchanged with AI agents, to Trans Union?

MR. PIRZINGER PRO SE: Objection. You're seeking disclosure of my mental impressions, legal theories and litigation strategy.

(Court Stenographer clarification.)

MR. PIRZINGER PRO SE: I said "objection," you're seeking disclosure of my mental impression, legal theories and litigation strategy.

MR. HOPE: Please mark the transcript.

Q. And why have you withheld these materials?

MR. PIRZINGER PRO SE: Objection, you're

seeking disclosure of my mental impressions, legal theories, and litigation strategy.

Q. So I'm going to dig in a bit more here. So what I'm asking is: What is the legal basis for your decision to withhold these materials from production? What is your objection on the record? Go ahead.

A. I'm not waiving my work product protection. Just like you have work product protection, so do I, and I'm not waiving it. I'm not looking to disclose any of my mental impressions, any of my legal theories, or any of my litigation strategy.

Q. So that is your basis for withholding these documents and this information from Trans Union. Do I have that correct?

A. That is the basis for withholding an answer. I'm not admitting that there's documents being withheld.

Q. Okay.

A. The fact that we're even discussing a yes-or-no, accept-or-deny answer is also -- is protected.

Q. Were you served with discovery in this matter seeking these materials, Mr. Pirzinger?

A. I was, and I replied promptly. I replied. In writing.
Q. Did you produce any documents or information in response to those requests?
A. No, there were no documents to produce. They were -- you sought legal -- you sought disclosure of my mental impressions, legal theories, and litigation strategies, which is a protected privilege under Federal Rules of Civil Procedure.
Q. Let me correct you there, just for a moment. Whether or not the documents exist is separate from whether or not those documents are discoverable. Right? So you can assert privilege, and you can say that, "I'm not going to produce these documents because they are subject to some privilege." But that does not mean the documents themselves, in, you know, the physical sense, don't exist. Do you follow me?
A. I hear you.
Q. Okay. And so did you assert objections to the requests for those documents by Trans Union?
A. I believe I did in writing; I believe I did.
Q. And what objections did you assert?
A. I don't have the writing in front of me,

but I'm telling you now, I am -- the objection is legally privileged information, mental impressions, legal theories and litigation strategies. That's protected under 26(b)(3).

Q. I have your answer. Thank you.

A. You're welcome.

Q. Mr. Pirzinger, are you familiar with the Fair Credit Reporting Act, or FCRA?

A. To a degree.

Q. When did you first learn about the FCRA?

A. Oh, several years ago back, I don't have the exact date.

Q. How did you learn about it?

A. Either Facebook or YouTube or both.

Q. What does the FCRA require of credit reporting agencies?

A. I don't have -- I don't know the particulars word for word. I haven't memorized it A to Z, so I can't give you a hundred percent accurate answer. But if you give me a more targeted question, maybe I can help you.

Q. Okay. That was a bad question. Let me ask a better one.

You brought a lawsuit against Trans Union for alleged violation of its obligations under

the FCRA. Is that right?
A. Yes.
Q. Okay. And what specific obligations?
A. The obligation to complete a reasonable reinvestigation, upon a consumer submitting an item in dispute for either completeness or accuracy; and also, violation of Trans Union's alleged failure to notice the results of the alleged reinvestigation.
Q. Okay. And you claim that Trans Union has published inaccurate information on your credit report. Is that right?
A. That's what the allegation was in the dispute.
Q. And based on your understanding, in order to avoid liability in this lawsuit, Trans Union bears the burden of proving that the information it received and recorded from furnishers was, in fact, accurate. Do I have that right?
A. You do not have that right.
Q. Okay.
A. The basis of this -- of their liability is failure to show that they performed a reasonable reinvestigation, and failure to show that they mailed the results of whatever reinvestigation they purportedly completed.

Q. Okay.
A. This is not about maintaining accuracy. That's what you're trying to flip it into, but that's not what this case was brought about for.
Q. I just want to make sure I have it right. Whether or not the actual information on your credit report is accurate or not, Trans Union is, in your view, liable for failing to conduct the reinvestigation. Is that right?
A. Failure to conduct a reasonable investigation. The keyword here is "reasonable." That's the only word that matters here: "Reasonable."
Q. Okay. So whether or not the information reported on your credit file was accurate, Trans Union is potentially liable for the alleged failure of conducting a reasonable reinvestigation of your disputes. Do I have that right?
A. Well, that's what the Fair Credit Reporting Act, it says, "The Agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate, and record the current status."
It's not up to me to prove to Trans Union what was or was not accurate. All I had to do

was raise a dispute, and then they had an obligation, according to Congress's creating of the Fair Credit Reporting Act. I didn't make this up. It says it in black and white, and that was verbatim, from the Act itself.

Q. What are you reading from now, Mr. Pirzinger?

A. The Fair Credit Reporting Act, right here.

Q. Okay. I'm going to ask you to produce whatever documents you're holding in front of you.

A. No problem. It's just a screenshot of the Section 611, Procedure in Case of Disputed Accuracy, 15 USC 1681i(a)(1)(A) --

(Court stenographer clarification.)

A. USC-Section 1681i -- some topic -- lowercase A, number 1, capital A.

Q. Okay. And where did you obtain that piece of paper that you have?

A. From the March 2026 version of the Fair Credit Reporting Act PDF file, available publicly on the internet.

Q. Do you have any other documents in front of you today?

A. Just some notes.

Q. I'm going to call for the production of those notes as well.
A. That's fine. I have nothing to hide.
Q. And do you have any screens open on your computer that you're consulting in connection with your testimony today?
A. I do not.
Q. Okay.
A. Well, just a Zoom screen.
Q. Sure. Mr. Pirzinger, what is your highest level of education?
A. If you consider a bachelor's "high," then that's it.
Q. So you attended college?
A. Yes.
Q. Where did you attend college?
A. Susquehanna University.
Q. Oh, Pennsylvania.
A. Right.
Q. I'm not too far from there. What years did you attend?
A. '98 through 2022 -- I'm sorry, 2002.
Q. I was going to say, I liked college too, but 24 years seemed like a long time.
Did you earn a degree?

A. It was earned.
Q. And what in?
A. Business administration, finance.
Q. Do you have any other certifications or degrees?
A. No.
Q. Are you currently employed?
A. No.
Q. What was your most recent employment?
A. Well, I'm self-employed, I work for myself.
Q. Okay. Did you hold a job before your self-employment began?
A. Yes, 20, 30 years ago, I guess.
Q. So following college, did you just go into business for yourself?
A. Shortly thereafter.
Q. Okay.
A. Probably a two- or three-year stint working for another.
Q. Working for another business or person?
A. Yes, yes. Business, correct.
Q. And what was that?
A. A mortgage company.
Q. Mortgage company. Okay.

Mr. Pirzinger, did you speak with or meet with anyone in preparation for your deposition today?
A. I did not.
Q. Okay. And did you review any documents?
A. I reviewed the Federal Rules of Civil Procedure section --
(Court Stenographer clarification.)
THE WITNESS: Sorry.
A. I reviewed the Federal Rules of Civil Procedure section on depositions.
Q. Did you review any other documents, besides the federal rules?
A. No, no other documents. Just the Fair Credit Reporting Act, or parts of it.
Q. Did you review your complaint?
A. Oh, that's correct. I did review the complaint. I breezed through it again, and I think that's the only other document of mine in this case that I reviewed.
I just wanted to make sure I wasn't saying something that didn't exist.
Q. Sure.
A. It's been a while since this has been going on.

Q. Now, you recall Trans Union served discovery in this matter seeking documents and information. Correct?
A. Yes.
Q. Did you produce any documents in response to those requests?
A. I produced many documents. I produced replies and objections; that's a document.
Q. Sure. How about any documents in response to Trans Union's requests for production of documents?
A. I don't think there were any documents to produce.
Q. Okay.
A. I think I made that clear in the objection.
Q. And is that because the documents don't exist, or because you are withholding documents because they are privileged and not discoverable?
A. Well, I don't have the exact answers and responses in front of me, so I don't want to say something that's inaccurate. But you have the replies, so you know exactly what I said or didn't say, and produced or didn't produce.
(Cross-talk.)

A. If I were to give you an answer now, off the cuff, I might give you the wrong answer, and since I'm under oath, I don't want to give you wrong information. You have all the information in front of you.

Q. Well, let me ask it this way.

Did you search for or collect any documents in response to Trans Union's requests for production of documents?

A. If -- I mean, I did search for whatever -- yeah, I did search, because after the fact, I did produce, I think, a letter from Elan Financial. So yes, of course I did.

Q. Okay. Where did you --

A. I did produce documents from -- from them.

Q. Okay. Where did you search for responsive documents?

A. Papers? Around? Loose papers that I came across.

Q. Do you have a file or a folder or desk somewhere where you keep these papers?

A. Unfortunately not. It's not very organized. Not many here.

Q. Did you do any electronic searches for

any documents?

A. No.

Q. Did you communicate via email with respect to your credit accounts?

A. No.

Q. Okay. Do you retain copies of mailed documents that you send to furnishers and credit reporting agencies?

A. Sometimes. It depends.

Q. And did you search those collections for potentially responsive documents?

A. Yeah, and I didn't have anything. Whatever I -- I think I replied accurately.

Q. Okay.

A. So however I replied, that was the truth.

Q. When did you decide to sue Trans Union in this matter?

A. I believe the suit came after denial of credit for when I was trying to make a vehicle purchase, and the -- they brought up an issue with the Trans Union credit report. I disputed stuff prior to that, trying to avoid a situation. And that's basically how it came about.

Q. Who drafted the complaint?

A. I did.
Q. And did you draft the subsequent amended and second amended complaint as well?
A. Yes, I did.
Q. And you also submitted dispute letters to Trans Union. Correct?
A. Yes.
Q. Who drafted these disputes?
A. I did.
Q. Did you speak with an attorney before deciding to sue Trans Union?
A. No. I didn't speak with anyone, but I heard attorneys speak on YouTube.
Q. Have you ever heard the term "credit clinic" or "credit repair organization"?
A. I've never heard the "credit clinic." "Credit repair," yes, that's a widely-used term. It's no secret to anyone.
Q. Have you ever spoken with or attempted to engage a credit repair organization, in connection with your disputes with Trans Union?
A. No.
Q. Did anyone assist you in preparing any of your complaints in this matter?
A. No.

Q. So you didn't show drafts to anyone?
A. No. Just whatever information I gathered from, you know, outside sources, like YouTube or Facebook, that's all.
Q. Did anyone assist you throughout the litigation process?
A. No, unfortunately. Had they, maybe I wouldn't -- we wouldn't be here, how many months later?
Q. I'm going mark another document for to you look at.
MR. HOPE: Mark this as Exhibit 3.
(Exhibit 3, Second Amended Complaint, Claims Upon Which Relief Can Be Granted, Filed 12/9/2025, 15 Pages, was received and marked for identification.)
Q. Let me know when you can see it.
A. I can see it.
Q. Okay. Do you recognize this document?
A. Yes.
Q. What is it?
A. Well, that's the -- that's the -- that's the standing complaint.
Q. Did you review this document before it was filed with the Court?

A. Of course. I created it. I reviewed it many times, over and over.

Q. And you also filed an initial complaint and a first amended complaint. Correct?

A. Correct.

Q. Did you review any documents or information in preparing these complaints? For example, credit card statements, bank records, other correspondence you might have had with furnishers?

A. No, just the credit report that Trans Union, you know, created.

Q. I'm going to scroll down here to Paragraph 9. There it says, "On December 26, 2024, Plaintiff executed a notarized "Revocation of Consent" addressed to Trans Union. In this document, Plaintiff stated that Plaintiff did not authorize Trans Union to send any disclosures, notices, or communications electronically, and that all future communications relating to Plaintiff's consumer files must be sent only by U.S. mail to Plaintiff's mailing address at [redacted], Mamaroneck, New York 10543."

Do you see that?

A. I do, yes.

Q. What does that mean?

A. That means -- well, prior to that, I was -- I was -- Trans Union and I were communicating electronically, through their website and portals and whatever, and email and whatever. And I learned, over the years, that by -- by engaging in these electronic communications, during the process of signing up, I potentially could have waived some rights that I may have been entitled to. And I didn't want to waive any of my rights that may or may not have existed. And I didn't know the details of that.

So I was like, you know what? I'm just going to revoke all electronic consent. I don't need instantaneous gratification. I can wait for the mail to arrive. So I put together the revocation of consent document, it's a few pages; signed it and sent it off, and notice was given. By any means communicated in this case, writing through the post office. I sent it FedEx; there's the tracking number right there.

So as of December 30th, they were noticed. If you want to go use the mailbox rule, they were noticed on December 26th, that any future communications between them and I had to occur through my mailbox, my physical U.S. postal mailbox.

Q. Okay. So you stated that you did exchange electronic communications with Trans Union prior to this.
Did you search for copies of those communications in response to Trans Union's request for production in this case?
A. No, because there was no more consent for any electronic communications after this date forward. So I don't have access to anything that they may have sent, they may have ignored, or whatever.
Q. How about documents that you would have sent electronically to Trans Union prior to this date? Did you search for those?
A. I don't -- honestly, I don't even know what I would have sent to them. The only thing that I recall from them is obtaining credit reports through their websites. I mean, I don't recall sending them anything electronically, if I did. Maybe I did, but I don't recall.
Q. Okay. Did you search for any electronic communications that you might have had with Trans Union prior to this date?
A. No.
Q. Did you submit --

(Cross-talk.)
Q. I'm sorry, go ahead.
A. I said, no, nothing other than the credit reports that they distributed to me electronically, which I believe was available on their website at -- up until that date. I didn't go on their website after that date.
Q. Did you submit similar revocations of consent to any other credit reporting agency?
A. It's possible, but I -- honestly, I don't recall. I haven't looked back at that record, because I've only been dealing with Trans Union since January of 2025.
Q. Have you disputed any of your credit accounts with any other credit reporting agency?
A. In the past, yes. Not since -- not since 2025.
(Cross-talk.)
(Court Stenographer clarification.)
A. Not since I started engaging with Trans Union.
Q. And were those disputes related to the same accounts that you've been disputing with Trans Union?
A. I'm sorry, I don't understand your

question. You asked if I disputed anything with other credit agencies; I said I disputed stuff in the past, but not since -- not since January of 2025.

So what's your question about?

Q. Understood. My question is: In the past, when you have raised disputes with other credit reporting agencies, did those disputes relate to the same accounts that you are disputing with Trans Union in this lawsuit?

A. I can't recall. It's a possibility, but I don't think so, but I'm not going to rule it out.

Q. Did you search for any documents or communications you would have had with other credit reporting agencies in response to Trans Union's requests for production in this case?

A. No.

Q. Now, Paragraph 12, it says, "After reviewing the December 20, 2024 disclosure, Plaintiff prepared a written communication dated January 2nd, 2025."

Do you see that?

A. Yes.

Q. Actually, let me back up for just a moment, and go back to Paragraph 9. You explained the revocation of consent, and what that meant.

Could you explain how that's relevant to your specific claims in this complaint?

A. Well, the second claim, where, under 15 USC 1681i, subsection lowercase a, Number 6, capital -- subsection capital A, "The credit reporting agency" -- and this is verbatim from the Act -- "shall provide written notice to a consumer of the results of a reinvestigation under this subsection, not later than five business days after the completion of the reinvestigation by mail, or, if authorized by the consumer for that purpose, by other means available to the agency."

So they were under an obligation to send me the results of the reinvestigation, no later than five business days after they completed the reinvestigation, by mail, because I revoked a consent by electronic means.

Q. Understood. Thank you for the clarification.

Return to Paragraph 12. It says, "This communication," meaning the communication dated January 2nd, 2025, "identified thirty-five individually numbered disputed items, each corresponding to an entry in the December 20th disclosure."

Do you see that?
A. Yes.
Q. And if we scroll down here to -- I believe it is, let's see, page 6 of the complaint, we ought to see these items. So these are the disputed items individually numbered, starting on page 6.
Do you see that?
A. Yes.
Q. And are these items the same items that are listed in your dispute letter of January 2nd?
A. Yes, verbatim.
Q. Okay. Now, you further allege, in Paragraphs 17 and 18, that Trans Union responded to your January 2nd letter on January 8th, stating that the dispute was "'illegible' or 'undeterminable'."
Is that right?
A. Yes.
Q. Okay.
A. You provided that letter in discovery.
Q. And that's the basis for your complaint that Trans Union did not conduct a reasonable reinvestigation of these disputes?
A. That's what started the -- yes, 100 percent.
Q. Okay.

A. That's the only written correspondence that I received from Trans Union in relation to the dispute from January 2nd. In discovery, you produced a document dated January 23rd, 2025, but I never got that document. Had I gotten that document, there probably wouldn't have been a lawsuit filed.

Q. And you allege in Paragraph 22 that you did not receive a response from Trans Union either verifying or updating the 35 disputed items by February 5, 2025. Is that correct?

A. One hundred percent correct.

Q. All right. So that document that was produced in discovery, you said you had not received, but had you received it, there would have been no lawsuit. Do I have that right?

A. Probably. That was the first time I saw that document, when you produced it.

Q. Okay.

A. That kind of blew me away when I saw that. I was like, are you kidding me?

Q. And then in Paragraph 24, you allege that "On February 22nd, 2025, after Trans Union's reinvestigation period had expired and during the time when Trans Union had not provided written reinvestigation results, Plaintiff applied for" --

sorry here -- "one hundred percent financing with nothing down to purchase a vehicle with a total purchase price of $95,865," and you give the purchase order there.

And then it says, "Multiple lenders denied credit and issued adverse action notices referencing Plaintiff's Trans Union consumer report."

Do you see that?

A. Yes.

Q. And is that credit denial the basis for your damages asserted here?

A. That's part of the damages.

Q. What else do you have, in terms of damages?

A. I think it was all stated in the complaint. There's FCRA violations for damages; there's punitive damages, and whatever actual costs incurred as a result of the repercussions of not being able to purchase a new vehicle, meaning rental expenses, repair expenses for a vehicle that was subpar mechanically.

Q. Any other actual expenses that you've incurred in connection with the claims here?

A. Not actual. Emotional expenses, you know, emotional damages.

Q. Okay.
A. It's all in the complaint. I believe I laid it all out.
MR. HOPE: Let me show you another document, which I will mark as Exhibit 4.
(Exhibit 4, Plaintiff's Responses to Trans Union LLC's First Interrogatories, Sixteen Pages, was received and marked for identification.)
Q. Let me know when you can see it.
A. I see it.
Q. Okay. Do you recognize this document?
A. Yes.
Q. What is it?
A. It's the -- my response to your first set of interrogatories.
Q. Okay. I'm going to scroll down to the bottom to confirm that all of the pages are here. And I believe at the end -- and I apologize for quickly scrolling; I know sometimes that can make people dizzy. Okay.
At the end, there's a signed verification. Did you sign that document?
A. Yes.
Q. And to your knowledge, is the document complete and accurate?

A. Yeah, I believe so. It was -- it was, based on my understanding and intent at the time it was signed. This was five months ago, so I haven't read it since.

Q. Can you identify any individuals besides yourself who have knowledge of the facts of this case?

A. No one has knowledge -- I have no idea. It's public record, so anybody can see all these documents. Well, not this one, because this isn't public record. But whatever -- whatever is available on the docket, anybody can see. I don't know who saw it.

Q. Sure. Understanding that certain elements of the case have been made public, prior to your filing of the case, there would have been individuals who may or may not have knowledge of your disputes.

Do you acknowledge that?

A. Yeah, but I don't -- I didn't share this with anybody.

Q. Okay. So no one, besides you or Trans Union, would have any knowledge of the facts of your specific case. Is that what you're alleging?

A. Correct.

Q. Okay.
A. I mean, other than what's on the record now. I mean, all the facts are on the record now. So.
Q. So did you talk to anyone about this case, friends or family members?
A. No.
Q. Did you talk to anyone about your disputes with the furnishers; Elan, for example?
A. No.
Q. And did you talk to anyone about your disputes with Trans Union before you filed the lawsuit?
A. No. I made up my mind after reviewing Facebook and YouTube.
Q. Did you talk to anyone about what you had seen on Facebook or YouTube?
A. No.
Q. Okay.
A. I'm in a small world here.
Q. Okay.
MR. HOPE: Let me show you another document, which I will mark Exhibit 5.
(Exhibit 5, Letter dated December 26, 2024 in Re "Revocation of Consent, Cancellation of

Agreements, Notification Requirements Under Applicable Laws, Bates Pirzinger_TransUnion_ Discovery_001465 through 1476, was received and marked for identification.)

Q. Do you recognize this document?

A. Yes.

Q. Okay. And is this the revocation of consent that you referenced in the complaint?

A. Yes.

Q. At the top, it says, "Notice to the Principal is Notice to the Agent," and "Notice to the Agent is Notice to the Principal."

A. Yes.

Q. Can you explain to me what that means?

A. That means anybody under the -- anybody who received -- well, because this was mailed to Trans Union, LLC at their address, 555 West Adams Street, Chicago, Illinois, anyone who received that envelope is considered an agent of the principal, Trans Union LLC.

So I'm declaring that if anybody other than the officer of Trans Union LLC took possession of this document, it's considered notice to Trans Union LLC, through their agent. So I'm covering all bases: Whoever touched that, under the

umbrella of Trans Union LLC, notice was thereby given to Trans Union LLC. Not necessarily if it was an officer of Trans Union LLC.

Q. Paragraph 1 here, under "Revocation of Consent," it says --

(Cross-talk.)

Q. I'm sorry, go ahead.

A. Can you zoom in, please?

Q. Zoom in. I'm sorry. That's better? Okay.

Paragraph 1, under "Revocation of Consent," it says, "As the legal and registered owner of the above-mentioned identifying information, I hereby revoke all previously granted consent for any and all communication to or with me, the consumer, via electronic means."

Do you see that?

A. Yes.

Q. What did you mean by, "as the legal and registered owner of the above-mentioned identifying information"?

A. Well, can you go up to the identifying information that is --

Q. I'm sorry. Okay. So that would be at the top here?

A. Right. So the only information there is the "From" data: Jeffrey Thomas Pirzinger, the address, SSN number, phone number and email. Hold on. So I think it's the -- I think it's referencing the first paragraph, "This presentment addresses matters arising" --

(Court stenographer clarification.)

THE WITNESS: Yeah, yeah.

A. Can I -- can you show the screen, the first and the second paragraphs? Because that's what we're pertaining to here.

Q. Okay. So it says "the identifying information." I didn't know if that meant up here, your name and address, et cetera, et cetera, or something else. But I'll show you both paragraphs together.

A. All right. Yeah, right there.

So maybe this wasn't explicitly clear, but what it was intended to mean was, the second paragraph here was referencing the information, meaning the name, Jeffrey Thomas Pirzinger, the Social Security number and email address in that first paragraph. So when it says "As the legal and registered owner of the above-mentioned identifying information," so as we started in the beginning of

this conversation, Jeffrey Thomas Pirzinger was the name created by New York State. I'm merely the registered owner. They registered the name, and I'm the owner of the name, being able to use the name. So that birth certificate was only given to me to use that name.

As far as the Social Security number, again, that Social Security number was given to me to use, which was connected directly to Jeffrey Thomas Pirzinger, based on the SS-5 that was submitted.

And the same thing with the email address: I'm the only one that has specific use of that email address. So those three items right there, "I hereby revoke all previously granted consent for any all communication to or with me, the consumer, via electronic means."

Q. Okay. Section 2 on page 3 -- let's see, there's a page that was intentionally left blank. Section 2 on page 3 demands "cancellation of online profiles and accounts."

What does that mean?

A. Well, any -- any -- I mean, any profile or account that I had with Trans Union on their websites, databases, whatever, I was demanding that they be cancelled. So that way, if I attempted to

log into their website, there wouldn't be a profile or login ID to even make that happen. If there was a membership, a paid membership or free membership, I had demanded that that be cancelled.

And if there's any accounts associated with the name, under the name of Trans Union, or the Social Security number or email address, I demanded that they all be cancelled, basically extinguishing the record of those three items that I laid out in Paragraph Number 1.

Q. Were you demanding that Trans Union erase your online credit profile?

A. No.

Q. Were you attempting to prevent Trans Union from sharing your credit profile with third parties?

A. I don't believe that was the basis of this document. No, that's not what that was. This was about communication between me and Trans Union, electronically, or...

Q. And at the bottom, we've already looked at this, but you had attached a copy of your passport, and then a Con Edison bill?

A. Yes, for identification. So that way, they can't come back and be like, "Oh, we don't know

who did this. We don't know if it's fraud or identity theft, or someone was stealing your ID." So that's why I attached those two items, to eliminate any ambiguity and false claims that I didn't send that in.

Q. Did you physically mail this dispute yourself?

A. Yes.

Q. Did you receive any assistance in drafting this dispute?

A. None.

Wait, hold on a second. You're calling this revocation a dispute?

Q. Well, let me back up. I will characterize it in a -- as a communication.

A. Okay.

Q. Did you receive any assistance in sending this communication?

A. No.

MR. HOPE: I'll mark a document as Exhibit 6.

(Exhibit 6, Letter from Trans Union dated 1/8/2025 with Attached Disclosure Form, Bates Pirzinger_TransUnion_Discovery_001499 through 1500, was received and marked for identification.)

Q. Let me know when you see it.
A. I see that.
Q. Okay. And I'll scroll up on the top. You see it's dated January 8, 2025.
Do you recognize this document?
A. Very much.
Q. Okay. And is this the January 8th letter from Trans Union that you reference in your complaint?
A. Yeah.
Q. And was this letter mailed to your home address?
A. Yes. And if you look at -- right above the -- right after the first paragraph, it says, "Re: Dispute status."
Q. Correct.
A. So I clearly made the connection.
Q. Understood. And so is it possible that this correspondence you received on the 8th was, in fact, a response to the communication that you sent on December 26th?
A. No, because the December 26th communication was not a dispute.
Q. Okay.
A. And it was not illegible.

Q. Okay. Did you ever follow-up with Trans Union after receiving this letter?

A. I followed -- the only time I followed up with them was, I believe, in June or July 2025. It was through the telephone, which the transcripts were put -- attached to the second amended complaint, of that phone call. I think there were one or two phone calls.

And in those phone calls, it was clear, based on those two different reps, that the January 2nd dispute was clearly legible. They were able to gather the basis of it, and I believe they told me that there was no reinvestigation that was done, if I recall correctly. But I'd have to review those transcripts, which are on the record with the second amended complaint.

MR. HOPE: Mr. Pirzinger, we've been going a little bit more than an hour now, and I imagine that the court reporter would be glad of a break. Why don't we take about ten minutes, if that's all right.

(A brief recess takes place.)

THE WITNESS: I just want to put my disclosure out there that I would like a copy of the transcript and recording when it's available.

(A discussion is held off the record.)
THE WITNESS: With the opportunity to review it.
BY MR. HOPE:
Q. Mr. Pirzinger, I am going to show you another document, which I will mark Exhibit 7. That is Exhibit 6. I'm trying to find Exhibit 7. Here we are.
(Exhibit 7, Letter to Trans Union dated January 2, 2025 in Re: 35 Disputed Inaccurate Items of Information, Bates Pirzinger_TransUnion_Discovery_001501 through 1515, was received and marked for identification.)
Q. Let me know when you can see it, Mr. Pirzinger.
A. I see it.
Q. Do you recognize this document?
A. Yes, this is the disputed document that I sent to Trans Union January 2nd.
Q. And if we scroll down here to page 3, are these the same 35 disputed items that are listed in your complaint?
A. Yes.
Q. And did you personally draft this dispute?

A. Letter by letter, yes, I did. Tedious.
Q. And did you mail it?
A. I did.
Q. Did you review any similar letters or templates before writing this letter?
A. Actually, let's rewind. I did send a similar dispute to Experian now that you mention it. Let me go to this page. Because Experian had about 175 different items to dispute, and yes, they were the same accounts. So that goes back to your prior question; this just jogs my memory.
Now, what is your question about this?
Q. Well, let me respond to your previous statement with a follow-up question.
Did you search for or produce those communications with Experian in response to Trans Union's request for production in this action?
A. I don't think so.
Q. Why not?
A. They're available. I mean, if you want it, I can give it to you. There's nothing to hide.
MR. HOPE: I'll call for production of those documents.
A. I'll send it when we're done.
Q. And my question, before we got

sidetracked there, was: Did you review any similar letters or templates before writing this letter?

A. No. I mean, just whatever -- whatever I learned on YouTube and Facebook, but that's it. I reviewed the Fair Credit Reporting Act, and tried to use their words as best I could.

Q. Were there any templates that you saw on Facebook or YouTube that you used as a guide in writing this letter?

A. No. They seemed very elementary, what I saw on there.

Q. I'm sorry, what seemed very elementary?

A. The templates that you're speaking of, you know, the stuff that people share out there.

Q. Okay. So my question --

(Cross-talk.)

A. Go ahead.

Q. So my question was, did you review any letters or templates, and it sounds like the answer is yes?

A. Well, whatever was displayed on the screen on these websites, that's it. I mean, I didn't -- you know what I mean? I didn't -- I didn't take a template and create this. I wanted to be unique. I mean, I don't think you'll see a dispute

like this in Trans Union's records.
Q. Understood. So if I have your testimony correct, it's that you did review similar letters or templates, but you did not use them as a guide in drafting this letter?
A. Correct. It's like it's -- you know, everybody learns something from somewhere, some books, somewhere.
Q. Did you share a draft of this letter with anyone before sending it to Trans Union?
A. No.
Q. Did you share it with anyone after sending it to Trans Union?
A. No.
Q. Okay.
A. But this is included in the complaint, so it's public record at this point.
Q. Now, there are 35 individual items listed here, but in fact, they relate to only three furnishers or accounts. Correct?
A. Correct.
Q. So that's Elan, that's TBOM/Fortiva, and then the last one is TD Bank/Target. Is that --
A. Correct.
Q. Right?

A. Yes.

Q. When did you find out that your Elan account was being reported inaccurately?

A. I don't know. You'd have to look at -- you'd have to look at -- I don't know the exact date. You'd have to look at Trans Union's -- when they distributed credit reports to me, and I guess theoretically, that would be notice.

(Cross-talk.)

Q. My apologies. Go ahead.

A. I don't have a -- I don't have records of the dates, so I don't know. I can't answer that accurately.

Q. Isn't it true that you first inquired into this account back in 2023?

A. It's possible. Inquired with whom?

Q. With either Trans Union or Elan?

A. It's possible.

Q. Okay. Before -- before this dispute, in January of -- it's 2025, I believe, did you ever dispute an account with Elan? Sorry, this is January 2026, my apologies. Oh no, it is January 2025.

Let me rephrase that, as I've sufficiently muddled the record.

Before January 2025, did you ever dispute an account with Elan?

A. I don't recall. I mean -- I mean, it's possible I may have disputed this account, but I don't know. I don't remember.

Q. When did you find out that the TBOM/Fortiva account was being reported inaccurately?

A. I don't recall that exact date either. I could only go by the December 20, 2024 consumer report from Trans Union, and whatever the date of the Experian report was. Because that's when I saw, I guess, those instances.

Q. And the report that you received from Experian, was that around the same time frame, in late 2024?

A. I think so. Yeah, it was around the same time.

Q. And were your disputes with Experian around the same time as you were disputing with Trans Union here, in January of 2025?

A. Yeah. It was either the exact same date, or right around, give or take a few days, I'm pretty sure.

Q. Did you review a consumer report from Equifax?

A. I don't believe I did.
Q. When did you find out that your TD Bank Target account was allegedly being reported inaccurately?
A. When I reviewed the consumer report.
Q. So that's in December 2024?
A. Around about, yes.
Q. Besides --
(Cross-talk.)
Q. I apologize.
A. That's my belief. You know, I don't have exact dates of every timeline. But as far as documentation is concerned, the dates of those reports would be a good date to reference.
Q. Besides the December 2024 credit report, did you review any other documentation to reach the conclusion that these accounts were being reported inaccurately?
A. No.
I'm sorry. Hold on a minute. Let me pause for a minute.
MR. HOPE: Let the record reflect that Mr. Pirzinger has muted his computer and shut his camera.
A. Sorry, there was an interruption I had

to deal with.

Q. Understood.

A. What was your last question?

Q. Understood. Mr. Pirzinger, were you -- I imagine you were just dealing with -- we are taking these depositions remotely; you are in your home. I assume you were dealing with an interruption, and not consulting any documents or information just now?

A. That's correct.

Q. Okay. That's fine. Let me repeat the question.

Did you review any documents, besides the 2024 Trans Union credit report, to reach the conclusion that these three accounts were being reported inaccurately?

A. Well, your question is a little -- it's allegedly inaccurately. I made a -- this all started with the dispute with Trans Union, that these disputes were allegedly inaccurate. That was the nature of the dispute; and it was up to Trans Union to determine whether they were inaccurate or not. All I did was raise the allegation.

And no, I did not review any other documents, other than the credit report. Because the Fair Credit Reporting Act doesn't require me to prove

the inaccuracy at the time of bringing forth a dispute. I was only merely following the Fair Credit Reporting Act, and the basis of this dispute communication. I wasn't trying to craft something that isn't or wasn't. The Fair Credit Reporting Act was very explicit and detailed, and said, "if you do this, you don't necessarily have to do that; they have to then do this."

Q. Now, after you bring suit, is it incumbent upon you to prove that the disputed items are, in fact, inaccurate?

A. Well, I later learned that when you bring a claim in a suit, yeah, you have to be able to substantiate your claim, if you want to get somewhere.

Q. And what documents or information do you have to substantiate the claims that the accounts are inaccurate?

A. I produced those in discovery, I believe. Out of these 35, I think it boiled down to three that I was able to provide clear documentation proving a potential inaccuracy --

(Cross-talk.)

Q. And for each of these --

Go ahead, I'm sorry.

A. As far as the proof goes.
Q. And was that for one account, or all three accounts?
A. I don't -- I don't remember what I submitted. I don't remember. I'd have to go back and look, whatever you received. But you have a record of it.
Q. Okay. Who submitted this dispute? Was it Jeffrey Pirzinger, the consumer, the agent, or the person?
A. Well, it was the agent on behalf of the consumer, the person. The claim can only be brought by the consumer, but the consumer can't speak. So the agent for the consumer, the living man, has got to write it up and put it together and send it out. That's how the world works. We're in commerce.
Q. Okay. Now, I apologize in advance, because this is going to be somewhat repetitive. But I want to go through each of these 35 disputed items with you, to make sure I understand the nature of each dispute.
So the first dispute is with Elan, and it says as the reason -- I'm sorry, the inaccurate item is "Pay Status: Charged off," and the reason for the inaccuracy listed here in that last box is

"Not charged off."

Do you see that?

A. I do.

Q. What does "charged off" mean?

A. I don't know. It's not defined.

Q. Okay, so --

A. But it's a negative --

(Cross-talk.)

(Court Stenographer clarification.)

A. It's a negative item on the consumer report, leading to a negative outcome in the eyes of a creditor. Now, what is a charge-off? I can give you my interpretation of what a charge-off is, but that's my presumption. You know, we're not here in a legal, lawful setting, trying to debate the correct definition of "charged off."

"Charged off," in my eyes, is when a creditor writes off a debt that was not performed on, for accounting and tax purposes. It doesn't necessarily mean they incurred an actual loss, but on the books of accounting, that's what they are showing. That's my understanding of "charged off."

Q. So the charge-off is a determination that's made by the creditor, under that definition. Correct?

A. I would say so.

Q. Okay. Do you have any documentation or evidence to show that Elan did not, in fact, charge-off this account?

A. No, I don't have access to their records. So I don't know what they have and what they don't have.

Q. Did you provide Trans Union with any proof that the item was not charged off?

A. No. The only documentation I provided Trans Union was this dispute communication here; nothing more, nothing less. Everything else, they have from the furnisher, which was their obligation to clarify.

So to save us a whole lot of questions, I just answered your questions for these 35 items. Aside from the three items I believe that I pointed out in discovery, that addressed three of these 35 items here.

Q. Item Number 2, you state that the inaccurate item is "Original charge-off: $18,779," and that the reason that it's inaccurate is "not charged off." Do you see that?

A. I do.

Q. Okay. Did someone open this account

without your authorization?
A. Well, according to the record, I would have to say yes. Because in discovery, there was no -- when Elan Financial produced their documentation as a result of the subpoena that you served on them, all they sent was statements, which is hearsay under the federal rules of evidence. There was no agreement, no application, no signed disclosures, no nothing.
So to answer your question, did I authorize it? The record doesn't show that I authorized it, and that's all I can go by, the record.
Q. How about your personal knowledge? Your personal knowledge?
A. I don't have personal knowledge of signing anything, because I don't have a record of it.
Q. Sorry, I just want to make sure I understand your testimony.
A. What my testimony is, Trans Union verified this item when it was initially put onto the credit report for the first time. So they should have a record, which they should have shared with you, as attorney of record, that this information

isn't, in fact, reasonably correct. So you should already know the answer to your question.

Q. Well --

(Cross-talk.)

(Court Stenographer clarification.)

Q. Please finish your response, Mr. Pirzinger I'm sorry.

A. No, I said, this claim was all about, did Trans Union complete a reasonable reinvestigation. So you know, if they did, you should already have all the answers to this; you should have all the documentation.

But go ahead, your turn.

Q. Thank you for your testimony.

My question was: Do you have personal knowledge that someone other than you opened this account without your authorization?

A. I don't have knowledge of who opened the account.

Q. Okay. Did you open the account? Do you have personal knowledge as to whether you opened the account?

A. I don't have personal knowledge of me opening the account. It's possible that I did, but I don't have the personal knowledge right now. I don't

even know when this account was opened. What year was it opened?

I'm not saying I didn't open it, but I don't have a record of it. I don't have personal knowledge of it. But the creditor would have a solid record of who, what, when, where, and why, that they either chose not produce, or didn't even have a record of it. So I think that speaks volumes.

Q. Did you ever make charges on this account?

A. Not that I can recall.

Q. Did someone other than you make charges on this account?

A. How would I know that? I don't know. I don't know who made the charges on the account. I don't have a record of who made the charges on the account.

Are there any receipts with any signatures that would match up with my signature? I mean, you're asking me to create something that doesn't exist, apparently.

Q. Do you know what this account was for?

A. I'm assuming it's a credit card. I mean, I don't know. Aren't these all credit cards?

Q. Do you use credit cards?

A. I do.

Q. How many do you have?

A. I don't know. Two or three.

Q. Do you have one with Fidelity?

A. I do not.

Q. Did you ever have one with Fidelity?

A. Not recently. If I did, it was a long time ago.

Q. Did you ever make payments on this account?

A. Not that I can recall.

Q. Did any of the entities we discussed today ever make payments on this account?

A. Not that I'm aware of.

Q. Did any entities that we've discussed today ever make charges on this account?

A. I have no idea. I mean, I don't have access to the account.

Q. What is your basis for the claim that the account was not charged off?

A. I don't have a basis for that claim, as I previously stated in our discovery exchanges.

Q. Item 3, you state that the inaccurate item is "Commentary: Maximum delinquency of 120 days in July of 2024 and in August of 2024."

Do you see that?
A. Yes.
Q. And the reason for the inaccuracy listed there is "Inaccurate. Not delinquent."
Do you see that?
A. How can you be 120 days late in two months?
Q. Okay.
A. Two consecutive months, how does that work?
Q. So your basis is essentially that because it's -- the delinquency is listed as 120 days in both July and in August, it is, per se, inaccurate?
A. By definition, it has to be. Unless I know something that I don't know (sic). Again, this is Trans Union's production, not mine, so maybe -- maybe they know something I don't know.
Q. Were there any payments on this account that were not properly credited?
A. I have no idea. You would have to ask the creditor.
Q. Do you have any proof of payments that were made during this period?
A. I don't have proof of any payments made

during this period, no.
Q. Do you have proof that anyone made charges on this account without your authorization?
A. No. I mean, I have no -- do I have proof of -- no. I mean, no. Why would I have that?
Q. Do you have proof that someone opened this account in your name, without your authorization?
A. I do not have proof.
Q. Do you have knowledge as to the person or entity that may have opened this account?
A. Well, Elan Services/Fidelity there, they opened the account. It's in their books; therefore, they opened it. Someone opened the account under their reign, their umbrella, their principal, their agent. Someone under their status opened the account.
Q. Do consumers open credit accounts, in your understanding?
A. Technically, no. The creditor opens them.
Q. Okay. What does the consumer or the debtor do? What is the verb with respect to the account?
A. The consumer would provide the property

of value, that the creditor would then exchange for a book entry, and therefore open the account.

Q. And what is the property of value that a creditor would provide?

(Cross-talk.)

Q. Apologies, let me rephrase that.

What is the property of value that a consumer would provide to a creditor?

A. The application -- the signed application and signed agreement that the creditor would then sell to their STV, and get paid in full for the book value that's created on the account.

Q. Okay.

A. Initially, and ongoing.

Q. Then understanding that you are working from this definition, let me ask: Did you apply for credit from Elan?

A. The record doesn't show that they have an application from me. That's all I can go by, the record.

Q. Do you have personal knowledge of submitting an application to Elan?

A. No, I don't have a copy of an application that I submitted.

Q. That's not what I'm asking. That is not

what I'm asking. Whether or not you have a copy of the document is a separate question from whether or not you have personal knowledge, in your head, of having submitted an application. That is my question.

A. I don't have personal knowledge. It doesn't mean it didn't happen; it's not -- not in my faintest memory. This happened a super long time ago. It's humanly possible. But immediately? No.

Q. Do you have any knowledge or recollection of any Jeffrey Pirzinger-affiliated entity having submitted an application to Elan for this account?

A. I do not have personal knowledge.

Q. Do you have any vague memory that you or some entity submitted a credit application to Elan or Fidelity?

A. No. I don't know if it was on paper, over the phone, or electronically; I don't know. Or if at all. But Trans Union has all the information, because they verified it, twice.

Q. Item Number 4, you state that the inaccurate item is "High Balance: $21,551 from October 2024 to November 2024." And the reason stated there is: "Inaccurate amount."

Do you see that?
A. Yes.
Q. Okay. What was the accurate balance, as of that time period?
A. I don't know, that's why I disputed it. So Trans Union can do their research, according to the Fair Credit Reporting Act, and determine whether it was inaccurate or not.
Q. Well, when you say it's inaccurate, what was the basis for your claim that it was inaccurate?
A. I didn't have a basis for the claim.
Q. Are you claiming in your complaint that the high balance is inaccurate?
A. The complaint made the claim that the high balance was inaccurate; I do not have a basis for it.
Q. Well, what is the basis for your allegation in the complaint that this high balance was inaccurate?
A. I do not have an allegation. I told you in our correspondence together I believe out of the 35 items, I think it boiled down to three where I had a basis to prove the inaccuracy.
But go ahead.
Q. Do you have any documentation showing

that the high balance was lower than $21,551?

A. No.

Q. Item Number 5. You state that the inaccurate item is "Status: $21,551 past due." And the reason stated for the inaccuracy is "Amount past due is inaccurate."

Do you see that?

A. I do.

Q. Do you believe that some amount different from $21,551 was, in fact, past due?

MR. PIRZINGER PRO SE: So look, I'm going to object to all your questioning on this because my answers rely on the discovery record. There's three items I gave explicit demonstrations, to show you exactly why and how the claim holds that was filed. So I'm objecting to all -- everything in -- that you've asked so far on this grid, and anything that you're further going to ask in relation to this grid.

Because whatever answer I give now is not going to contradict and override whatever answer I already gave you in writing through discovery. So whatever answer I gave you in discover, that shall supersede whatever I give you verbally now. I'm not waiving what I put in writing through the discovery

process thus far.

So there's my blanket objection to the next 25 different items you're going to ask on.

If I tell you "no" here, but in writing, I told you "yes" and I showed you why, then that shall stand.

(Cross-talk.)

A. I don't have that -- I don't have that response in front of me. So I don't want to contradict something, because then we have a truth and a false, a false and a true; that doesn't -- that doesn't work. So whatever I gave you in writing in response to the discovery that addressed three items proving the inaccuracies, that's what stands.

I don't have the details in front of me right now, so anything further that I say yes or no to, I don't want to contradict something I already factually proved to you.

Q. Your objection is noted, Mr. Pirzinger.

My question is: What is the basis for the allegation in your complaint that this amount past due is inaccurate?

MR. PIRZINGER PRO SE: I object. I don't have the basis right in front of me right now.

Q. Are you refusing to answer the question?

A. No, I gave you the answer. I said, I don't have the basis in front of me right now. The basis was previously provided to you, if it exists.

Q. You signed a complaint, Mr. Pirzinger, stating under oath that this account past due -- the amount past due, rather, for this account is inaccurate. And I'm asking you: What is the basis for the allegation in your signed pleading to this Court? And if the answer is, "I don't have one," that's fine?

A. I don't have a basis for this one. As I told you, there were three items that I have a basis for. I don't have those in front of me.

So if I tell you, no, I don't have for one of them, but I actually do when I go look back and look at my written record, the written record is what's going to stand, not this testimony here that is inaccurate, being vocalized.

MR. PIRZINGER PRO SE: So I'm going to object to your questioning right now, because I don't want to give you a false answer.

Q. Mr. Pirzinger, I have your objection; I think that's noted. I'm going to ask you about each one of these accounts. Okay?

Number 6, the disputed inaccuracy is

"Balance 10/24 -- 10/2024, $21,551." And the basis for the inaccuracy that's alleged here and in your complaint is: "Inaccurate amount."

What is the basis for that allegation?

A. I don't recall.

Q. Item Number 7. The disputed inaccurate item is "Balance 11/2024, $21,551" and the basis for the inaccuracy, alleged here and in your complaint, is "Inaccurate amount."

What is the basis for that allegation?

A. I don't recall. I'd have to look at the writing I previously submitted to you to give you an accurate answer.

Upon commencing (sic) of this deposition, I'm happy to go back to that one or two documents that I sent during the course of discovery, and I could resend it to you so you could match up the accurate answers, as for which of these items I have a basis for, and which of the items I don't have a basis for. That's honorable.

Q. Item Number 8. You state that the inaccurate item is "Rating 4/2024 30." And the basis for the inaccuracy is "Payment not late."

What is the basis for this allegation, here and in your complaint?

A. I do not recall.
Q. Okay. Items 9 through 12 note that "Rating" for 5/2024, 6/2024, 7/2024, and 8/2024 are all inaccurate, all because "Payment not late."
What is the basis for your allegation, here and in the complaint, that these --
A. I don't --
Q. Items are inaccurate?
A. I do not recall. I'd have to review the credit report to see if there was a basis.
Q. Besides the listing on a credit report, what other document would you look at to support the allegation that the payments were not late?
A. I don't have -- I definitely don't have any other basis, if it's not on the credit report, to show why it was not late.
Q. Item 13 and 14, you state that the inaccurate item is that "Rating as of 10/2024 C/O," charge-off, and "Rating as of 11/2024 C/O," charge-off, are inaccurate because the account was not charged off.
What is the basis for your allegation, here and in the complaint, that this account was not inaccurate -- or was inaccurate, because it was not charged off?

A. I do not have a basis for that.
Q. Items 15 and 16 state that the inaccurate item is "Remarks: 10/2024 CBC/PRL" and "11/2024 CBC/PRL" are inaccurate because the "Account was not Closed By Consumer, No Unpaid Balance, Not Charged Off."
What is the basis for these allegations, here and in your complaint?
A. My oral and affidavit, that I did not close this account -- the consumer did not close the account. That's my testimony under oath, in writing through an affidavit, and here today.
Q. So the inaccuracy here is whether or not the account was closed by the consumer. Do I have that correct?
A. Correct. And it was not closed by the consumer, if it was closed at all.
(Cross-talk.)
A. Trans Union -- Trans Union is alleging that this account was closed by the consumer, and I am testifying that it was not closed by the consumer.
Q. Okay. But there is no basis for the claimed inaccuracies regarding the amount, the fact that the account was -- had no unpaid balance, and was not charged off. Is that correct?

A. Correct.
Q. Item 17 deals with a different account. This is the TBOM/Fortiva account. The inaccurate item you have listed here is, "Balance $1,864," and the reason it's inaccurate you state is "Inaccurate amount."
What is the basis for the allegation, here and in your complaint that this is an inaccurate amount?
A. I don't recall the basis. I would have to review the writing that I previously sent to you.
Q. Do you have any documentation saying the balance was lower than $1,864?
A. Only if it exists on the credit report, nothing else.
Q. Did you apply for credit with TBOM or Fortiva?
A. I have no idea.
Q. Did any of the Pirzinger entities apply for credit with TBOM or Fortiva?
A. I don't recall.
Q. What credit cards do you have?
A. Let's see, OpenSky, I think it's by Capital Bank. Or, no. I don't even -- Chime? I don't know. I don't even know the names of these.

They're not real credit cards, so secured credit cards.
Q. What is a secured credit card?
A. It's like debit cards.
Q. Okay. So you have debit cards that are connected to bank accounts?
A. Right. I don't have any credit cards.
Q. Have you ever applied for any credit cards?
A. Yes, in the past.
Q. When was the most recent application?
A. I have no idea. It was that TD Bank credit card, which is coming up right around the corner here.
Q. Do you recall when you applied for that credit card?
A. It was a long time ago now.
Q. Were there any credit applications since the TD Bank card?
A. I'm sure there were. Yes, there were.
Q. Okay.
A. You just have to look at the inquiries. You just have to look at the inquiries on the Trans Union credit report. You guys have access to that, whatever is there.

Q. Okay. Do you have any knowledge of any specific credit applications that you made, since the TD Bank card?
A. Not specifically, but I guess the record will show on the credit report.
Q. Do you have a recollection of any information that is not listed on the credit report or some other document, related to your credit applications?
A. No.
Q. Who is your mortgage with?
A. There is no mortgage.
Q. You own the home outright?
A. Yep.
Q. Did you pay for the home in cash?
A. Yeah, I think so.
Q. Who did you pay?
A. The seller.
Q. How did you make payment for the home?
A. I have no idea. I guess a check at the time. Like everybody else does.
Q. How many bank accounts do you have, Mr. Pirzinger?
MR. PIRZINGER PRO SE: Objecting -- objection, you're seeking information that is

irrelevant.

A. I don't know how many bank accounts I have; I didn't count them all.

Q. Do you have personal knowledge of the banks where you have accounts?

MR. PIRZINGER PRO SE: Objection, irrelevant.

A. Of course I have personal knowledge of banks.

Q. Okay. What accounts do you have banks -- what banks do you have accounts at?

A. I have an account with Trustco Bank.

Q. Do you have accounts with any other banks?

A. Just Wells Fargo.

Q. Do you have accounts with any other banks?

A. No.

Q. Item 18, TBOM/Fortiva, and you have an account number there. And the inaccurate item is "Pay Status: Account 90 Days Past Due," and the reason you've given is, "Inaccurate. Not Past Due."

What is basis for the allegation, here and in your complaint?

A. I don't recall -- I don't recall that I

have a basis for that.
Q. Item 19. The inaccuracy listed is "Terms: $110 per month," and the basis for the inaccuracy that you have listed here is "Inaccurate amount."
What is the accurate amount for the terms?
A. I don't recall what that would be.
Q. What is the basis for your allegation, here and in your complaint, that $110 per month is inaccurate?
A. I don't -- I don't know if I have a basis for that one.
Q. Item 20. You state that the inaccurate item is "Commentary: Maximum Delinquency of 90 days in 2024 for $112." And the reason for the inaccuracy listed is "Inaccurate. No delinquency."
What is the basis for that allegation, here and in the complaint, that this is inaccurate?
A. I'd have to look at the credit report again, but I have a feeling that there was an inconsistency with the dates and amounts, and that they didn't line up. But again, I'd have to look at that report.
Q. Item 21. The identified item as

inaccurate is "Past due: $112," and the reason you've given is "Inaccurate. $0 past due."

What is the basis for your allegation, here and in the complaint, that zero dollars was past due on this account?

A. I don't know that I have a basis. I'd have to look at the credit report.

Q. Item 22. The identified inaccuracy is "Rating 11/2024 30," meaning 30 days, I would assume. And the reason you've given for the inaccuracy is "Payment not late."

What is the basis for your allegation, here and in the complaint, that the payment was not late on this account?

A. I don't recall the basis. I would have to review the prior documentation sent to you.

Q. What form of documentation was that, was it a --

A. It was a writing, in response to one of these discovery items, or letters to the judge.

Q. Was it an account statement?

A. No.

Q. What form did the writing take? Was it a response to one of your letters?

A. Yeah, a response to one of my letters,

or your letters, clarification.

You previously asked for the basis of all this stuff, and I addressed what I had a provable basis for. You and the judge acknowledged it. I think we talked about it on conference.

Q. Okay. So for each of these, you made allegations in a signed complaint that these accounts were inaccurate, without any basis.

Do I have that correct?

A. For many of them.

Q. Yes. Okay.

(Cross-talk.)

Q. Did you ever seek to amend the complaint, to withdraw these allegations that you made without any sort of basis?

A. No, I did not do that, because I believe by that time, it would have been the fourth amended -- or third -- fourth rendition. And I already made it clear on the record that I think there were -- the 35 boiled down to three specific items, and that was disclosed on the record. And that was put in writing as well, which I believe is on the docket for everyone to see.

Q. Do you believe that there is an ongoing obligation to attest to the accuracy and the truth of

the allegations in your signed pleadings to the Court?

A. Say that again.

Q. Do you believe there is an ongoing obligation to attest to the truth and accuracy of your allegations in signed pleadings to the Court?

A. Well, yeah. I mean, everything, you know, submitted to the Court is -- was intended to be truthful at the -- at the time of the -- at the time of the submission. And any -- any -- any -- any adjustments of that have been put forth on the record, I believe, in a conference with you -- with you and the judge, and also in writing.

So -- sorry, a huge distraction here.

Did I answer your question, or not yet?

Q. You did.

My question to you in follow-up to that is: You've amended your complaint twice, to allege more facts in support of your claims, but you have not seen fit to amend your complaint to withdraw claims that you know now not to be true. And my question to you is: Why not?

A. Because I already met the legal threshold to proceed to the next step in the matter, and the claim was that Trans Union did not complete a

reasonable reinvestigation. I wasn't claiming accuracy or inaccuracy. This is not a -- what is it? An EB claim. This is a 1681(a)(1)(A) and 6(A) claim.

So all I had to do was bring forth the dispute, and they had an obligation to do a reasonable reinvestigation, which they have not demonstrated to do yet.

The Second Circuit requires that, for me to bring a claim, all I have to prove is at least one of the alleged inaccuracies that I'm claiming in the complaint, which I have succeeded at, three times over.

So if you -- in addition to which, I believe the time frame to amend the complaint, based on our scheduling order, has passed; however, I'm happy to withdraw 31 of the alleged inaccurate claims to pacify you. But we're on record right now, you know, yet again, showing you that I have a basis solidly for three.

The credit report speaks for two of them on its face, and my testimony about the consumer not closing the account is the third one. So I don't know what more you need.

Q. My question is: We were forced to take discovery on 35 disputed inaccuracies, for which you

had, at least for 32 of them, absolutely no basis.
Do you agree that that's true?
A. That's the position that you chose to take, yeah.
Q. Well, you asserted in a signed pleading that there were 35 inaccuracies, and we took discovery on those. And, in fact, you are now testifying today that for 32 of them, you had no basis to allege that these items are inaccurate. Is that correct?
A. Right. I merely -- I merely parroted what my dispute was that I sent off to Trans Union. The basis of the complaint was because of the dispute, so I demonstrated the dispute.
The 35 items were never resolved, as far as a reasonable reinvestigation goes. The case was about a reasonable reinvestigation.
I claimed to Trans Union that the items were inaccurate; and that's all I had to do, according to the Fair Credit Reporting Act. So that's what I did.
(Cross-talk.)
A. If -- sorry, if the rule under the Fair Credit Reporting Act was I had to dispute and prove, well, the initial dispute would have been way

different. But that's not what it says.
Q. So I just want to be clear here, that in your pleading to the Court, you are not alleging that these are actually inaccurate; you are just merely alleging that you disputed them as inaccurate. Do I have that correct?
A. Correct. Correct. And then the Second Circuit made it clear that: Okay, that's cool; but in order to proceed here, you need to actually prove at least one to prevail in the case. Which is what I did after the fact, after their direction.
So if I caused you harm in undue time, I repent for my sins.
Q. Okay. Item 23. The inaccurate item you have identified is "Pay Status: Account 90 days Past Due," and the reason for the inaccuracy is "Inaccurate. Account Not Past Due."
What is the basis for the allegation, here and in your complaint that the account was not past due?
A. I don't recall if I have a basis.
Q. Item Number 24. The disputed inaccuracy is "Terms: $461 per month," and the reason that you have listed here is "Inaccurate amount."
What is the basis for your allegation

here and in your complaint that $461 per month was an inaccurate amount?

A. I don't know if I have a basis.

Q. Item Number 25. The disputed inaccuracy is "Commentary: Maximum Delinquency in 90 days in 12/2024 for $1,221." And the reason for the inaccuracy listed here is "Inaccurate. No delinquency."

What is the basis for your allegation, here and in the complaint that there is no delinquency?

A. I don't know if I have a basis.

Q. Item Number 26. The inaccurate item listed here is "Remarks: Closed by credit grantor," and the reason that you have listed is "Account is closed, but inaccurate commentary on who closed the account."

What is the basis for your allegation of this inaccuracy, here and in the complaint?

A. Who was the credit grantor? If the account was opened by me, which is -- you know, or through me; well, I provided the initial credit, which was the application, which acted as the security that they sold to generate a book entry. So who provided the credit? I was the grantor. I

didn't close this account. So there's my testimony.
Q. Item Number 27. The inaccurate item you have listed is "Balance: 10/2024, one thousand -- I'm sorry, $12,438." And the reason you have listed here is, "Inaccurate balance amount."
What is the basis for the allegation, here and in your complaint that $12,438 was an inaccurate balance amount?
A. I don't know if I have a basis for that.
Q. Item 28. The inaccurate item listed is "Balance: 11/2024, $13,109," and the reason listed is "Inaccurate balance amount."
What is the basis for the allegations, here and in your complaint, that this was an inaccurate balance amount?
A. I don't know that I have a basis.
Q. Item 29. The inaccurate item listed is "Scheduled Payment 10/2024 $434," and the reason you have listed is "Inaccurate amount."
What is the basis for your allegation, here and in your complaint that the $434 was an inaccurate amount?
A. I don't have a basis.
Q. Item 30. "Scheduled payment 12/2024, $461," and you note in your dispute that this is an

"inaccurate amount."

What is the basis for your allegation, here and in the complaint that $461 was an inaccurate amount?

A. I don't know that I have a basis.

Q. Item 31. It's listed here as "Past Due 10/2024 $341," and the reason you have listed is "Inaccurate. Not past due."

What is the basis for your allegation, here and in the complaint that $341 was not past due?

A. I don't know that I have a basis for Items 31 through 35. But the basis does exist for whatever I previously sent you documentation on and mentioned in the hearing with the Judge, the conference call.

Q. Okay. Do you remember submitting an identity theft report to the FTC?

A. Yeah, you showed it on the screen. It was submitted to them, with the same verbiage.

Q. Okay. So we'll look back at Exhibit 2, and I believe it was page 2.

Do you see that there?

A. Yes.

Q. Okay. Do you recognize this document?

A. Yes.

Q. And is this the identity theft report you submitted to the FTC?
A. Yes.
Q. Okay.
A. Which is -- it's factually true.
Q. Why did you submit an identity theft report?
A. To remove -- to request Trans Union to remove an item that doesn't belong on there, based on these facts.
Q. Okay. So scrolling down here -- and I apologize if it's small; I can zoom in.
It says that you discovered the fraud in October of 2024. Do you see that?
A. I see that.
Q. Okay. Now, the consumer report you got from Trans Union was in December of 2024. What did you get in October that caused you to discover this identity theft?
A. I have no idea. I guess you have to look at some data report on or before October.
Q. Well, my question to you is: This is the date that you say you discovered it. And I'm asking, what was the happenstance? What occurred --
(Cross-talk.)

A. It must have been -- it must have been another Trans Union report. Or there must have been -- there must have been a Trans Union report around that date as well.

Q. Okay. Do you specifically remember requesting a Trans Union credit report in or around October of 2024?

A. No, but I did request them over time. You know, Trans Union, I'm sure, has a lot of those dates.

Q. Did you request any other credit reports, from Experian or Equifax, for example, in or around October 2024?

A. It's possible. I can't say yes or no, but I'm not ruling it out.

Q. Is it possible that one of those credit reports caused you to discover the alleged identity theft in connection with this account?

A. I mean, I don't know where the initial discovery came, but as far as Trans Union is concerned, it had to be -- the relationship between this and Trans Union was -- this was reported to Trans Union, because that cover letter one page up was sent to Trans Union.

Can you scroll up? That cover letter,

was it sent to Trans Union, or was it not?

Q. It was. Yes. This is attached to your letter to Trans Union, dated November --

A. Correct, correct, right. So there was a Trans Union report that had this account on it.

Q. Okay.

A. So that's why this was filed. There was a Trans Union report very close to -- in October, I guess, of 2024 that had this information on there, and that's what it was directly tied to.

So you're asking me if I found out about this through another means? I mean, maybe it was -- I mean, it's possible that it was on another report. Because this Elan furnished the data, so it's possible that they furnished it to, you know, other agencies. And it's very possible that I sent the same correspondence to the other one or two -- I mean, I don't know. I don't have the record of wherever -- if this was sent to one of the other CRAs.

Q. And on the FTC affidavit, it states that the "Date Fraud Began" was March of 2012. How did you settle on that date?

A. That's what the Trans Union report showed.

Q. And who was the identity theft?
A. Who what?
Q. I'm sorry. Who was the identity thief?
A. Elan Financial in this case, because they're reporting that Jeffrey Pirzinger opened an account; that's why it's -- that's why it is appearing in the Trans Union system, because that's what Elan is communicating; when in theory, it's not Jeffrey Pirzinger's account; it's Elan's account. They're the owner.
(Cross-talk.)
A. If Elan owns an account, they can't put their account on someone else's report.
So my position is: Elan owns the account. They have control over it; they have discretion over it; not me. So if that's the case, it doesn't report -- it doesn't belong on a Trans Union disclosure attached to my Social Security number that I have the right to use.
That was the basis of this, that's the theory, and that is the factual allegation.
(Cross-talk.)
A. I guess Trans Union didn't agree --
Q. I'm sorry.
A. I guess Trans Union didn't agree.

(Cross-talk.)

(Court Stenographer clarification.)

A. I said, I guess Trans Union did not agree with the statement here, because they decided, through, I don't know, some reinvestigation of some kind, that what I put here was not true; therefore, they kept it on the report. Because if they found that this was true, they had to delete it from the report. So I guess Trans Union made a legal determination that this was -- this was false.

Q. Do you remember receiving a response to this dispute?

A. I do not.

Q. I'm going to show you another document.

A. Was a response ever sent?

Q. I'm going to show you a document I'll mark Exhibit 8.

(Exhibit 8, Letter from Trans Union dated 11/16/2024, Bates Pirzinger_TransUnion _Discovery_001369 through 1388, was received and marked for identification.)

Q. Take a look at this document. Let me know if you recognize it. The date issued there at the top is 11/16/2024. It's addressed to you at your home address.

A. I mean, I probably got this.
Q. Okay.
A. Let me take my time...
Q. Yeah, take your time and look at it.
Mr. Pirzinger, as you're reading this, I'll represent to you that this was the document sent in response to that letter we just looked at regarding the identity theft.
A. Right. So go back up to my cover -- it says I "have a right to block fraudulent information from your credit report. Stop a company from reporting information resulting" -- Now, if you go up to my cover letter, I believe I did make a request to block the information, or delete it. And I'm sure I made a request in that cover letter.
Q. Okay.
A. So this cover letter doesn't -- unless this page has some determination that was made.
"Need more information." What is this? Okay, so I did make the request. It's "missing essential personal identifying information." Really?
"Account specific information such as name of creditor, account number" --
(Court Stenographer clarification.)
A. So it says they couldn't block the trade

line because my "request was missing essential personal identifying information," which it was not. It was all there; the date of birth was there, the name was there, the address was there, and the Social Security number was there. So Reason Number 1 is a falsity.

"Reason Number 2: Account specific information such as name of creditor," well, that was there; "account numbers," that was there; or "other account details that would allow us to complete your request was not included." It absolutely was included. So you have two reasons -- I don't know who is generating this.

And: "Reason Number 3: The description of the identity theft was too vague and/or did not include specific information related to the identity theft, including the dates the fraud occurred."

Well, that's inaccurate as well. We just went over the date that it was discovered, and the date that it started, and all these details. So they had all the information at their disposal, in clear English, in at least 12 point font, to satisfy Reason Number 1, Reason Number 2 and Reason Number 3.

So Mr. Andrew (sic), what's the real reason why that wasn't honored? Because this letter

is inaccurately written. And they're actually saying, "Re: Fraud Block Request - Need more information. Reason Number 1" --

(Court Stenographer clarification.)

THE WITNESS: Sorry.

A. The letter says "Re: Fraud Block Request - Need more information, Reason: 1."

Reason Number 1 is, "Your request is missing essential personal identifying information." Can we go -- since we are on the record, can we go back up to that cover letter and the FTC report, to see if the essential personal identifying information is there, or did I make a mistake and omit it?

Q. Mr. Pirzinger, did you provide any additional information to Trans Union after receiving this letter?

A. I don't think so. Not since -- no, not between -- I don't think so. I mean, you would have a better record than me.

But they already had the information. So the fact that they're trying to put me through the wringer, and it's like -- really? Like I sent you everything that you needed, in clear black and white, 12-point font. Any reasonable person over the age of seven can read and make out digits and letters, and

you're telling me a multi-billion-dollar company, on the -- registered with the SEC, on the New York Stock Exchange or NASDAQ can't make out text that I put on writing? Come on.

Q. Mr. Pirzinger, is there a reason you didn't include that the Elan account was opened as a result of identity theft, in your January 2, 2025 dispute?

A. I guess at the time -- I mean, I'm reading through this in great detail now. I guess at the time, I probably saw this as nonsensical attempt to railroad me as a consumer, and to not delete something that I already provided all the information for.

So I'm sure at that time, I wasn't interested in fighting a losing battle, and I saw this identity theft dispute as a losing battle. So I took a different route January 2nd.

But if I what I needed to do was send it in again, then maybe I would have done that. You know, it's ridiculous the amount of communication that we have to provide to all these credit reporting agencies, including Trans Union, just to accomplish a simple task. The fact that they totally railroaded me in this situation is despicable. It's a joke.

And the fact that this is on the record, and this is going to be displayed between 12 jurors is laughable.

But go ahead. What's your next question?

Q. What is your current credit score?

A. I don't know. It's not something that I monitor nowadays, because I know it's irrelevant until Trans Union removes all the stuff that they failed to do a reasonable reinvestigation for.

This isn't about accuracy or inaccuracy; it's about, did they perform a reasonable reinvestigation. And since "reasonable" is not defined in the FCRA, we're going to have to leave that to 12 individuals to determine whether reasonableness was taking place.

Q. What was --

(Cross-talk.)

Q. Go ahead, I'm sorry.

A. I had a credit score over 800 -- over 800, at the high light -- at high time.

Q. So prior to Trans Union reporting these accounts, your credit score was over 800?

A. Yes, it was.

Q. Okay. Do you have proof of that?

A. I'm sure if I really searched hard, I could probably find something.
Q. But you did not search for or produce any of those documents in response to Trans Union's requests in this action?
A. I mean, I searched on the surface. I mean, you know, I mean, you got -- I mean, I don't save everything. I don't know where I looked. I don't eve -- you know, it's like -- I know I did. I don't know what records exist now. It was years back.
Q. How many years ago was your credit score over 800?
A. Probably before this time. I mean, I don't know? Back in -- for a long time. You know, prior to -- prior to 2020, 2021, '22? I don't know. I don't know what year.
Q. Do you monitor your credit score regularly?
A. No.
Q. Did you, prior to these disputes with Trans Union, monitor your credit score regularly?
A. Yes, I think I took a look at it pretty frequently back then.
Q. Why?

A. Just because that's what everybody was -- well, not everybody, but a large group of people thought was important and necessary to operate in commerce, in order to get any type of loan, insurance, rental situation. I mean, anything where anybody wants you to make a payment of any kind, to any degree. Even just to open a bank account, they want to see what your credit score looks like.

Q. Were you planning any purchases or credit applications at the time that you were monitoring your credit score?

A. Not specifically. But, you know, life unfolds unpredictably and spontaneously, so you never know what comes up.

Q. Understood. In your interrogatory responses, you state that you had experienced "stress, anxiety and emotional distress as a natural consequence of Trans Union's alleged statutory violations, and resulting credit denials."

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted] [redacted] [redacted]

[redacted]

Q. [redacted]

A. [redacted]

[redacted]

A. No, that's personal information, medical protected, privileged stuff.

Q. Okay. But you are seeking to recover for your emotional distress. Correct?

A. Yes.

Q. You placed that in issue in this litigation?

A. I placed what?

Q. You placed that in issue in this litigation? In other words --
A. Yes.
Q. Okay.
A. Yes.
Q. Is there anyone else that you have failed to identify as having any knowledge of the claims, damages, or potential defenses at issue in this litigation?
A. No.
[redacted]
[redacted].
[redacted]
Q. Did you talk about --
(Cross-talk.)
Q. Go ahead.
[redacted]

[redacted]

[redacted]

[redacted].

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

A. Say that again.

[redacted]

Q. Have you discussed any of these things with any friend or family members?

A. No.

Q. Okay.

MR. HOPE: We've been going again for a little bit more than an hour. We'll take another break, if that's okay, ten minutes.

(A discussion is held off the record.)

(A brief recess takes place.)
BY MR. HOPE:
Q. Mr. Pirzinger, I'm going to show you another document which I will mark as Exhibit 9. Let me know when you can see it.
(Exhibit 9, Denial Letter from Mercedes Benz of New Rochelle dated 2/22/2025, No Bates, 15 Pages, was received and marked for identification.)
A. Okay. Zoom in a little bit.
Q. Yes, of course. Is that better?
A. Yes.
Q. Do you recognize this document?
A. Yes.
Q. And this is a credit denial letter from Mercedes, dated February 22nd, 2025.
A. Yes.
Q. Is that right?
A. Yes.
Q. And this was soon after your January 2025 dispute. Correct?
A. Yes.
Q. Did you apply for credit in 2023 or 2024?
A. I have no idea. Whatever Trans Union's report shows as inquiries, that's the best answer I

can give you.
Q. Were you shopping for a car at that point?
A. I would imagine so. Yeah, I think I did attempt at one point before that. I don't remember the details, though.
Q. So what prompted you to go to Mercedes in February of 2025?
A. Because I needed a car, and they were in town, and I've gotten a hundred percent financing before for a car, and this is what I wanted to get. So I went there and tried my best.
Q. When did you get a hundred percent financing for a car?
A. It was two times over. Back in 2012, and 2002, and again in 2016.
Q. Okay. And what car did you get that --
A. And probably -- probably again in 2019.
Q. Okay. So do I take it that the car you were driving as of February 2025 was the car that you purchased for one hundred percent financing in 2019. Is that right?
A. Yeah.
Q. Okay. And what was the make and model of that car?

A. 2018 Hyundai Santa Fe.
Q. Is that what you're driving today?
A. Yes.
Q. Okay.
A. And during that time right there, February, that's when the vehicle, I believe, was under an engine replacement. So that was -- that was the necessity to get a new vehicle, my vehicle was failing.
Q. Did you look at any vehicles besides Mercedes?
A. No.
Q. Have you owned a Mercedes before?
A. No.
Q. Okay. On page 1 there, it says your credit score is 563. Do you see that?
A. I do.
Q. Okay. What was your salary or income in February of 2025, annually?
A. I don't know. Probably -- I don't know. Probably close to 200.
Q. $200,000 per year?
A. Probably.
Q. What's the nature of your business? How do you make your money?

A. I exchange property for other property.
Q. Okay. Do you have a profession?
A. I do a lot of different things.
Q. Tell me about them.
A. I provide services and goods for exchange of property.
Q. Okay. What types of services did you provide?
A. Financing, real estate, consulting, and everything in between.
(Court Stenographer clarification.)
A. Financing, real estate, consulting, and whatever I need to do. Wherever I can make a buck.
Q. Okay. Let's start with financing. What sort of financing services do you provide?
A. Just financial education.
Q. So not financing services, but financial services. Is that right, or do I have that wrong?
A. Right, yes. That's correct.
(Cross-talk.)
A. No, I don't provide financing --
(Cross-talk.)
A. Just financial information.
Q. Okay. Who do you provide this financial information to?

A. Anyone that wants to listen.
Q. Okay. Do you have a company through which you provide this financial information?
A. No.
Q. Is there a website that I could go contact you, to get financial information?
A. No, I don't have any websites.
Q. Then how do you market to clients?
A. I don't market to clients.
Q. Okay. How do you find clients?
A. I don't find clients. I do a lot of real estate stuff. I seek foreclosure rights.
Q. How do clients find you?
A. Through word of mouth. I look through public records. Sometimes I seek out the clients.
I mean, I've been working in the real estate world for 20-plus years. So whatever comes my way, comes my way.
Q. So my question to you is how --
(Cross-talk.)
Q. Go ahead.
A. I said, I deal a lot in the distressed market, the foreclosure world, and that's all public record. So a lot of times, I'm driving around, I see opportunities, I knock on doors.

Q. So you seek clients primarily through foreclosure records for real estate. Do I have that right?
A. Yeah, bank records, foreclosure records, real estate records, public records.
Q. And how do you find bank records?
A. Court filings.
Q. Okay. And do you charge hourly for your services?
A. Not usually. Usually, it's a flat fee.
Q. Okay. A flat fee for what? Advice on dealing with credit issues?
A. No, not credit issues. House valuation issues, renovation issues --
(Court Stenographer clarification.)
A. House renovation, construction issues, real estate disposition, if they want to, you know, sell it. Foreclosure mediation. Talking with the banks or the IRS. Releasing tax liens. Everything related to real estate and numbers and finance.
Q. And what is your professional background in this area? Where did you learn to do this?
A. I learned it on my own, over the course of 20 years.
Q. Do you have any licenses or

certifications to provide this sort of advice?
A. I do have a license, real estate broker license.
Q. And where did you get that?
A. New York.
Q. When did you get that?
A. 2002.
Q. And is that active?
A. It is.
Q. Okay. Do you have any current listings as a broker?
A. No.
Q. Do you -- is any of your income stream tied to your work as a real estate broker?
A. Well, that's a part of it.
Q. And how does that come in?
A. Sporadically.
Q. When you say "sporadically," how does -- explain that to me. What does that mean?
A. It means not regularly, not every Friday like an employee.
Q. Okay.
A. A little bit here, a little bit there, sometimes on this week, sometimes that one.
Q. Now, do you represent buyers or sellers

in the real estate market?
A. Sometimes.
Q. How many did you represent in 2025?
A. I don't know.
Q. Was it more than five?
A. I don't know. Probably not.
Q. Was it more than one?
A. Probably.
Q. Okay. So between one and five listings?
MR. PIRZINGER PRO SE: I object to all this. This has nothing with the reasonable reinvestigation.
Q. Well, if you indulge me here, one of the issues that was cited in your credit denial was salary. You're looking to buy a $95,000 car, so we're going to dig into the reasons why you might have been denied. Okay?
A. Well, what does it say on here? It tells you --
(Cross-talk.)
(Court Stenographer clarification.)
Q. So --
A. This was a credit decision based on Trans Union. It says it here right here on the paper.

Q. But not exclusively because of that. Right? You read this document?
A. Well, let's read it again. Where does it say anything else?
Q. Okay. Before we get there, were you accepted for any financing deals on this car? In other words, were any offers -- I know you wanted to put zero money down to buy this $95,000 car, and that was denied. Did any lenders offer you any terms for credit on this vehicle?
A. Not that I recall.
Q. Okay.
A. And I don't see anything in here about salary, or anything other than Trans Union credit score, credit report. Do you?
Q. Well, let's take a look.
A. Who was this one from, Mercedes? Same thing?
Q. Mercedes. This is a document you provided to us. Okay? This letter looks like you received it from Mercedes-Benz in New Rochelle. Do you see that?
A. I'm looking.
Q. And it looks here like Capital One and Santander did approve you. Right?

A. Well, they definitely didn't tell me about this, because I went in there for a hundred percent financing. So this was on this letter, but that wasn't disclosed to me at the time.

But again, this letter was here, noticed and disclosed to you.

But I mean, yes. $67,000 down payment, $49,000 down payment. That's not exactly realistic.

Q. So you didn't accept any one of those offers?

A. No, that's not what I went there for. I went there for a hundred percent financing. If I wanted to go spend $49,000 cash on a vehicle, I could have done that, if I wanted to. But that wasn't -- that wasn't the basis of this. There's nothing wrong with using credit.

Q. Sure. This is also among the documents you provided. And this is from Chase, it's dated March 5, 2025, and says, "Dear applicant."

So this is -- do you recognize this document?

A. Sure, "Your application was..."

Q. So you see as far as for the reasons for credit denial, do you see that one says "Insufficient income relative to loan amount requested"?

A. Yes.

Q. So that's why we're digging into your income. I want to know, you know, hey; how did you make your money? Because one of the reasons, they say, is that you didn't make enough. No shame in that. This is very expensive car. I'm sure it's very nice.

But that's why I want to talk to you about your income. So let's go back --

A. Okay.

[redacted]

MR. HOPE: [redacted]

[redacted]

(Cross-talk.)

(Court Stenographer clarification.)

[redacted]

[redacted]

Q. Oh, okay --

(Cross-talk.)

(Court Stenographer clarification.)

A. I said, we do not need to share views. So what we need to find out is what income Chase was relying on, and how they determined that that income was insufficient. Anything outside of that is moot.

So if you want to reach out to Chase or Mercedes, because that's where the information was disseminated to, on whatever was on that loan application, and I don't remember, that's all that matters here.

MR. PIRZINGER PRO SE: So any question outside of that, I'm objecting to, because it's not

relevant.
A. The only thing that is relevant is what Chase has on their books, on what exactly they used to process this "insufficient income relative to loan amount requested" claim.
Q. Well, that's not exactly true, though. Right? Because what really matters, Mr. Pirzinger, as much as anything, is what amount that you reported to them. You're telling me that that amount --
(Cross-talk.)
Q. Let me finish, please, and then you can weigh in. We're not going to talk over each other. Right?
So what matters here is the amount of income that you reported to them, and the basis for that income, and whether or not that could be corroborated. Okay? That's what we're trying to get to the bottom of here. That's all there is.
A. First, we need to find out what was reported to them, and then we can move on.
Q. Well, as the person who applied for credit, wouldn't that be you? You're sitting right here under oath; why don't you tell me?
A. I don't know what's on the application. I don't have a copy of it. So until I can get a copy

of the application, or the data that was on the application, I can't provide you with an accurate answer, because I don't recall.

[redacted]

A. It happens all the time. It happens all the time, every day. It's called no income verification. It's called no documentation loans. In fact, many auto loans don't do any income verification via documentation.

Q. Okay. So let's go back to your income, and you can tell me, what was the largest income stream that you had in 2024?

A. I don't know.

Q. Okay. How do you keep track of your income?

A. I don't.

[redacted]

Q. Okay. So besides the financial services that you provide to distressed property owners that you locate via public records and court filings, who are your other clients for your financial advice?

A. Financial advice? I don't give financial advice to anybody else. I mean, I get property valuations, asset management companies.

Q. What asset management companies do you work for?

A. E Street is one of them.

Q. How much did you make from E Street in

2024?

A. They're a new client, so I don't know. Nothing yet.

Q. Can you identify any specific source of income that you would have had in 2024? A specific person or entity?

A. No.

MR. PIRZINGER PRO SE: It's irrelevant, so object.

Q. Well, whether or not it's relevant, I'm asking if you can identify them?

A. No, I can't.

Q. Okay. So you have no personal knowledge of any specific income source that you had in 2024. Is that right?

A. No.

Q. Sorry. No, you can't; or no, that's not right?

A. No, I can't provide any specific source of income for 2024.

Q. Okay.

[redacted]

[redacted]

A. Right, I don't keep track of that.

Q. And you don't keep track of that either. Okay. So then how did you know that you made $200,000, and how do you know that that's what you told these fine folks at Chase?

A. It's a rough estimate.

Q. Based on what? You don't track it. Right? Tell me, where is this coming from?

A. It's just coming from just, you know, life expenses. Life -- living life.

Q. You cannot -- Mr. Pirzinger, come on. You know, you're under oath here. You want to elaborate a little bit more?

A. I mean, it's streams of income that come in from all these various sources. I mean, it's -- I don't keep track of everything. I'm not -- I stopped keeping track quite a few a years back.

Q. Mr. Pirzinger --

A. I just live day-to-day. Whatever comes, comes in; whatever goes out, goes out.

I know I could have -- I know I could have handled whatever, you know, payment for this

car, but they didn't want to give me that opportunity.
Q. Okay.
(Cross-talk.)
A. When they said "insufficient income relative to loan amount," I kind of laughed at that. I was like, really? How is that possible?
Q. Okay. Mr. Pirzinger, under oath today, I'm asking you to name a single income stream, or a single entity or person who would have paid you in 2024. And your answer is, you cannot name one?
Do I have that right?
A. Voxtur. Voxtur Appraisal, that's one.
(Court Stenographer clarification.)
A. Voxtur, V-O-X-T-U-R.
Q. Okay. And how much appraisal work did you do for them?
A. No appraisal work. It's -- it would be broker price opinions, different opinions of value.
Q. Okay. What do you charge for a broker price opinion?
A. It could be anywhere from 75 to $300.
Q. Okay. And so how many of those opinions did you write?
A. I don't know.

Q. Well, was it more than a hundred?
A. Yeah.
Q. It was more than a hundred?
A. I would say so.
Q. Okay. Was it more than 500?
A. In total, yeah. To them specifically, no.
Q. Okay. So in 2024, you wrote more than 500 broker price opinions?
A. Yes.
Q. Okay. And who decides the entity you just mentioned did you write those for?
A. CoreLogic was another one.
Q. Okay. Any others?
A. ServiceLink. That would probably be the other one.
Q. Any others?
A. No.
Q. And did all these companies issue 1099s?
A. Yes.
Q. And is this the largest source of your income?
A. Probably.
Q. So how many -- in 2024, how many of these opinions did you write in a given day?

A. A given day? It's not a given day. It's over a year.
Q. Okay.
A. It's not something that -- like I said, it's very sporadic. It's not -- this is not an employee status, regular nine-to-five.
Q. You're turning at least 40 or 50 of these out a month. Right?
A. Oh, yeah.
Q. And you do site visits for every one of these properties?
A. No, no.
Q. How are you rendering your opinion?
A. Wait, what is your question?
Q. How are you rendering your opinions?
A. By looking at comparables.
Q. And these are all for properties in New York?
A. Yes.
Q. And besides this work that you do providing opinions, and the financial advice that you provide to distressed property owners, what other source of income do you have?
A. That's pretty much it.
Q. Okay. And did you provide a

representation or proof of income in connection with your credit application?
A. No.
Q. Okay.
A. It wasn't required.
Q. One of the other things on here that's listed as a reason for the denial is, "Too many recent requests for new credit with others."
Who else did you apply for credit with?
A. I don't know. You'd have to look at the credit report. That's a good question.
Q. The last one is, "Value of vehicle is insufficient relative to the amount requested."
Do you see that?
A. Yeah, that's real interesting.
Q. Why is that interesting to you?
A. Well, I think it was a -- say, a hundred-thousand-dollar vehicle. So a hundred-thousand-dollar vehicle's value is insufficient to the amount requested. I don't know how that's possible. I requested a hundred percent financing. I didn't request...you know.
Q. So you don't understand that a lender might not want to be potentially responsible for 100 percent of the vehicle? Right? The value

requested is too high relative to the value. Right?
So for example, when you buy a house, sometimes they make you put some money down. Right? Because it --
(Cross-talk.)
A. Well, this is what Chase is saying.
(Court Stenographer clarification.)
A. No, I get that. That's what Chase is saying here. That's their answer.
Q. Okay. And that doesn't relate to any of your disputes with Trans Union. Right?
A. No, the primary one was the Mercedes, through Mercedes Financial. They relied on Trans Union's report exclusively.
Q. But you applied -- okay. So you are not -- essentially, your sole basis here is that Mercedes, the one application that you made to Mercedes, for -- Mercedes Benz Financial, is the sole basis for your credit denial? That is -- you know, you provided these documents to us.
A. Right.
Q. So I just want to make sure that these documents that you provided are irrelevant. Is that Right?
A. Pretty much, except for the Mercedes

one. Because the Chase, you just outlined several different things that you can debunk. Okay, great. Well, Mercedes didn't do any of that. They highlighted Trans Union exclusively. Solely based on the credit report, the credit score, the credit profile.

So I mean, unless there's some other item that they highlighted for the reason, which I don't think I saw.

Yeah, they took the application, they sent to a half-a-dozen different lenders, and some of them, you know, did things all differently. So you just spent, you know, an ungodly amount of time on Chase's reasoning, while Mercedes's reasoning is solely based on Trans Union's credit profile.

Q. Okay. So let's look at these reasons.

So you have "The FICA below the minimum required."

A. Right.

Q. Do you see that? Okay. So that's your credit score.

A. Uh-huh. And that's the result of the reportings on the credit report.

Q. Right. And we'll get to that in a minute.

"Proportion of balances to credit limits." Do you see that?

A. Yep, that's another item that was disputed.

Q. Okay. And then, "Too few accounts currently paid as agreed."

Do you see that?

A. Right.

Q. Yeah, okay.

(Cross-talk.)

Q. Go ahead.

A. So "time since delinquency is too recent or unknown." They're all the stuff that I disputed. And if they did the reasonable reinvestigation, and did what they were supposed to do, none of those would have been an issue. They wouldn't have even been there, and the score would have been where it could have been, and everything -- we would have been -- life has been going on.

Q. Okay.

A. But they didn't want to do a reinvestigation, so here we are.

Q. Okay. Let's unpack these one by one, and set aside the credit score, which is a black box that is impenetrable to me or to you.

"But proportion of balances to credit limits," okay? "On bank/national revolving or other revolving accounts is too high."

And remember, you disputed three accounts. Correct?

A. Right.

Q. Okay. And I asked you for every one of those accounts, what was the accurate balance. You know what you told me?

A. Had they done a reasonable reinvestigation, which they didn't, they should have deleted the stuff that they couldn't do a reinvestigation on. So this stuff wouldn't even have been there.

Q. Well, my question to you is: It's too high. And I said, well, what's the actual balance? And you said, I don't know.

(Cross-talk.)

Q. And you don't have any basis --

(Cross-talk.)

(Court Stenographer clarification.)

Q. Okay. Let me back up and get a clean record here.

So this credit denial says that "The proportion of balances to credit limits on

bank/national revolving or other revolving accounts is too high." Okay?

Mr. Pirzinger, you disputed three separate accounts, and I asked you: For each one of those accounts, what is the accurate balance? And you said you didn't know.

And then I asked you, what was the basis for your allegation that those balances were not accurate, and you said, what?

A. I said I didn't have that data.

Q. Okay.

A. But you guys have the data. And you said that you did a reasonable reinvestigation, but your discovery proves otherwise.

Q. So Mr. Pirzinger, they're saying that the balances are too high, and you've disputed that, that they're actually too high.

And I said, what is the basis for your allegation that the account balances are too high, and you said, I have no basis for it. So that's my question.

A. Because I had no basis, that's irrelevant to whether they were supposed to do a reasonable reinvestigation or not. The FCRA doesn't require a basis. It requires a reasonable

reinvestigation --

(Court Stenographer clarification.)

A. The FCRA only requires a dispute of an item. Not a basis, not a reason, not proof. You're creating a set of rules that doesn't exist.

Q. What I'm trying to do, Mr. Pirzinger, you say for your damages here that the damages arise from your denial of credit by Mercedes, and no other lender; just Mercedes. This is the only document. Right?

A. After the -- after the dispute was submitted, and your alleged reinvestigation was completed.

Q. Okay. And I'm telling you that the reason that Mercedes Benz indicates that they denied you credit was that Mercedes found that the balances on these accounts were too high. And that's not something -- that is not something that you have actually disputed. Right? Because you don't know what the balances are. Is that right?

A. No, you're wrong. I did dispute it, very clear, in black and white. I disputed all those items, and you guys allegedly claim you did a reasonable investigation.

I've asked you in discovery how, why,

when, where, show me; and you can't. So you didn't even do a reinvestigation.

So if you did the reinvestigation, okay, the record would show that it was reasonable, and I would have gone away. But I'm here, because you still haven't shown that you've done a reasonable reinvestigation. If you didn't do a reasonable reinvestigation, then January 23rd, when the notice was sent out, you would have said, "Yep, we couldn't reasonably verify it; therefore, we deleted it." And that's what the FCRA says.

But you want to skirt around the issue and play your gamesmanship, and keep going on. So go ahead.

Q. I can see you're getting a little agitated. Do you want to take a break, Mr. Pirzinger?

A. No, I'm good. Go ahead.

Q. Okay. We'll push through.

Next one: "Too few accounts currently paid as agreed." Do you see that?

A. I do.

Q. Okay. And then "Time since delinquency is too recent or unknown." Do you see that?

A. I do. So "too few accounts currently

paid as agreed." Well, if there's ten accounts on there, and three of them are --

(Court Stenographer clarification.)

THE WITNESS: Sorry.

A. "So too few accounts currently paid as agreed." If you have ten accounts on there, and three of them are showing as not paid as agreed, well, their ratio of seven accounts out of ten of paid as agreed is not enough. But if seven out of seven accounts were paid as agreed, well, that would look pretty good.

So the fact that they didn't do a reasonable reinvestigation, and still claimed to verify it, that's not acceptable under the eyes of the FCRA. SO that's why there's liability in Trans Union's hands right now.

"Time since delinquency is too recent or unknown;" because they're reporting stuff that wasn't reinvestigated reasonably. If they couldn't reinvestigate it reasonably, it should have been deleted. Therefore, this denial and this reason for the denial wouldn't have occurred, and it wouldn't be landing in Trans Union's liability books.

I'm happy to go away. I want to get out of this controversy. Maybe you don't want to get out

of it, because your fee relies on the controversy. But I'm happy to get out this controversy. Quickly. Agree with your adversary quickly; I'm happy to do that.

I made you several proposals. Fantastic. Bring me something.

Q. How many accounts on your credit report were paid as agreed?

A. I don't know. I haven't looked at the credit report since then. But it's in the complaint. I believe the whole -- no, I don't know. I'd have to look at the whole report.

Q. And then as of March 2025, what was the time of your most recent delinquency?

A. I don't know. I'd have to look at the report.

Q. Were you delinquent on any of your accounts?

A. I don't know. I'd have to see the report. I don't have that report memorialized in my head.

[redacted]

[redacted]

Q. So you're volunteering to pay --

A. If I have a contract --

Q. Go ahead. Go ahead.

A. I said, I have a contract to be here today, because of the claim that I filed. That's the contract why I'm here today.

Q. Okay.

A. Absent of that, I have no reason to be here. So go ahead and do your question, something, go ahead.

Q. My question to you is: Your refusal to pay an amount on an account does not necessarily mean you are delinquent. Right? Because your payments are voluntary. Do I have that right?

A. Are you concluding that I refused to pay? How did you come to that conclusion?

[redacted]

Q. Okay. Now, my question to you is: Do you take a similar approach to account statements and

balances that you receive from creditors? Namely, that there's a voluntary aspect to your repayment of these debts, such that your refusal to pay does not equate to a delinquency?

A. Well, a refusal to perform is dishonest. So if there's a contract that requires performance, and you fail to perform, yeah, that would be considered a delinquency.

Show me the contract that required me to perform on something that Trans Union is alleging is my responsibility, because they verified it with no basis. So you're asking me for basis; what's your basis? You provided no basis of your verification in this discovery process.

Q. Let me show you one more document. This I'll mark as Exhibit 10.

(Exhibit 10, Affidavit of Jeffrey Thomas Pirzinger dated March 15, 2026, Eight Pages, was received and marked for identification.)

Q. Let me know when you can see it.

A. Yes, I see this.

Q. Okay. Do you recognize this document, Mr. Pirzinger?

A. I'm assuming this is the affidavit that is filed with the complaint.

Q. Okay.
A. Oh, no, this is Affidavit Elan. This was -- this is recent. This is -- I'd have to read it word for word --
Q. I'll scroll down here to get you the date. There you go.
A. Right. And this is probably the document I was referring to earlier on, that highlighted exactly -- yeah, this was in reference to the "account closed by consumer" statement. This was the evidence for this single allegation.
Q. Okay. So in sum and substance, this is the proof that you have provided with respect to the inaccuracies that you allege in your complaint. Do I have that right?
A. Pertaining to this one, "Account closed by consumer" item. There's two other items -- there's two other items that were addressed in another -- probably at the same time, just not in an affidavit.
Q. Okay. And for those other accounts, your claim is that the proof of inaccuracy is inherent in the consumer report itself, which you believe is inconsistent. Right?
A. Yes, one of them lists two different

charge-off amounts that the report blatantly shows as charged off. How can you have two different charge-off amounts for the same account, at two different -- at the same time? It's clearly misleading to everyone reading it.

And I even asked you, in the interrogatories or the admissions, which is the correct amount? I still haven't got an answer.

Q. So but the basis, the documentary basis for that allegation is the credit report itself, and your reading of it?

A. Yes, and I think there's one other item where the basis is the credit report itself as well.

(Court stenographer clarification.)

A. I believe the second -- the other item was inherently demonstrated in the credit report itself as well, that proves that it's misleading.

Q. Okay. And those were for the two accounts for?

A. I think Elan was another one.

Q. So this is Elan, but those other two accounts you mentioned were the TBOM account and the TD Bank account. Correct?

A. Yeah, but I think the second and third item was also -- one of them was also for Elan, I

believe. And it was the -- if I recall, the higher balances was the issue.

And the other one, I believe, was -- it might have been Elan, too; I'd have to look. Or it might be the TD. It was regarding, I think, a date, a late payment date; I think something about a December and a January didn't coincide, based on two reports that were filed. I think looking at the -- yeah, the report.

Q. It mentioned -- it mentions a credit report in Exhibit A here. Right? Okay. Let's go through this.

So Paragraph 7 says, "The Trans Union consumer report dated December 20, 2024 that I received reports the remark associated with that account," meaning the Elan account, "stating 'Account Closed By Consumer'."

And then Paragraph 8 says, "A true and correct copy of the relevant page of that report is attached as Exhibit A."

Do you see that?

A. Yes.

Q. And then, Paragraph 9 states, "On February 15, 2024, I received a letter from Elan stating that Elan had elected to close the account

ending in 0853 effective February 13, 2024. A true and correct copy of that letter is attached as Exhibit C."

Do you see that?

A. Yes.

Q. Okay. And so that is the basis of the dispute with Elan. Right?

A. One of the three items, yeah.

Q. Okay. And then --

(Cross-talk.)

A. The reports --

(Court Stenographer clarification.)

A. The credit report says the consumer closed it. Elan's letter says they elected to close it. That's a discrepancy. That's a factual discrepancy.

Q. Okay. And explain to me how that discrepancy relates to the Mercedes denial? Which of the factors?

A. I don't know how -- how that comment, the fact that it was closed by whom, affects the credit score. You'd have to talk to Trans Union or whoever came up with the credit score that Mercedes Benz relied on.

The score was derived from the data, the

items in the report. So whether -- if a consumer closes the report, and then -- closes an account, and then it shows a charge-off, that's misleading to the creditor, because why would a consumer volunteer to close an account, and then intentionally not pay it? Versus, if a creditor elected to close an account, and then a consumer elected not to pay it, that would make more sense. And I'm sure there's a different score waiting in the credit profile that a lender or creditor would rely on.

So, you know, depending upon who is noted as the closing party, and whether it was subsequently paid or not, charged off or not, I'm sure that has a weight on the credit score.

Q. Well, let's stay on topic now, because the dispute here is who closed the account, you or Elan. Right?

A. Right.

(Cross-talk.)

Q. That's what we're talking right now.

I'll let you talk. Just let me talk, then you can talk. All right?

Right now, you submitted evidence in support of your claims that the Elan report was inaccurate, because Elan, and not you, the consumer,

closed that account. Right?
A. Right.
Q. Okay. I'm going to go back to Exhibit 9, and we're going to look at those factors, okay, that Mercedes identified for denying your credit application. Okay? And -- wrong thing. I knew I was going to do it eventually, hold on. All right. Here we go. Okay.
Now, the key factors were, the FICO below minimum required --
(Cross-talk.)
(Court Stenographer clarification.)
THE WITNESS: He said "The FICO below minimum required."
(Court Stenographer clarification.)
A. I said, "Which is compiled from the credit profile of the items that are displayed on the credit report. So how the items on the credit report are displayed, and the data that is there, is composing the FICO score, which is causing it to go below the minimum required amount.
Q. So, Mr. Pirzinger, I don't want to testify for you. But you claim that whether you or Elan closed that account directly relates, or could potentially relate, to the FICO score. Do I have

that right?
A. It could, yes.
Q. Okay. That's fine.
"Proportion of balances to credit limits." Okay. Now, you agreed with me that whether or not you or Elan closed that account has nothing to do with the proportion of balances to credit limits. Right?
A. Well, I don't know how the credit score is compiled, based on --
Q. Not the score. Let's back up here. Come on, now. We've already addressed the score. This is proportion of balances to credit limits. This is another factor. We've already talked about scoring. Right?
A. I agree with your statement.
Q. So you would agree that whether you or Elan closed that account has nothing to do with the proportion of balances to credit limits. Right?
A. Right. Right.
Q. And you'd also agree that whether you or Elan closed the account has nothing to do with "too few accounts currently paid as agreed." Correct?
A. Correct.
Q. Last question: You'd agree that whether

you or Elan closed that account has nothing to do with the "time since delinquency." Right?

A. Correct, on its face.

Q. Okay. See? That wasn't so hard. Me trying to navigate to back this, Exhibit 10; we'll see about that. Okay.

A. However, reporting an incorrect charge-off balance does affect those items that were highlighted in Mercedes's denial letter, which was actually displayed on the credit report.

Q. Okay. Did you receive any other credit denials, besides the documents that you provided us in this litigation?

A. Not that I'm aware of.

Q. Okay. Do you have any evidence to prove that Trans Union's reinvestigations were unreasonable?

A. Well, yes. So far, all that you guys displayed was the ACDC -- DV file, which in itself, is not considered reasonable. I've asked for documents that Trans Union reviewed; I haven't received any of those. I've asked for policies and procedures that would show what they're supposed to do; I haven't received any of that.

So I mean, what I did receive was a

document recently, that said that they have to send the results within seven business days, and the FCRA says they have to do it within five. So their own policies goes against what the FCRA says, which is just fantastic.

So, you know, I've been asking for the data and the documents. I've even asked for admissions; if you don't have it, so state, and those have been skirted as well.

I've been pretty patient with those requests for answers. I even offered settlement in lieu of answering, in lieu of documents. In fact, I'm not going to like flourish on receiving all this data. Like, it's not my desire to go to a jury trial. It's not my desire to have this last till tomorrow. Like, I want this to end as quickly as they want it to end.

You're the only party that wants it to continue, so you can continue to get paid. But go ahead.

Q. Mr. Pirzinger, I object to your characterization, and I'd ask you refrain in the future. It's impolite, and it's incorrect.

The last question, I think: Do you have any evidence that Trans Union had reason to believe

that the furnishers it relied on in reporting to your account were not reliable sources of information?

A. Yes, because of the subpoena that you served, the documents that they provided were not certified. They're just statements, which is hearsay. So if they're relying on -- I mean, they didn't even review statements.

But let's say they did review statements; they're not certified. So it's a bunch of hearsay. But yeah, that's my proof right there. So far, that's where we're at. And they didn't even review those documents at the reinvestigation. They reviewed them now a month ago, within the last couple of weeks. The reason they had to provide -- get the subpoenas is because they didn't have them on record. Which is kind of funny, I'm scratching my head; how do you do a reinvestigation without any records?

MR. HOPE: Okay. Mr. Pirzinger, thank you for your time. That's all I have for you today subject to whatever the Judge may require you to answer, that you refused to answer earlier. I'll have to take a look at those questions and see where that comes down.

THE WITNESS: Okay. And just for the record, I do request to review the transcript.

(The proceedings concluded at 12:49 p.m.)

J U R A T.

I DO HEREBY CERTIFY that I have read the foregoing transcript of my deposition testimony and I certify that is it true and correct to the best of my knowledge.

^

SWORN AND SUBSCRIBED
BEFORE ME ON THIS
DAY OF 2026

Notary Public of the State of

C E R T I F I C A T E

I, ELLEN J. GODINO, CCR, CRCR, RPR, do hereby certify that prior to the commencement of the examination, JEFFREY THOMAS PIRZINGER was duly sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

ELLEN J. GODINO
CERTIFIED COURT REPORTER
REGISTERED PROFESSIONAL REPORTER
CERTIFIED REALTIME COURT REPORTER
DATED: June 15, 2026

ATTACH TO DEPOSITION OF: JEFFREY PIRZINGER
IN THE MATTER OF: JEFFREY PIRZINGER VS. TRANSUNION

DATE TAKEN: June 8, 2026

E R R A T A S H E E T

INSTRUCTIONS: After reading the transcript of testimony, please note any change, addition or deletion on this sheet. DO NOT make any marks or notations on the transcript itself.

Please sign and date this errata sheet and return it to the court reporter whose name is shown below.

PAGE LINE CHANGE

DATE and SIGNATURE:
RETURN TO: cs-midatlantic@veritext.com
MAIL: ATTN: LITSUP
1650 Market St, Suite 5150
Philadelphia, PA 19103

8259103

Jeffrey Pirzinger

June 15, 2026

RE: Pirzinger, Jeffrey Thomas v. Trans Union LLC

6/8/2026, Jeffrey Thomas Pirzinger (#8259103)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-midatlantic@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

**&**

**&** 2:5

**0**

**0** 96:2
**001344** 3:17 17:15
**001351** 3:14 15:5
**001369** 4:16 109:20
**001465** 4:6 56:3
**001499** 4:9 61:24
**001501** 4:13 64:12
**01760** 1:2
**0853** 157:1

**1**

**1** 3:13 5:7 15:2 15:3 17:10 35:14,17 57:4 57:11 60:10 99:3 111:5,23 112:3,7,8 123:15
**1,221** 102:6
**1,864** 91:4,13
**1/8/2025** 4:8 61:23
**10** 4:20 153:16 153:17 161:5
**10/2024** 88:1 89:18 90:3 103:3,18 104:7
**10/24** 88:1
**100** 22:12 50:24 142:25
**1040** 132:7,12
**10543** 1:17 7:14 44:22
**109** 4:15
**1099** 135:7 136:11
**1099s** 132:23 136:7,8 137:22 140:19
**11** 5:3
**11/16/2024** 4:15 109:19,24
**11/2024** 88:7 89:19 90:4 96:9 103:11
**110** 95:3,10
**112** 95:16 96:1
**12** 5:23 22:16 48:17 49:20 89:2 111:22 112:24 114:2 114:15
**12,438** 103:4,7
**12/05/1979** 21:25
**12/12/1979** 22:5 23:4
**12/2024** 102:6 103:24
**12/9/2025** 3:20 43:15
**120** 79:24 80:6 80:12
**121** 4:18
**12:49** 164:2
**12th** 22:5
**13** 89:17 157:1
**13,109** 103:11
**132** 5:7
**1343782800...** 22:22
**135** 1:16 6:1 7:13 44:21
**1352** 3:17 17:16
**1388** 4:16 109:20
**14** 5:15,20 89:17
**1476** 4:6 56:3
**15** 3:13,20 4:19 4:21 35:14 43:15 49:4 90:2 121:7 153:18 156:24 166:21 168:3
**1500** 4:10 61:24
**1515** 4:13 64:12
**153** 4:20
**16** 3:13 5:14 15:4 90:2
**1650** 167:22
**1681** 99:3
**1681i** 35:14,16 49:4
**17** 3:15 50:13 91:2
**175** 65:9
**18** 5:21 50:13 94:19
**18,779** 75:21
**19** 95:2
**19103** 167:22
**19406** 2:7
**1979** 22:13,16

**2**

**2** 3:15 4:12 5:4 5:17 17:12,13 59:17,19 64:10 75:20 104:20 104:21 111:7 111:23 113:7
**2/22/2025** 4:18 121:7
**20** 37:14 48:18 69:9 95:14 125:17 126:24 156:14
**200** 123:21
**200,000** 123:22 131:13,20

132:3,5,19 138:7
**2002** 36:22 122:16 127:7
**2012** 107:22 122:15
**2016** 122:16
**2018** 123:1
**2019** 122:18,21
**2020** 115:16
**2021** 23:8 115:16
**2022** 3:13 15:4 36:22
**2023** 68:15 121:22
**2024** 3:15 4:4 17:14 44:13 48:18 55:25 69:9,15 70:6 70:15 71:13 79:25,25 83:24 83:24 95:16 105:14,17 106:7,13 107:9 121:23 131:16 131:18 132:16 133:3 135:25 137:1,5,14,20 139:11 140:8 140:24 156:14 156:24 157:1
**2025** 4:12 47:13,17 48:3 48:20 49:22 51:4,10,22 62:4 63:4 64:10 68:20,23 69:1,20 113:7 119:7 121:15 121:20 122:8 122:20 123:19 128:3 130:19 131:11,14,15 151:13
**2026** 1:17 4:21 35:20 68:22 153:18 165:18 166:21 167:3 168:3
**20th** 49:24
**21** 23:8 95:25
**21,551** 83:23 85:1,4,10 88:1 88:7
**22** 5:6 23:8 51:7 96:8 115:16
**2200** 2:6
**22nd** 51:22 121:15
**23** 5:24 101:14
**23rd** 51:4 149:8
**24** 36:24 51:21 101:22
**25** 86:3 102:4
**26** 4:4 5:14 29:10 32:4 44:13 55:24 102:13
**26th** 45:23 62:21,22
**27** 5:15 103:2
**28** 5:17,18,20 5:21 103:10
**29** 5:23,24 103:17
**2nd** 48:19 49:22 50:10,14 51:3 63:11 64:19 113:18
**2s** 132:23

**3**

**3** 3:19 29:10 32:4 43:12,13 59:17,19 64:20 79:23 111:14 111:23
**30** 37:14 88:22 96:9,9 103:24 168:16
**300** 139:22
**30th** 45:21
**31** 99:16 104:6 104:12
**32** 100:1,8
**341** 104:7,10
**35** 4:12 5:3 51:9 64:10,21 67:18 72:20 73:19 75:16,18 84:22 97:20 99:25 100:6,15 104:12
**350** 2:6
**36** 5:4

**4**

**4** 3:21 5:12 53:5,6 83:22
**4/2024** 88:22
**40** 141:7
**43** 3:19
**434** 103:18,21
**461** 101:23 102:1 103:25 104:3
**49,000** 130:8,13

**5**

**5** 4:4 22:13 51:10 55:23,24 59:10 85:3 130:19
**5/2024** 89:3
**50** 141:7
**500** 140:5,9
**5150** 167:22
**53** 3:21
**55** 4:4
**555** 56:17
**563** 123:16

**6**

**6** 3:4,6 4:8 49:4 50:4,6 61:21 61:22 64:7 87:25 99:3
**6/2024** 89:3
**6/8/2026** 168:5
**61** 4:8
**610-407-0700** 2:7
**611** 35:13
**64** 4:11
**65** 5:6
**67,000** 130:7

**7**

**7** 4:11 64:6,7,9 88:6 156:13
**7/2024** 89:3
**75** 139:22
**7:25** 1:2

**8**

**8** 1:17 3:15 4:15 5:12 17:14 62:4 88:21 109:17 109:18 156:18 167:3
**8/2024** 89:3
**800** 114:20,21 114:23 115:13
**8259103** 167:25 168:5
**8th** 50:14 62:7 62:19

**9**

**9** 4:18 5:18 44:13 48:24 89:2 121:4,6 156:23 159:4
**90** 94:21 95:15 101:15 102:5
**914-497-1104** 8:3
**9251** 166:19
**95,000** 128:15 129:8
**95,865** 52:3
**98** 36:22
**9:01** 1:18

**a**

**a.m.** 1:18
**ability** 7:1 166:11
**able** 52:19 59:4 63:12 72:13,21
**above** 1:13 57:13,20 58:24 62:14 168:6
**absent** 152:11
**absolutely** 100:1 111:11
**accept** 14:22 30:22 130:9 135:8
**acceptable** 150:14
**acceptance** 10:20 11:8,16 11:24 12:20 14:8
**accepted** 11:25 12:22 25:11 129:6
**access** 21:15 46:9 75:5 79:18 92:24
**accommodati...** 10:16,21 11:24 14:25
**accomplish** 113:23
**account** 21:15 24:24 25:19,23 25:23,25 26:6 26:9 59:23 68:3,15,21 69:2,4,7 70:3 73:2 75:4,25 77:17,19,20,22 77:24 78:1,10 78:13,15,17,22 79:10,13,16,18 79:20 80:19 81:3,7,11,13,14 81:17,24 82:2 82:12 83:13 87:5,6 89:20 89:23 90:4,10 90:11,14,20,24 91:2,3 94:12 94:20,21 96:5 96:14,21 99:22 101:15,17,19 102:15,17,21 103:1 106:18 107:5 108:6,9 108:9,12,13,15 110:22,23 111:7,9,10 113:6 116:7 147:19 152:15 152:25 154:10 154:16 155:3 155:22,23 156:16,16,16 156:25 158:2,5 158:6,16 159:1 159:24 160:6 160:18,22 161:1 163:2
**accounting** 74:19,21
**accounts** 18:14 18:20 20:19,24 21:13 41:4 47:15,23 48:8 59:20 60:5 65:10 67:20 70:17 71:14 72:17 73:3 81:18 87:24 92:6 93:22

94:2,5,10,11,13 94:16 97:7 114:23 145:5 146:3,5,8 147:1,4,5 148:17 149:20 149:25 150:1,5 150:6,8,10 151:7,18 154:21 155:19 155:22 160:23
**accumulated** 26:13
**accuracy** 33:6 34:2 35:14 97:25 98:5 99:2 114:11 168:9
**accurate** 26:14 32:19 33:18 34:7,15,25 53:25 84:3 88:13,18 95:6 135:2 146:8 147:5,9 166:8
**accurately** 41:13 68:13
**acdc** 161:19
**acknowledge** 14:17 54:19
**acknowledged** 97:4
**acknowledg...** 168:12
**act** 18:10 32:8 34:20 35:3,4,8 35:21 38:15 49:7 66:5 71:25 72:3,5 84:7 100:20,24
**acted** 102:23
**acting** 19:7
**action** 10:11,25 11:12 12:17 52:6 65:17 115:5 166:14 166:17
**active** 120:4 127:8
**actual** 34:6 52:17,22,24 74:20 146:16
**actually** 10:8 48:23 65:6 87:15 101:4,9 112:1 119:2 147:17 148:19 161:10
**adams** 56:17
**addition** 99:13 167:6
**additional** 112:15
**address** 7:12 8:4,25 9:4,7 44:21 56:17 58:3,14,22 59:12,13 60:7 62:12 109:25 111:4
**addressed** 44:15 75:18 86:13 97:3 109:24 154:18 160:12
**addresses** 9:8 58:5
**adjusted** 132:18
**adjustments** 98:11
**administration** 37:3
**admissions** 155:7 162:8
**admit** 14:12
**admitting** 30:18
**advance** 73:17
**adversary** 151:3
**adverse** 52:6
**advice** 126:11 127:1 136:18 136:19,20 141:21
**affect** 161:8
**affects** 157:21
**affidavit** 4:20 90:9,12 107:21 153:17,24 154:2,20
**affiliated** 83:11
**age** 112:24
**agencies** 32:16 41:8 48:2,7,14 107:16 113:23 120:2
**agency** 34:20 47:9,15 49:6 49:12
**agent** 20:14 21:4,25 23:16 23:18 26:19 27:15 28:19 56:11,12,19,24 73:9,11,14 81:16
**agents** 29:14
**agitated** 149:16
**ago** 15:19 32:11 37:14 54:3 79:8 83:9 92:17 115:12 163:13
**agree** 100:2 108:23,25 109:4 151:3 160:16,17,21 160:25
**agreed** 145:6 149:21 150:1,6 150:7,9,10 151:8 160:5,23
**agreement** 14:18 76:8

82:10
**agreements** 4:5 56:1
**ahead** 30:7 47:2 57:7 66:17 68:10 72:25 77:13 84:24 114:4,19 118:23 125:21 145:11 149:14 149:18 152:6,6 152:12,13 162:20
**ai** 27:15,17 28:4,9,19 29:14
**alive** 19:8
**allegation** 33:12 71:22 84:18,20 86:21 87:8 88:4,10 88:24 89:5,13 89:22 91:7 94:23 95:9,18 96:3,12 101:18 101:25 102:9 102:18 103:6 103:20 104:2,9 108:21 147:8 147:19 154:11 155:10
**allegations** 90:7 97:7,14 98:1,6 103:13
**allege** 50:12 51:7,21 98:18 100:9 154:14
**alleged** 17:7 32:25 33:7,8 34:16 88:2,8 99:10,16 106:17 116:18 148:12
**allegedly** 20:24 70:3 71:17,19 148:23
**alleging** 25:18 25:18 54:24 90:19 101:3,5 153:10
**allotted** 168:19
**allow** 111:10
**ambiguity** 61:4
**amend** 97:13 98:20 99:14
**amended** 3:19 42:2,3 43:13 44:4 63:6,16 97:18 98:18
**amount** 11:13 11:21,22 83:25 85:5,9 86:21 87:6 88:3,9 90:23 91:6,9 95:5,6 101:24 102:2 103:5,8 103:12,15,19 103:22 104:1,4
113:21 130:25 134:5,8,9,14 139:6 142:13 142:20 144:13 152:15 155:8 159:21
**amounts** 95:22 155:1,3
**andrew** 2:5 6:6 111:24
**andrew.hope** 2:8
**annually** 123:19
**answer** 6:21 8:9,19 12:10 12:24 21:21 27:10,12,13 30:18,22 32:5 32:20 40:1,2 66:19 68:12 76:10 77:2 85:20,21,23 86:25 87:1,9 87:21 88:13 98:15 121:25 132:4,10 135:3 139:11 143:9 155:8 163:21 163:21
**answered** 12:13 75:16
**answering** 162:12
**answers** 6:11 39:20 77:11 85:13 88:18 162:11
**anxiety** 116:17 118:15,19 120:6,11
**anybody** 54:9 54:12,21 56:15 56:15,21 116:6 136:20
**anyway** 17:3 24:6
**apologies** 68:10 68:22 82:6
**apologize** 53:18 70:10 73:17 105:12 132:11
**apparently** 26:7 78:21
**appearances** 2:1
**appearing** 19:1 19:11 20:9 108:7
**appears** 15:13 23:25 24:2 27:7
**applicable** 4:5 56:2 168:8
**applicant** 130:19
**application** 76:8 82:9,10

82:19,22,24 83:4,12,16 92:11 102:23 130:22 133:22 134:24 135:1,2 142:2 143:17 144:10 159:6
**applications** 92:18 93:2,9 116:10
**applied** 51:25 92:8,15 134:21 143:15
**apply** 82:16 91:16,19 121:22 142:9
**appraisal** 139:13,16,18
**approach** 152:25
**approve** 129:25
**area** 126:22
**arising** 58:6
**arrive** 45:15
**artificial** 26:18
**aside** 75:17 145:24
**asked** 12:12 48:1 85:17 97:2 146:7 147:4,7 148:25 155:6 161:20 161:22 162:7
**asking** 6:7 28:6 29:3 30:4 78:20 82:25 83:1 87:7 105:24 107:11 137:11 139:9 152:20,20 153:12 162:6
**aspect** 153:2
**assert** 31:13,20 31:24
**asserted** 52:11 100:5 117:12
**asset** 136:21,22
**assist** 42:23 43:5
**assistance** 61:9 61:17
**associated** 60:5 156:15
**assume** 6:22 71:7 96:9
**assuming** 78:23 153:24
**attach** 167:1
**attached** 4:8 60:22 61:3,23 63:6 107:2 108:18 156:20 157:2 168:11
**attachments** 3:16 17:14
**attack** 119:12
**attempt** 113:11 122:5
**attempted** 27:23 42:19 59:25
**attempting** 6:10 60:14
**attend** 36:16,21
**attended** 36:14
**attest** 97:25 98:5
**attn** 167:22
**attorney** 8:20 19:24 26:25 27:2,5 29:6,9 42:10 76:25 166:13,15 168:13
**attorneys** 2:8 28:4 42:13
**august** 79:25 80:13
**authority** 21:5 25:23
**authorization** 76:1 77:17 81:3,8
**authorize** 28:1 44:16 76:11
**authorized** 20:19 21:7 49:11 76:12
**auto** 135:21
**autograph** 21:24 24:13
**available** 35:21 47:5 49:12 54:11 63:25 65:20 168:6
**avoid** 33:15 41:23
**aware** 8:22 79:14 161:14

**b**

**b** 4:1 15:16,25 29:10 32:4
**bachelor's** 36:12
**back** 8:16 27:13 32:11 47:11 48:23,24 60:25 61:14 65:10 68:15 73:5 87:15 88:15 104:20 110:9 112:11 115:11,15,24 119:6 122:15 131:9 135:23 138:20 146:22 159:3 160:11 161:5
**background** 126:21
**backup** 13:8

**bad** 32:22
**balance** 83:23 84:3,13,15,18 85:1 88:1,7 90:5,24 91:4 91:13 103:3,5 103:8,11,12,15 146:8,16 147:5 161:8
**balances** 145:1 146:1,25 147:8 147:16,19 148:16,20 153:1 156:2 160:4,7,13,19
**bank** 10:8 44:8 67:23 70:2 91:24 92:6,12 92:19 93:3,22 94:2,12 116:7 126:4,6 146:2 147:1 155:23
**banker's** 14:8
**banks** 94:5,9 94:11,11,14,17 126:19
**based** 33:14 54:2 59:10 63:10 99:14 105:9 128:23 138:10 144:4 144:15 152:3 156:7 160:10
**bases** 8:18 56:25
**basically** 41:24 60:8
**basis** 24:23 25:3,10,17 26:20 30:4,14 30:17 33:21 50:20 52:10 60:17 63:12 72:3 79:19,21 80:11 84:10,11 84:15,17,23 86:20,24 87:2 87:3,7,11,12 88:1,4,7,10,19 88:20,22,24 89:5,10,15,22 90:1,7,22 91:7 91:10 94:23 95:1,3,9,13,18 96:3,6,12,15 97:2,4,8,15 99:18 100:1,9 100:13 101:18 101:21,25 102:3,9,12,18 103:6,9,13,16 103:20,23 104:2,5,9,11,12 108:20 130:15 134:15 143:16 143:19 146:19 147:7,18,20,22 147:25 148:4 153:12,12,13 153:13 155:9,9 155:13 157:6
**bates** 3:13,16 4:6,9,12,15,19 15:4 17:15 56:2 61:23 64:11 109:19 121:7
**battle** 113:16 113:17
**bears** 33:16
**beechwood** 1:16 6:1 7:13 44:21
**began** 37:13 107:22
**beginning** 58:25 116:24
**begins** 6:16
**behalf** 73:11
**belief** 70:11
**believe** 8:16 23:8,16 25:3 26:7 31:22,22 41:19 47:5 50:4 53:2,18 54:1 60:17 63:4,12 68:20 70:1 72:20 75:17 84:21 85:9 97:16,22 97:24 98:4,12 99:14 104:21 110:13 123:6 151:11 154:24 155:15 156:1,3 162:25
**belong** 105:9 108:17
**belongs** 24:25
**benz** 4:18 121:7 129:21 143:18 148:15 157:24
**best** 66:6 121:25 122:12 165:5 166:11
**better** 32:23 57:9 112:19 121:10
**bill** 60:23
**billion** 113:1
**bipc.com** 2:8
**birth** 15:24 16:24 17:2 21:25 22:9,16 59:5 111:3
**bit** 15:9 17:18 25:4 30:3 63:18 120:23 121:9 127:23 127:23 138:16
**bitcoin** 11:17
**black** 35:4 112:23 145:24 148:22

**blank** 59:18
**blanket** 86:2
**blatantly** 155:1
**blew** 51:19
**block** 110:10 110:14,25 112:2,6
**boiled** 72:20 84:22 97:20
**bone** 119:15
**book** 13:22 82:2,12 102:24
**books** 21:16 26:6 67:8 74:21 81:13 134:3 150:23
**born** 16:10
**bottom** 21:23 53:17 60:21 134:18
**boulevard** 2:6
**box** 73:25 145:24
**break** 63:20 120:24 149:16
**breezed** 38:18
**brief** 63:22 121:1
**briefly** 20:3
**bring** 72:9,13 99:4,9 151:6
**bringing** 72:1
**broken** 119:15
**broker** 127:2 127:11,14 139:19,20 140:9
**brought** 22:12 22:14 32:24 34:4 41:21 73:12
**buchanan** 2:5
**buck** 124:13
**bunch** 163:9
**burden** 33:16
**business** 15:23 23:17 37:3,16 37:21,22 49:9 49:15 123:24 162:2
**button** 21:9
**buttons** 21:7
**buy** 128:15 129:8 143:2
**buyers** 127:25

**c**

**c** 89:18,19 157:3 166:1,1
**call** 36:1 63:7 65:22 104:15
**called** 132:24 135:19,20
**calling** 61:12
**calls** 63:8,9
**camera** 70:24
**cancellation** 4:4 55:25 59:19
**cancelled** 59:25 60:4,8
**capital** 18:6 22:19 35:17 49:5,5 91:24 129:24
**car** 122:2,9,11 122:14,17,19 122:20,25 128:15 129:6,8 131:6 139:1
**card** 44:8 78:23 92:3,13,16,19 93:3
**cards** 78:24,25 91:22 92:1,2,4 92:5,7,9
**case** 1:2 8:12 9:21 10:3,5,7,8 10:23 17:9 19:15 20:6 34:4 35:13 38:19 45:18 46:6 48:15 54:7,15,16,24 55:6 100:16 101:10 108:4 108:16
**cases** 9:19,20 9:24
**cash** 93:15 130:13
**caused** 101:12 105:18 106:17
**causing** 159:20
**cbc** 90:3,4
**ccr** 1:14 166:2
**cell** 21:8
**certain** 54:14 151:23,25 152:21
**certificate** 22:17 23:1 59:5
**certifications** 37:4 127:1
**certified** 163:5 163:9 166:20 166:21
**certify** 165:3,5 166:3,7,12
**cetera** 58:14,14
**change** 132:4 167:5,9
**changes** 21:1 168:10
**characterizati...** 162:22
**characterize** 61:15
**charge** 34:21 74:12,13,23 75:4,21 89:19 89:20 126:8

139:20 155:1,3 158:3 161:8
**charged** 73:24 74:1,4,16,17,22 75:9,23 79:20 89:21,25 90:6 90:25 155:2 158:13
**charges** 78:9,12 78:15,16 79:16 81:3
**chase** 130:18 133:16,19 134:3 138:8 143:6,8 144:1
**chase's** 144:14
**chat** 29:1
**chatgpt** 26:18
**check** 12:5,17 12:19 93:20
**chicago** 56:18
**chime** 91:24
**chose** 78:7 100:3
**circuit** 99:8 101:8
**cited** 128:14
**civil** 10:3 29:10 31:9 38:6,10
**claim** 25:3 33:9 49:3 72:13,14 73:12 77:8 79:19,21 84:10 84:11,14 85:15 98:25 99:3,3,9 134:5 138:2 148:23 152:8 154:22 159:23
**claimed** 90:23 100:18 150:13
**claiming** 84:12 99:1,10
**claims** 3:19 43:14 49:2 52:23 61:4 72:17 98:19,21 99:16 117:12 118:8 120:7 158:24
**clarification** 9:2 12:2 13:2 14:1 25:15 29:18 35:15 38:8 47:19 49:19 58:7 74:9 77:5 97:1 109:2 110:24 112:4 124:11 126:15 128:21 132:9 133:14 139:14 143:7 146:21 148:2 150:3 155:14 157:12 159:12 159:15
**clarify** 6:21 75:14
**claude** 26:18
**clean** 146:22
**clear** 27:25 39:15 58:18 63:9 72:21 97:19 101:2,8 111:22 112:23 148:22
**clearly** 62:17 63:11 155:4
**clears** 19:13
**click** 21:8
**client** 8:20 137:2
**clients** 125:8,9 125:10,11,13 125:15 126:1 136:18
**clinic** 42:15,16
**close** 11:1 90:10,10 103:1 107:8 123:21 156:25 157:14 158:5,6
**closed** 11:2 13:6 90:5,14 90:16,17,20,21 102:14,16,16 154:10,16 156:17 157:14 157:21 158:16 159:1,24 160:6 160:18,22 161:1
**closes** 158:2,2
**closing** 99:22 158:12
**closure** 11:25 12:21
**coincide** 156:7
**collect** 14:14 40:7
**collection** 14:23
**collections** 10:10 41:10
**college** 36:14 36:16,23 37:15
**come** 27:13 60:25 113:4 127:16 138:14 138:17 152:19 160:12
**comes** 116:14 125:17,18 138:22,23 163:23
**coming** 92:13 138:11,12
**commencem...** 166:3
**commencing** 1:18 88:14
**comment** 157:20
**commentary** 79:24 95:15 102:5,16

**commerce** 73:16 116:4
**commercial** 13:20,21,21
**commission** 25:16
**common** 13:18
**communicate** 41:3
**communicated** 45:18 120:16
**communicating** 45:2 108:8
**communication** 48:19 49:21,21 57:15 59:15 60:19 61:15,18 62:20,23 72:4 75:11 113:21
**communicati...** 26:17 27:15 28:3,19,25 29:13 44:18,19 45:6,24 46:2,5 46:8,22 48:13 65:16
**companies** 136:21,22 140:19
**company** 37:24 37:25 110:11 113:1 125:2
**comparables** 141:16
**compel** 8:25 9:4
**compensation** 133:5
**compiled** 159:16 160:10
**complaint** 3:19 38:16,18 41:25 42:3 43:13,23 44:3,4 49:2 50:4,20 52:16 53:2 56:8 62:9 63:6,16 64:22 67:16 84:12,14 84:18 86:21 87:4 88:3,8,25 89:6,23 90:8 91:8 94:24 95:10,19 96:4 96:13 97:7,14 98:18,20 99:11 99:14 100:13 101:19 102:1 102:10,19 103:7,14,21 104:3,10 151:10 153:25 154:14
**complaints** 42:24 44:7
**complete** 33:4 53:25 77:9 98:25 111:10
**completed** 21:20 33:25 49:15 148:13 168:16
**completeness** 33:6
**completion** 49:10
**composing** 159:20
**computer** 22:18 36:5 70:23
**computers** 21:16
**con** 60:23
**concept** 13:9
**concerned** 70:13 106:21
**concluded** 164:1
**concluding** 152:18
**conclusion** 70:17 71:14 152:19
**conditions** 116:21 118:12
**conduct** 34:8 34:10,21 50:21
**conducting** 34:17
**conference** 97:5 98:12 104:15
**confirm** 53:17
**confused** 6:19
**confusing** 18:21
**conglomerate** 13:24
**congress** 18:8,9
**congress's** 35:2
**connected** 59:9 92:6
**connection** 11:3 23:12 27:6 36:5 42:20 52:23 62:17 106:18 142:1
**consecutive** 80:9
**consent** 4:4 44:15 45:13,16 46:7 47:9 48:25 49:16 55:25 56:8 57:5,12,14 59:15
**consequence** 116:18
**consider** 36:12
**considered** 56:19,23 153:8 161:20
**construction** 126:16

**consulted** 27:5
**consulting** 36:5 71:8 124:9,12
**consumer** 18:2 18:8,13,18,22 19:5,6 20:13 20:18 22:4,15 23:22 24:25 33:5 44:19 49:7,11 52:7 57:15 59:16 69:9,24 70:5 73:9,12,13,13 73:14 74:10 81:22,25 82:8 90:5,10,14,17 90:20,21 99:21 105:16 113:12 154:10,17,23 156:14,17 157:13 158:1,4 158:7,25
**consumers** 81:18
**contact** 117:16 125:6
**context** 9:17 15:22
**continue** 162:19,19
**continued** 4:1
**contract** 152:2 152:5,7,9 153:6,9
**contracts** 152:3
**contradict** 85:21 86:10,17
**control** 21:1,5 21:15 108:15
**controversy** 150:25 151:1,2
**conversation** 6:13 59:1
**conversations** 27:24
**cool** 101:8
**copies** 29:12 41:6 46:4 168:14
**copy** 60:22 63:24 82:23 83:1 134:25,25 156:19 157:2
**corelogic** 140:13
**corner** 92:14
**corporation** 20:25
**correct** 11:15 20:4,7,11 22:2 30:16 31:10 37:22 38:17 39:3 42:6 44:4 44:5 51:10,11 54:25 62:16 67:3,6,20,21,24 71:9 74:15,25 77:1 90:15,16 90:25 91:1 97:9 100:10 101:6,7,7 107:4,4 117:17 117:21 121:20 124:19 146:5 155:8,23 156:19 157:2 160:23,24 161:3 165:5
**correctly** 63:14
**correspondent...** 27:18 44:9 51:1 62:19 84:21 107:17
**corresponding** 49:24
**corroborated** 134:17
**costs** 52:17
**counsel** 27:18 27:24 166:13 166:15 168:14
**count** 94:3
**couple** 163:13
**course** 40:13 44:1 88:16 94:8 121:10 126:23
**court** 1:1 6:10 9:2,14 12:2 13:2 14:1 25:15 27:19 29:18 35:15 38:8 43:25 47:19 58:7 63:19 74:9 77:5 87:9 98:2 98:6,8 101:3 109:2 110:24 112:4 124:11 126:7,15 128:21 132:9 133:14 136:17 139:14 143:7 146:21 148:2 150:3 155:14 157:12 159:12 159:15 166:20 166:21 167:8
**courts** 12:22 133:9
**cover** 106:23 106:25 110:9 110:13,15,17 112:11
**covering** 56:25
**craft** 72:4
**cras** 107:20
**crcr** 1:14 166:2
**create** 16:12,14 21:7,9 66:24 78:20
**created** 15:24 16:15,18,21 18:20 19:18 22:5,20 23:4,5 23:7 44:1,11

59:2 82:12
**creating** 35:2 148:5
**creation** 17:2 22:10
**credit** 13:23 18:10 32:8,15 33:10 34:7,15 34:19 35:2,8 35:21 38:15 41:4,7,20,22 42:14,15,16,17 42:20 44:8,10 46:17 47:4,9 47:14,15 48:2 48:6,13 49:5 52:6,10 60:12 60:15 66:5 68:7 70:15 71:13,24,25 72:2,5 76:23 78:23,24,25 81:18 82:17 83:16 84:7 89:10,11,15 91:14,16,20,22 92:1,1,3,7,8,13 92:16,18,24 93:2,5,7,8 95:20 96:7 99:20 100:20 100:24 102:14 102:20,22,25 106:6,11,16 110:11 113:22 114:6,20,23 115:12,18,22 116:8,10,11,19 120:2 121:14 121:22 123:16 126:12,13 128:14,23 129:10,14,15 130:16,24 134:22 142:2,8 142:9,11 143:19 144:5,5 144:5,15,21,23 145:1,24 146:1 146:24,25 148:8,16 151:7 151:10 155:10 155:13,16 156:10 157:13 157:22,23 158:9,14 159:6 159:17,18,18 160:4,7,9,13,19 161:10,11
**credited** 80:20
**creditor** 74:12 74:18,24 78:5 80:22 81:20 82:1,4,8,10 110:23 111:8 158:4,6,10
**creditors** 151:25 153:1
**cross** 12:8 21:19 39:25 47:1,18 57:6 66:16 68:9 70:9 72:23 74:8 77:4 82:5 86:7 90:18 97:12 100:22 105:25 108:11 108:22 109:1 114:18 118:22 124:20,22 125:20 128:20 132:8 133:13 134:10 139:4 143:5 145:10 146:18,20 157:10 158:19 159:11
**cs** 167:21 168:15
**cuff** 40:2
**currency** 11:6 11:21 13:22,25
**current** 7:12 8:2,4 34:23 114:6 127:10
**currently** 6:25 37:7 119:17 120:3 145:6 149:20,25 150:5 160:23
**cv** 1:2

**d**

**d** 3:1 15:16,25 117:9,9
**damages** 52:11 52:12,14,16,17 52:25 118:8 148:7,7
**data** 58:2 105:21 107:14 135:1 147:10 147:12 157:25 159:19 162:7 162:14
**databases** 21:8 59:24
**date** 21:25 22:4 22:9,10 25:2 32:12 46:8,14 46:23 47:6,7 68:5 69:8,10 69:22 70:14 105:23 106:4 107:22,23 109:23 111:3 111:19,20 154:6 156:5,6 166:10 167:3,7 167:20
**dated** 3:15 4:4 4:8,11,15,18,21 17:13 48:19 49:21 51:4 55:24 61:23

62:4 64:9 107:3 109:19 121:7,15 130:18 153:18 156:14 166:21
**dates** 22:9 68:12 70:12,13 95:22 106:10 111:17
**day** 119:1 135:19 138:22 138:22 140:25 141:1,1 165:18
**days** 22:10 49:9 49:15 69:22 79:24 80:6,12 94:21 95:15 96:9 101:15 102:5 162:2 168:16
**dead** 19:8,10
**deal** 19:19 71:1 125:22
**dealing** 47:12 71:5,7 119:13 126:12
**deals** 91:2 129:6
**dear** 130:19
**debate** 74:15 133:6
**debit** 92:4,5
**debt** 14:13,18 14:23 74:18
**debtor** 81:23
**debts** 153:3
**debunk** 144:2
**december** 4:4 22:5,13,16 44:13 45:21,23 48:18 49:24 55:24 62:21,22 69:9 70:6,15 105:17 156:7 156:14
**decide** 41:17
**decided** 10:17 10:19,22 109:4
**decides** 136:9 140:11
**deciding** 42:11
**decision** 30:5 128:23
**declaring** 56:21
**defendant** 1:8 2:8 9:20 10:5,6 10:18
**defenses** 118:8
**define** 11:5
**defined** 18:8,9 74:5 114:14
**definitely** 89:14 130:1
**definition** 74:16,24 80:15 82:16
**degree** 32:9 36:25 116:7 117:13,13 118:17
**degrees** 37:5
**delete** 109:8 110:14 113:12
**deleted** 146:12 149:10 150:21
**deletion** 167:6
**delinquency** 79:24 80:12 95:15,17 102:5 102:8,11 145:12 149:23 150:17 151:14 153:4,8 161:2
**delinquent** 80:4 151:17 152:16
**demanded** 60:4 60:7
**demanding** 59:24 60:11
**demands** 59:19
**demonstrated** 99:7 100:14 155:16
**demonstrations** 85:14
**denial** 4:18 41:19 52:10 121:6,14 128:14 130:24 142:7 143:19 146:24 148:8 150:21,22 157:18 161:9
**denials** 116:19 161:12
**denied** 26:8 52:6 128:17 129:9 148:15
**deny** 30:22
**denying** 159:5
**depending** 158:11
**depends** 41:9
**deponent** 168:13
**deposed** 9:10
**deposing** 168:13
**deposition** 1:5 8:19 19:2 20:10 38:2 88:15 165:4 167:1
**depositions** 38:11 71:6
**derived** 157:25
**description** 3:11 4:2 111:14
**desire** 162:14 162:15
**desk** 40:21
**despicable** 113:25

**detail** 113:10 117:14
**detailed** 72:6
**details** 45:10 86:15 111:10 111:20 122:6
**determination** 74:23 109:10 110:18
**determine** 34:22 71:21 84:7 114:15
**determined** 133:17
**different** 12:11 18:23 19:4 22:25 23:4 24:3,5,6 63:10 65:9 85:10 86:3 91:2 101:1 113:18 119:14 124:3 139:19 144:2 144:11 154:25 155:2,4 158:8
**differently** 144:12
**difficult** 6:13
**dig** 30:3 128:16
**digging** 131:2
**digital** 13:22
**digits** 112:25
**direction** 101:11
**directly** 27:7 59:9 107:10 159:24
**disagree** 135:10,10,11
**disclose** 30:11
**disclosed** 97:21 130:4,6
**disclosure** 4:8 26:21 28:21 29:16,20 30:1 31:7 48:18 49:25 61:23 63:24 108:18
**disclosures** 44:17 76:9
**discover** 85:23 105:18 106:17
**discoverable** 31:13 39:19
**discovered** 105:13,23 111:19
**discovery** 3:14 3:17 4:6,9,13 4:16 8:17 15:5 17:15 26:12 30:24 39:2 50:19 51:3,13 56:3 61:24 64:12 72:19 75:18 76:3 79:22 85:13,22 85:25 86:13 88:16 96:20 99:25 100:7 106:20 109:20 117:17 147:14 148:25 153:14
**discrepancy** 157:15,16,18
**discretion** 108:16
**discussed** 79:12 79:15 120:18
**discussing** 30:21
**discussion** 64:1 120:25
**dishonest** 153:5
**dismissal** 10:14 10:15
**dismissed** 10:12,23 13:6
**disparity** 22:8
**displayed** 66:21 114:2 159:17,19 161:10,19
**disposal** 111:21
**disposition** 126:17
**dispute** 3:15 17:13 24:23 26:8 33:6,13 35:1 42:5 50:10,15 51:3 61:6,10,13 62:15,23 63:11 64:25 65:7,9 66:25 68:19,21 69:2 71:18,20 72:2,3 73:8,21 73:22 75:11 99:5 100:12,14 100:14,24,25 103:25 109:12 113:8,17 120:4 120:13 121:20 148:3,11,21 157:7 158:16
**disputed** 4:12 25:13,21 34:22 35:13 41:22 47:14 48:1,2 49:23 50:5 51:9 64:10,18 64:21 69:4 72:10 73:19 84:5 87:25 88:6 99:25 101:5,22 102:4 145:4,13 146:4 147:3,16 148:19,22
**disputes** 24:8 26:19 34:18 42:8,21 47:22 48:6,7 50:22 54:18 55:9,12 69:18 71:19 115:21 118:15

120:2 143:11
**disputing** 47:23 48:8 69:19
**disseminated** 133:21
**distraction** 98:14
**distress** 116:17 117:21 118:15 118:19 120:6 120:12
**distressed** 125:22 136:16 141:22
**distributed** 25:12,20 47:4 68:7
**distributing** 26:3
**district** 1:1,1
**dizzy** 53:20
**docket** 54:12 97:23
**doctor** 8:21 119:12
**document** 15:10 16:6,8 17:11,20,22 22:25 25:2,5 38:19 39:8 43:10,19,24 44:15 45:16 51:4,5,5,12,17 53:5,11,22,24 55:23 56:5,23 60:18 61:20 62:5 64:6,17 64:18 83:2 89:12 93:8 104:24 109:14 109:16,22 110:6 121:4,12 129:2,19 130:21 148:9 153:15,22 154:8 162:1
**documentary** 135:14 155:9
**documentation** 70:13,16 72:21 75:2,10 76:5 77:12 84:25 91:12 96:16,17 104:13 135:20 135:22
**documents** 15:1 26:17 28:2,14 29:13 30:15,18 31:3 31:5,11,12,15 31:16,21 35:11 35:23 38:5,12 38:14 39:2,5,7 39:9,11,12,17 39:18 40:8,9 40:15,18 41:1 41:7,11 44:6 46:12 48:12 54:10 65:23 71:8,12,24 72:16 88:16 115:4 130:17 132:1 143:20 143:23 161:12 161:21 162:7 162:12 163:4 163:12
**doing** 6:12 15:22 23:17
**dollar** 113:1 142:18,19
**dollars** 11:7,11 11:14,15 12:16 96:4 135:12,16
**doors** 125:25
**dozen** 144:11
**draft** 27:17 42:2 64:24 67:9
**drafted** 41:25 42:8
**drafting** 61:10 67:5
**drafts** 43:1
**drawee** 12:1,3 12:4 14:8
**drive** 1:16 6:1 7:13 44:21
**driving** 122:20 123:2 125:24
**due** 85:4,6,10 86:22 87:5,6 94:21,22 96:1 96:2,5 101:16 101:17,20 104:6,8,10
**duly** 6:2 166:4
**dv** 161:19

**e**

**e** 3:1 4:1 117:9 136:24,25 166:1,1 167:4 167:4,4
**earlier** 154:8 163:21
**earn** 36:25
**earned** 37:1
**easiest** 118:25
**eb** 99:3
**edison** 60:23
**education** 12:12 36:11 124:16
**effective** 157:1
**effectuated** 16:5,7 22:16
**eight** 4:21 153:18
**either** 9:14 32:14 33:6 51:8 68:17 69:8,21 78:7 138:5
**elaborate** 138:16

**elan** 20:14,25 21:4 24:24 25:12,17,18 26:1,1,6 40:12 55:9 67:22 68:2,17,21 69:2 73:22 75:3 76:4 81:12 82:17,22 83:12,16 107:14 108:4,8 108:12,14 113:6 154:2 155:20,21,25 156:4,16,24,25 157:7 158:17 158:24,25 159:24 160:6 160:18,22 161:1
**elan's** 25:24 108:9 157:14
**elected** 156:25 157:14 158:6,7
**electronic** 40:25 45:6,13 46:2,8,21 49:17 57:16 59:16
**electronically** 44:18 45:3 46:13,19 47:5 60:20 83:19
**elementary** 66:10,12
**elements** 54:15
**eliminate** 61:3
**ellen** 1:14 166:2 166:19
**else's** 108:13
**email** 8:4,25 9:4,6,8 41:3 45:4 58:3,22 59:11,13 60:7
**emotional** 52:24,25 116:17 117:21 118:15,19 119:14 120:6 120:12
**employed** 37:7 37:10
**employee** 127:21 141:6 166:13,15
**employment** 37:9,13
**engage** 42:20
**engaged** 26:17 27:2
**engaging** 45:5 47:20
**engine** 123:7
**english** 111:22
**ens** 18:1,23
**entities** 19:18 19:19 20:2 79:12,15 91:19
**entitled** 1:13 45:8
**entity** 15:23,25 16:12,13,15,15 16:17,23 18:1 18:7,19,24 19:5,6,17,23 20:5,25 21:6 22:4,10,18,21 22:22 23:6,17 23:23,23 24:11 24:25 81:11 83:12,16 137:6 139:10 140:11
**entries** 13:23 21:8
**entry** 49:24 82:2 102:24
**envelope** 56:19
**equate** 153:4
**equifax** 69:25 106:12
**equivalent** 11:15 12:16,19
**erase** 60:12
**errata** 167:7 168:11,13,16
**esq** 2:5
**essential** 110:21 111:1 112:9,12
**essentially** 80:11 143:16
**established** 16:19
**estate** 124:9,12 125:12,17 126:2,5,17,20 127:2,14 128:1
**estimate** 138:9
**et** 58:14,14
**eve** 115:9
**eventually** 159:7
**everybody** 20:2 67:7 93:21 116:1,2
**evidence** 75:3 76:7 154:11 158:23 161:15 162:25
**exact** 32:12 39:20 68:5 69:8,21 70:12
**exactly** 18:18 39:23 85:15 130:8 134:3,6 154:9
**examination** 1:6 3:6 6:4 166:4
**examinations** 3:3
**example** 44:8 55:9 106:12 135:6 143:2

**except** 143:25
**exchange** 13:10 13:13,14,17,24 14:2 46:2 82:1 113:3 124:1,6
**exchanged** 26:16 29:14
**exchanges** 79:22
**exclusively** 129:1 143:14 144:4
**executed** 44:14
**exhibit** 3:13,15 3:19,21 4:4,8 4:11,15,18,20 15:2,3 17:10 17:12,13 43:12 43:13 53:5,6 55:23,24 61:21 61:22 64:6,7,7 64:9 104:20 109:17,18 121:4,6 153:16 153:17 156:11 156:20 157:3 159:4 161:5
**exhibits** 3:10
**exist** 21:9 31:11 31:18 38:22 39:18 78:21 104:12 115:10 148:5
**existed** 45:10
**existence** 16:20 16:21,22,24 22:15
**exists** 87:3 91:14
**expenses** 52:20 52:20,22,24 138:13
**expensive** 131:6
**experian** 65:7,8 65:16 69:11,14 69:18 106:12
**experienced** 116:16 118:14
**experiencing** 118:12 120:7 120:12
**expired** 51:23
**explain** 22:11 23:12 49:1 56:14 127:19 157:17
**explained** 48:24
**explicit** 7:10 72:6 85:14
**explicitly** 58:18
**extension** 131:15
**extent** 12:15
**extinguishing** 60:8
**eyes** 74:11,17 150:14

**f**

**f** 166:1
**face** 99:21 161:3
**facebook** 32:14 43:4 55:15,17 66:4,8
**fact** 6:12 30:21 33:17 40:12 62:20 67:19 72:11 75:3 77:1 85:10 90:23 100:7 101:11 112:21 113:24 114:1 119:1 135:21 150:12 157:21 162:12
**factor** 160:14
**factors** 157:19 159:4,9
**facts** 54:6,23 55:3 98:19 105:10
**factual** 108:21 157:15
**factually** 86:18 105:5
**fail** 17:5 153:7
**failed** 17:5 114:10 118:7
**failing** 34:8 123:9
**fails** 168:18
**failure** 33:7,22 33:23 34:10,16
**faintest** 83:8
**fair** 18:10 32:8 34:19 35:2,8 35:20 38:14 66:5 71:25 72:2,5 84:7 100:20,23
**false** 61:4 86:11 86:11 87:21 109:10
**falsity** 111:6
**familiar** 32:7
**family** 55:6 120:19
**fantastic** 151:6 162:5
**far** 26:13 36:20 59:7 70:12 73:1 85:17 86:1 100:15 106:20 130:23 161:18 163:11
**fargo** 94:15
**fcra** 32:8,10,15 33:1 52:16 114:14 147:24 148:3 149:11 150:15 162:2,4

**fe** 123:1
**february** 51:10 51:22 116:25 117:1 121:15 122:8,20 123:6 123:19 131:17 156:24 157:1
**federal** 13:1,3 25:16 29:10 31:9 38:6,10 38:13 76:7
**fedex** 45:19
**fee** 126:10,11 151:1
**feeling** 95:21
**fica** 144:17
**fico** 159:9,13 159:20,25
**fictitious** 18:7 19:10,18,19 20:24 22:20
**fidelity** 20:15 21:4 79:4,6 81:12 83:17
**fighting** 113:16
**file** 9:4 34:15 35:21 40:21 132:14,16 136:5 161:19
**filed** 3:19 22:5 43:14,25 44:3 51:6 55:12 85:16 107:7 131:11,15 137:22 152:8 153:25 156:8
**files** 44:19
**filing** 54:16 133:4
**filings** 126:7 136:17
**fin** 20:14
**finance** 37:3 126:20
**financial** 20:25 21:4 25:12,17 25:18 26:1,2 40:13 76:4 108:4 124:16 124:17,23,24 125:3,6 136:15 136:18,19,20 141:21 143:13 143:18
**financial's** 26:6
**financially** 166:16
**financing** 52:1 122:10,14,21 124:9,12,14,15 124:17,21 129:6 130:3,12 142:22
**find** 64:7 68:2 69:6 70:2 115:2 119:3 125:10,11,13 126:6 133:16 134:19
**fine** 13:7 36:3 71:10 87:10 138:8 160:3
**finish** 6:16 77:6 132:10 134:11
**first** 3:22 15:2 17:19,25 32:10 44:4 51:16 53:7,14 58:5 58:10,23 62:14 68:14 73:22 76:23 134:19
**fit** 98:20
**five** 49:9,15,22 54:3 128:5,9 141:6 162:3
**fix** 119:15
**flat** 126:10,11
**flip** 34:3
**flourish** 162:13
**folder** 40:21
**folks** 136:10 138:8
**follow** 11:10 31:18 63:1 65:14 98:17
**followed** 63:3,3
**following** 11:20 37:15 72:2
**follows** 6:3
**font** 111:22 112:24
**forced** 99:24
**foreclosure** 125:12,23 126:2,4,18
**foregoing** 165:4 166:7
**form** 4:9 61:23 96:17,23
**formed** 26:20
**forms** 138:2
**forth** 16:20 72:1 98:11 99:4 166:10
**fortiva** 67:22 69:7 91:3,17 91:20 94:19
**forum** 8:8
**forward** 12:10 12:16 46:9 119:3
**found** 107:11 109:7 148:16
**fourth** 97:17,18
**frame** 69:14 99:14
**fraud** 61:1 105:13 107:22 111:17 112:2,6
**fraudulent** 110:10
**free** 34:20 60:3
**frequently** 115:24

**friday** 127:20
**friend** 120:19
**friends** 55:6
**front** 31:25 35:11,23 39:21 40:4 86:9,15 86:24 87:2,13 136:14 137:25
**ftc** 25:14,16 104:17 105:2 107:21 112:11
**full** 7:7 11:13 11:20,22 17:25 82:11
**fully** 7:1,5
**funny** 163:16
**furnished** 107:14,15
**furnisher** 25:12 75:13
**furnishers** 33:17 41:7 44:9 55:9 67:20 163:1
**further** 20:13 25:21 26:11 50:12 85:18 86:16 166:7,12
**future** 44:18 45:23 162:23

**g**

**g** 2:5
**gamesmanship** 149:13
**gate** 119:6
**gather** 63:12
**gathered** 43:3
**gemini** 26:18
**general** 119:25
**generate** 102:24
**generated** 23:2
**generates** 24:2
**generating** 111:13
**getting** 24:6 149:15
**give** 32:19,20 40:1,2,3 52:3 65:21 69:22 74:12 85:20,24 87:21 88:12 122:1 136:19 139:1
**given** 24:12 45:17 57:1 59:5,8 94:22 96:2,10 140:25 141:1,1
**giving** 12:9
**glad** 63:19
**go** 8:25 9:5 27:12 30:7 37:15 45:22 47:2,6 48:24 57:7,22 65:8 66:17 68:10 69:9 72:25 73:5,19 76:12 77:13 82:19 84:24 87:15 88:15 110:9,12 112:10,10 114:4,19 118:23 119:3,9 119:12 122:7 125:5,21 130:13 131:9 135:23 145:11 149:13,18 150:24 152:6,6 152:12,13 154:6 156:11 159:3,8,20 162:14,19
**god** 17:2 22:12
**godino** 1:14 166:2,19
**goes** 65:10 73:1 100:16 138:23 138:23 162:4
**going** 6:22 15:1 17:11 27:9 30:3 31:14 35:10 36:1,23 38:25 43:10 44:12 45:13 48:11 53:16 63:18 64:5 73:18 85:12,18 85:21 86:3 87:17,19,23 109:14,16 114:2,14 118:24,24 120:22 121:3 128:16 131:19 131:25 134:12 145:19 149:13 159:3,4,7 162:13
**good** 6:5 70:14 119:1 135:15 142:11 149:18 150:11
**goods** 124:5
**gotten** 51:5 122:10
**government** 151:23
**granted** 3:19 43:14 57:14 59:14
**grantor** 102:14 102:20,25
**gratification** 45:14
**great** 113:10 144:2
**grid** 85:17,19
**gross** 132:18
**group** 116:2
**guess** 10:16,22 11:19 37:14

68:7 69:12 93:4,20 105:20 107:9 108:23 108:25 109:3,9 113:9,10
**guide** 66:8 67:4
**guys** 92:24 147:12 148:23 161:18

**h**

**h** 4:1 167:4
**half** 144:11
**handled** 138:25
**hands** 150:16
**handwriting** 15:15 16:5,7
**happen** 60:2 83:7 119:5
**happened** 83:8
**happens** 135:18,18
**happenstance** 105:24
**happy** 88:15 99:16 150:24 151:2,3
**hard** 115:1 161:4
**harm** 101:12
**head** 83:3 136:12 151:21 163:16
**hear** 31:19
**heard** 42:13,14 42:16
**hearing** 9:14 104:14
**hearsay** 76:7 163:6,10
**heart** 119:12
**held** 1:15 64:1 120:25
**help** 32:21 118:25 119:10
**hereinbefore** 166:10
**hey** 131:3
**hide** 36:3 65:21
**high** 36:12 83:23 84:13,15 84:18 85:1 114:21,21 143:1 146:3,16 147:2,16,17,19 148:17
**higher** 156:1
**highest** 36:11
**highlighted** 144:4,8 154:9 161:9
**history** 29:1
**hold** 37:12 58:3 61:12 70:20 117:8 120:17 159:7
**holder** 23:17,21
**holding** 35:11
**holds** 85:15
**holes** 26:12
**home** 7:12,17 62:11 71:6 93:13,15,19 109:25
**honestly** 46:15 47:10
**honorable** 88:20
**honored** 111:25
**hope** 2:5 3:6 6:4,6 27:22 28:8,13,17,24 29:22 43:12 53:4 55:22 61:20 63:17 64:4 65:22 70:22 120:22 121:2 131:25 163:18
**hour** 63:18 120:23
**hourly** 126:8
**house** 126:13 126:16 143:2
**huge** 98:14 119:4
**huh** 144:22
**human** 16:24 20:9
**humanly** 83:9
**hundred** 32:19 51:11 52:1 122:10,13,21 130:2,12 140:1 140:3 142:18 142:19,21
**hyundai** 123:1

**i**

**i.d.** 15:25
**idea** 54:8 79:17 80:21 91:18 92:12 93:20 105:20 121:24
**identification** 15:6 17:16 43:16 53:8 56:4 60:24 61:25 64:13 109:21 121:8 153:19
**identified** 49:22 95:25 96:8 101:15 117:10 159:5
**identify** 54:5 118:7 137:4,11
**identifying** 57:13,20,22 58:12,24 110:21 111:2 112:9,12

**identity** 25:3 25:14,16 26:2 61:2 104:17 105:1,6,19 106:17 108:1,3 110:8 111:15 111:16 113:7 113:17 117:16
**ids** 24:3
**ignored** 17:24 46:10
**illegible** 50:15 62:25
**illinois** 56:18
**imagine** 63:19 71:5 122:4
**immediately** 83:9
**impenetrable** 145:25
**impolite** 162:23
**important** 6:15 116:3
**impossibility** 21:14,17
**impression** 29:21
**impressions** 26:23 28:11,21 29:16 30:1,11 31:7 32:2
**inaccuracies** 86:14 90:23 99:10,25 100:6 154:14
**inaccuracy** 26:4 72:1,22 73:25 80:3 84:23 85:5 87:25 88:2,8 88:23 90:13 95:2,4,16 96:8 96:10 99:2 101:16,22 102:4,7,19 114:11 154:22
**inaccurate** 4:12 24:24 33:10 34:23 39:22 64:10 71:19,21 72:11,18 73:23 75:21,22 79:23 80:4,14 83:23 83:25 84:8,9 84:10,13,15,19 85:4,6 86:22 87:7,18 88:3,6 88:9,22 89:4,8 89:18,20,24,24 90:3,4 91:3,5,5 91:8 94:20,22 95:4,11,14,17 95:19 96:1,2 97:8 99:16 100:9,19 101:4 101:5,14,17,24 102:2,7,13,16 103:2,5,8,10,12 103:15,17,19 103:22 104:1,3 104:8 111:18 158:25
**inaccurately** 68:3 69:7 70:4 70:18 71:15,17 112:1
**include** 111:16 113:6 133:3
**included** 67:16 111:11,12
**including** 111:17 113:23
**income** 123:18 127:13 130:25 131:3,9 132:5 132:18,22 133:2,10,16,17 134:4,15,16 135:5,8,9,19,21 135:23,24 136:3 137:5,14 137:20 138:2 138:17 139:5,9 140:22 141:23 142:1
**inconsistency** 95:22
**inconsistent** 154:24
**incorrect** 161:7 162:23
**incumbent** 72:10
**incurred** 52:18 52:23 74:20
**indicates** 148:15
**individual** 67:18
**individually** 49:23 50:6
**individuals** 54:5,17 114:15
**indulge** 128:13
**information** 4:12 25:11,20 26:3,22 27:21 28:7,11,16,23 29:4 30:15 31:4 32:2 33:10,16 34:6 34:14,22 39:3 40:4,4 43:2 44:7 57:13,21 57:23 58:1,13 58:20,25 64:11 71:8 72:16 76:25 83:20 93:7,25 107:9 110:10,12,14 110:19,21,22 111:2,8,16,21 112:3,7,9,12,15 112:20 113:13 117:11,17,18

124:23,25 125:3,6 133:20 137:24 163:2
**ingersoll** 2:5
**inherent** 154:23
**inherently** 155:16
**initial** 44:3 100:25 102:22 106:19
**initially** 76:22 82:14 119:6
**initiative** 119:3
**inquired** 68:14 68:16
**inquiries** 92:22 92:23 121:25
**instances** 69:12
**instantaneous** 45:14
**instructions** 167:5
**instrument** 11:23 12:21 14:4
**insufficient** 130:24 133:18 134:4 139:5 142:13,20
**insurance** 116:5
**intend** 24:20
**intended** 16:4 21:11 58:19 98:8
**intent** 54:2
**intentionally** 59:18 158:5
**interested** 113:16 166:16
**interesting** 142:15,16
**interfere** 7:1
**internet** 35:22
**interpretation** 74:13
**interrogatories** 3:22 53:7,15 155:7
**interrogatory** 116:15
**interrupting** 132:11
**interruption** 70:25 71:7
**investigation** 17:6 34:11 148:24
**irrelevant** 17:3 94:1,7 114:8 137:8 143:23 147:23
**irs** 126:19 131:19 132:6,7 132:13 133:4 152:22
**issue** 26:10 41:21 117:23 118:1,8 140:19 145:16 149:12 156:2
**issued** 3:13 15:4 52:6 109:23
**issues** 120:17 126:12,13,14 126:14,16 128:14
**item** 33:5 73:24 74:10 75:9,20 75:21 76:22 79:23,24 83:22 83:23 85:3,4 88:6,7,21,22 89:17,18 90:3 91:2,4 94:19 94:20 95:2,14 95:15,25,25 96:8 101:14,14 101:22 102:4 102:13,13 103:2,2,10,10 103:17,17,24 104:6 105:9 144:8 145:3 148:4 154:17 155:12,15,25
**items** 4:12 49:23 50:5,6,9 50:9 51:9 59:13 60:9 61:3 64:10,21 65:9 67:18 72:10 73:19 75:16,17,19 84:22 85:14 86:3,13 87:12 88:18,19 89:2 89:8 90:2 96:20 97:21 100:9,15,18 104:12 148:23 154:17,18 157:8 158:1 159:17,18 161:8

**j**

**j** 1:14 165:1 166:2,19
**january** 4:11 47:13 48:3,19 49:22 50:10,14 50:14 51:3,4 62:4,7 63:11 64:10,19 68:20 68:22,23 69:1 69:20 113:7,18 119:7 121:20 149:8 156:7
**jeffrey** 1:4,7 2:3 3:4,13 4:20 6:1 7:9 15:3,16 15:16,23 18:1

18:7,13,19,22 18:23 19:1,16 19:25 20:5,8 20:14,18 21:3 21:6,6,13,14,24 22:4,14,19 23:3,22 24:9 24:10,14,25 25:1,19,22 26:2,4,5,9 58:2 58:21 59:1,9 73:9 83:11 108:5,9 153:17 166:4 167:1,1 168:1,4,5
**job** 37:12
**jogs** 65:11
**john** 24:4,4
**joke** 113:25
**judge** 12:23 27:13 96:20 97:4 98:13 104:14 163:20
**july** 63:4 79:25 80:13
**june** 1:17 63:4 166:21 167:3 168:3
**jurors** 114:2
**jury** 162:14

**k**

**keep** 40:22 136:2 138:4,5 138:19 149:13
**keeping** 138:20
**kept** 109:7
**key** 159:9
**keyword** 34:11
**kidding** 51:20
**kind** 15:21 17:3 51:19 109:6 116:6 139:6 163:16
**king** 2:7
**knew** 159:7
**knock** 125:25
**know** 6:20 15:7 17:12 24:3 26:11 31:17 32:17 39:23 43:3,17 44:11 45:10,12 46:15 52:25 53:9,19 54:12 58:13 60:25 61:1 62:1 64:14 66:14,23 67:6 68:4,5,12 69:5 70:11 74:5,14 75:6 77:2,10 78:1,14,14,15 78:22,24 79:3 80:16,16,18,18 83:18,19 84:5 91:25,25 94:2 95:12 96:6 98:8,21 99:18 99:23 102:3,12 102:21 103:9 103:16 104:5 104:11 106:9 106:19 107:15 107:18 109:5 109:23 111:12 113:21 114:7,8 115:7,8,9,9,10 115:15,15,16 115:17 116:12 116:14 119:8 119:11 120:15 120:15 121:5 123:20,20 126:17 128:4,6 129:7 131:3,3 131:21 134:24 136:1,12 137:2 138:6,7,12,15 138:24,24,25 139:25 142:10 142:20,22 143:19 144:12 144:13 146:9 146:17 147:6 148:19 151:9 151:11,15,19 153:20 157:20 158:11 160:9 162:6
**knowledge** 53:24 54:6,8 54:17,23 76:14 76:15,16 77:16 77:18,21,23,25 78:5 81:10 82:21 83:3,6 83:10,14 93:1 94:4,8 117:11 118:7 137:13 165:6
**knows** 20:2

**l**

**l** 117:9
**labor** 133:5
**laid** 53:3 60:9
**landing** 150:23
**large** 116:2
**largest** 135:24 140:21
**late** 69:15 80:6 88:23 89:4,13 89:16 96:11,14 156:6
**laughable** 114:3
**laughed** 139:6
**lawful** 74:15
**laws** 4:5 56:2
**lawsuit** 6:7 26:20 27:3,6 32:24 33:15 48:9 51:6,15 55:13
**lawyers** 6:6

**leading** 74:11
**learn** 32:10,13 126:22
**learned** 45:4 66:4 72:12 126:23
**learns** 67:7
**leave** 114:14
**ledgers** 21:16
**left** 59:18
**legal** 26:23 28:12,22 29:17 29:21 30:1,4 30:12 31:6,7 32:3 57:12,19 58:23 74:15 98:23 109:9 168:23
**legally** 26:22 27:21 28:6,11 28:16 29:4 32:2
**legible** 63:11
**legis** 18:1,24
**legitimate** 135:8
**lender** 135:7,16 142:23 148:9 158:9
**lenders** 52:5 129:9 133:9 144:11
**letter** 3:15 4:4 4:8,11,15,18 17:13 20:13 40:12 50:10,14 50:19 55:24 61:22 62:8,11 63:2 64:9 65:1 65:1,5 66:2,9 67:5,9 106:23 106:25 107:3 109:18 110:7 110:13,15,17 111:25 112:6 112:11,16 121:6,14 129:20 130:3,5 156:24 157:2 157:14 161:9
**letters** 18:6 22:19 42:5 65:4 66:2,19 67:3 96:20,24 96:25 97:1 112:25
**level** 36:11 119:9
**liability** 33:15 33:21 150:15 150:23
**liable** 10:16,22 14:13,18,22,24 14:25 34:8,16
**license** 127:2,3
**licenses** 126:25
**liens** 126:19
**lieu** 162:12,12
**life** 116:12 138:13,13,13 145:19
**light** 114:21
**liked** 36:23
**limits** 145:2 146:2,25 160:5 160:7,13,19
**line** 5:1,11 24:21 95:23 111:1 167:9
**listed** 23:23 50:10 64:21 67:19 73:25 80:3,12 91:4 93:7 95:2,4,17 101:24 102:7 102:14,15 103:3,4,10,11 103:17,19 104:6,7 142:7
**listen** 125:1
**listing** 89:11
**listings** 127:10 128:9
**lists** 154:25
**litigants** 8:15
**litigation** 26:23 27:16 28:12,22 29:17,21 30:2 30:12 31:8 32:3 43:6 117:24 118:2,9 161:13
**litsup** 167:22
**little** 25:4 63:18 71:16 120:23 121:9 127:23 127:23 138:16 149:15
**live** 7:22 138:22
**lived** 7:15
**living** 19:3,4 21:25 73:14 138:13
**llc** 1:7 56:17,20 56:22,24 57:1 57:2,3 168:4
**llc's** 3:22 53:7
**loan** 116:4 130:25 133:21 134:4 135:15 135:16 139:6
**loans** 135:20,21
**locate** 117:6 136:17
**located** 1:16
**locations** 1:15
**log** 60:1
**login** 60:2
**long** 7:15 36:24 79:7 83:8 92:17 115:15 119:8
**look** 43:11 62:13 68:4,5,6

73:6 85:11 87:15,16 88:11 89:12 92:22,23 95:20,23 96:7 104:20 105:21 109:22 110:4 115:23 123:10 125:14 129:16 136:13 142:10 144:16 150:11 151:12,15 156:4 159:4 163:22
**looked** 47:11 60:21 110:7 115:8 151:9
**looking** 30:11 117:5 128:15 129:23 141:16 156:8
**looks** 15:14 116:8 129:20 129:24
**loose** 40:19
**losing** 113:16 113:17
**loss** 74:20
**lot** 26:12 75:15 106:9 124:3 125:11,22,24
**lower** 85:1 91:13
**lowercase** 35:17 49:4

**m**

**made** 27:15,25 39:15 54:15 55:14 62:17 71:17 74:24 78:15,16 80:24 80:25 81:2 84:14 93:2 97:6,15,19 101:8 109:9 110:15,18 131:12,19 132:3 138:6 143:17 151:5
**mail** 17:6 44:20 45:14 49:10,16 61:6 65:2 167:22
**mailbox** 45:22 45:25,25
**mailed** 33:23 41:6 56:16 62:11
**mailing** 44:20
**maintaining** 34:2
**make** 6:17 20:3 21:1 27:10,11 34:5 35:3 38:21 41:20 53:19 60:2 73:20 76:19 78:9,12 79:9 79:13,16 93:19 110:13,20 112:13,25 113:3 116:6 122:24 123:25 124:13 131:4,5 132:3 135:12 135:15 136:25 143:3,22 158:8 167:6
**makes** 6:12,18
**mamaroneck** 1:17 6:2 7:13 44:21
**man** 15:22 19:3 19:4,7,9,23 21:25 73:14
**management** 136:21,22
**march** 4:21 35:20 107:22 116:25 117:1 130:19 151:13 153:18
**mark** 17:11 27:9,22 28:8 28:13,17,24 29:22 43:10,12 53:5 55:23 61:20 64:6 109:17 121:4 153:16
**marked** 5:10 15:6 17:10,16 43:15 53:8 56:4 61:25 64:13 109:21 121:8 153:19
**market** 125:8,9 125:23 128:1 167:22
**marks** 167:6
**match** 78:19 88:17
**materials** 8:14 8:18 29:24 30:5,25
**matter** 1:13 11:1,2 13:5,6 14:3 27:16 30:25 39:2 41:18 42:24 98:24 117:17 167:1
**matters** 34:12 58:6 133:23 134:7,14
**maximum** 79:24 95:15 102:5
**mean** 8:25 13:23 15:20 16:4,18,24 18:5,17 20:22 21:11 22:25 24:16,16,19 27:17 29:6 31:16 40:10

44:25 46:18 55:2,3 57:19 58:19 59:21,22 65:20 66:3,22 66:23,25 69:3 69:3 74:4,20 78:20,24 79:17 81:4,5 83:7 98:7 106:19 107:12,13,18 110:1 112:18 113:9 115:6,7 115:7,7,14 116:5 125:16 127:19 130:7 131:21 136:20 138:17,18 144:7 152:15 161:25 163:6
**meaning** 6:22 49:21 52:19 58:21 96:9 156:16
**means** 16:2,19 16:21,25 18:6 18:11 20:23,23 26:8 45:1,17 49:12,17 56:14 56:15 57:16 59:16 107:12 127:20
**meant** 15:21 21:10 48:25 58:13
**mechanically** 52:21
**mediation** 126:18
**medical** 116:20 117:18
**medication** 6:25 118:11
**medium** 13:10 14:2
**mediums** 13:24
**meet** 38:2 119:20
**members** 55:6 120:19
**membership** 60:3,3,3
**memorialized** 151:20
**memorized** 32:18
**memory** 65:11 83:8,15
**mental** 26:22 28:11,21 29:16 29:20 30:1,11 31:7 32:2
**mention** 29:8 65:7
**mentioned** 57:13,20 58:24 104:14 140:12 155:22 156:10
**mentions** 156:10
**mercedes** 4:18 121:6,15 122:7 123:11,13 129:17,19,21 133:20 143:12 143:13,17,18 143:18,25 144:3 148:8,9 148:15,16 157:18,23 159:5
**mercedes's** 144:14 161:9
**merely** 23:20 23:20 59:2 72:2 100:11,11 101:4
**met** 98:23
**midatlantic** 167:21 168:15
**million** 24:4 135:12,16
**mind** 55:14 119:14 120:16
**mine** 38:19 80:17
**minimum** 144:17 159:10 159:14,21
**minnesota** 16:1 16:10,12 23:3 23:7,10,13,15 23:24
**minute** 70:20 70:21 144:25
**minutes** 63:20 120:24
**misleading** 155:5,17 158:3
**missing** 110:20 111:1 112:9
**mistake** 112:13
**misunderstood** 12:15
**model** 122:24
**moment** 31:11 48:24
**monday** 1:17
**money** 11:3,5,7 12:16 13:9,14 123:25 129:8 131:4 135:17 143:3
**monitor** 114:8 115:18,22
**monitoring** 116:11
**month** 95:3,10 101:23 102:1 141:8 163:13
**months** 43:8 54:3 80:7,9 116:22
**moot** 133:18
**morning** 6:5

**mortgage** 37:24,25 93:11 93:12
**motion** 8:25 9:4
**mouth** 125:14
**move** 14:10 17:8 119:4 134:20
**muddled** 68:25
**multi** 113:1
**multiple** 52:5
**muted** 70:23

**n**

**n** 3:1 117:9
**name** 6:5 7:7 16:14 17:1 18:6 19:8,9,10 19:11,12,16 21:3,6,12 22:14,17 23:17 23:19,20,20,21 23:25 24:2,5 24:12 58:14,21 59:2,3,4,4,6 60:6,6 81:7 110:23 111:4,8 117:2,4,6 136:10 139:9 139:11 167:8
**names** 91:25
**nasdaq** 113:3
**national** 146:2 147:1
**natural** 116:17 119:5
**naturally** 120:14
**nature** 10:7,13 10:15 71:20 73:20 123:24
**navigate** 161:5
**necessarily** 24:18 57:2 72:7 74:20 152:15
**necessary** 116:3 119:10
**necessity** 123:8
**need** 45:13 99:23 101:9 110:19 112:2,7 124:13 133:11 133:15,16 134:19
**needed** 112:23 113:19 122:9
**needs** 19:22,22 20:1
**negative** 74:7 74:10,11
**neither** 166:12 166:14
**never** 25:23 42:16 51:4 100:15 116:13
**new** 1:1,17 4:18 6:2 7:13 15:24 16:15 19:18 22:13 23:5 44:21 52:19 59:2 113:2 121:7 123:8 127:5 129:21 137:2 141:17 142:8
**nice** 131:7
**nine** 141:6
**non** 132:5
**nonsensical** 113:11
**normal** 6:13
**notarized** 44:14
**notary** 165:20
**notations** 167:6
**note** 89:2 103:25 167:5 168:10
**noted** 86:19 87:23 158:12
**notes** 1:12 13:1 13:3 35:25 36:2
**notice** 33:8 45:17 49:7 56:10,11,11,12 56:23 57:1 68:8 149:8
**noticed** 8:17 45:22,23 130:5
**notices** 44:17 52:6
**notification** 4:5 56:1
**november** 3:13 3:15 15:4 17:14 83:24 107:3
**nowadays** 114:8
**number** 3:11 4:2 8:2 23:1 35:17 45:19 49:4 58:3,3,22 59:7,8 60:7,10 75:20 83:22 85:3 87:25 88:6,21 94:20 101:22 102:4 102:13 103:2 108:19 110:23 111:5,5,7,14,23 111:23,23 112:3,8
**numbered** 49:23 50:6
**numbers** 111:9 126:20

**o**

**o** 89:18,19 117:9,9,9 139:15

**oath** 9:13 40:3 87:5 90:11 132:2 134:23 138:15 139:8
**object** 26:21 27:20 85:12 86:23 87:20 128:10 137:9 162:21
**objecting** 17:4 85:16 93:24 133:25
**objection** 7:24 8:5 28:5,10,15 28:20 29:2,15 29:20,25 30:6 32:1 39:16 86:2,19 87:22 93:25 94:6
**objections** 31:20,24 39:8
**obligation** 14:9 33:4 35:1 49:13 75:13 97:25 98:5 99:5
**obligations** 11:7 32:25 33:3
**obtain** 35:18
**obtaining** 46:17
**occur** 45:24 119:6
**occurred** 105:24 111:17 150:22
**october** 83:24 105:14,18,21 106:7,13 107:8
**offer** 129:9
**offered** 14:4 162:11
**offering** 28:6
**offers** 129:7 130:10
**office** 8:15 45:19
**officer** 56:22 57:3
**oh** 7:16 32:11 36:18 38:17 60:25 68:22 133:12 141:9 154:2
**okay** 6:19,23 7:22 8:9,11,13 8:17,23 9:10 9:17,23 10:1,4 10:10,13,24 11:19 12:7 13:7,11,14,17 14:10,11 15:1 15:9,12,14 16:3 17:18,22 18:17,22 20:3 20:8,12,22 21:18,20,23 22:3 23:6 24:13,17,19 25:6,8 26:24 27:9 30:20 31:20 32:22 33:3,9,20 34:1 34:14 35:10,18 36:8 37:12,18 37:25 38:5 39:14 40:14,17 41:6,14 43:19 46:1,21 50:12 50:18,25 51:18 53:1,11,16,20 54:22 55:1,19 55:21 56:7 57:10,24 58:12 59:17 61:16 62:3,7,24 63:1 66:15 67:15 68:19 71:10 73:8,17 74:6 75:2,25 77:20 80:8 81:22 82:13 84:3 87:24 89:2 90:22 92:5,21 93:1 94:10 97:6,11 101:8 101:14 104:16 104:20,24 105:4,11,16 106:5 107:6 110:2,16,20 114:25 117:20 118:4 120:21 120:24 121:9 122:17,19,24 123:4,15,18 124:2,7,14,24 125:2,10 126:8 126:11 127:10 127:22 128:9 128:17 129:5 129:12,20 131:10,16,23 132:16,18 133:8,12 134:17 135:11 135:23 136:2,8 136:10,15 137:13,21 138:1,6 139:3 139:8,16,20,23 140:5,8,11,14 141:3,25 142:4 143:10,15 144:2,16,20 145:5,9,20,23 146:2,7,22 147:2,11 148:14 149:3 149:19,23 152:10,24 153:22 154:1 154:12,21 155:18 156:11 157:6,9,17

159:3,5,6,8 160:3,5 161:4 161:6,11,15 163:18,24
**omit** 24:21 112:13
**once** 119:21
**one's** 120:16
**ongoing** 82:14 97:24 98:4
**online** 59:19 60:12
**open** 20:19 21:9,13,14 25:22,23 36:4 75:25 77:20 78:3 81:18 82:2 116:7
**opened** 25:19 25:25 26:6,9 77:16,18,21 78:1,2 81:6,11 81:13,14,14,16 102:21 108:5 113:6
**opening** 77:24
**opens** 81:20
**opensky** 91:23
**operate** 13:19 116:3
**opinion** 139:21 141:13
**opinions** 139:19,19,23
140:9,25 141:15,21
**opportunities** 125:25
**opportunity** 64:2 139:2
**oral** 1:6 90:9
**order** 33:15 52:4 99:15 101:9 116:4
**organization** 42:15,20
**organized** 40:24
**original** 75:21
**ought** 50:5 135:16
**outcome** 74:11
**outlined** 144:1
**outright** 93:13
**outside** 43:3 132:24 133:18 133:25
**override** 85:21
**own** 7:17,19,20 7:21 18:13,20 23:1 24:2 93:13 126:23 162:3
**owned** 123:13
**owner** 23:19,21 57:12,20 58:24 59:3,4 108:10
**owners** 136:16 141:22
**ownership** 23:19
**owns** 108:12,14

**p**

**p.m.** 164:2
**pa** 167:22
**pacify** 99:17
**page** 3:3,11 4:2 5:1,11 17:19 50:4,6 59:17 59:18,19 64:20 65:8 104:21 106:23 110:18 123:15 156:19 167:9
**pages** 3:20,22 4:19,21 43:15 45:16 53:8,17 121:8 153:18
**paid** 12:5 60:3 82:11 139:10 145:6 149:21 150:1,5,7,9,10 151:8 158:13 160:23 162:19
**paper** 11:7 12:16 13:14,21 19:8,9,10,11,12 19:16 24:3 35:19 83:18 128:25
**papers** 40:19 40:19,22
**paragraph** 17:25 44:13 48:17,24 49:20 51:7,21 57:4 57:11 58:5,20 58:23 60:10 62:14 156:13 156:18,23
**paragraphs** 50:13 58:10,15
**parroted** 100:11
**part** 12:17 52:12 127:15
**particulars** 32:18
**parties** 60:16 166:14
**parts** 38:15
**party** 10:21 11:24 14:25 18:19 158:12 162:18
**passed** 99:15
**passport** 3:13 15:3,12,14 22:23 23:2 60:23
**past** 18:14,21 47:16 48:3,6 85:4,5,10 86:22 87:5,6

92:10 94:21,22 96:1,2,4 101:15,17,20 104:6,8,10
**patient** 8:21 162:10
**pause** 70:21
**pay** 11:3,11,17 14:6,7 73:24 93:15,17 94:21 101:15 152:4 152:15,19 153:3 158:5,7
**payment** 10:16 10:22 88:23 89:4 93:19 96:11,13 103:18,24 116:6 130:7,8 138:25 156:6
**payments** 79:9 79:13 80:19,23 80:25 89:13 151:23 152:16 152:22
**pc** 2:5
**pdf** 35:21
**pennsylvania** 2:7 36:18
**people** 6:14 53:20 66:14 116:3 119:1
**percent** 22:12 32:19 50:24 51:11 52:1 122:10,13,21 130:3,12 142:21,25
**perform** 10:17 10:19,23 114:12 153:5,7 153:10
**performance** 153:6
**performed** 10:20 33:22 74:18
**period** 51:23 80:24 81:1 84:4
**permits** 23:16
**person** 18:2,9 19:14 20:9,9 20:24 22:24 23:13 24:10 25:1 37:21 73:10,12 81:10 112:24 134:21 137:6 139:10
**personal** 76:14 76:15,16 77:15 77:21,23,25 78:4 82:21 83:3,6,14 94:4 94:8 110:21 111:2 112:9,12 117:18 137:13
**personally** 64:24
**pertaining** 58:11 154:16
**philadelphia** 167:22
**phone** 58:3 63:7,8,9 83:19 117:5
**physical** 31:17 45:25 119:15
**physically** 61:6
**physician** 117:2
**piece** 35:19
**pirzinger** 1:4,7 2:3 3:4,13,14 3:17 4:6,9,13 4:16,20 6:1,5 7:9,24 8:5,13 9:6 10:9 15:4,5 15:16,17,23 17:15 18:1,7 18:13,19,22,23 19:1,17 20:1,5 20:8,14,18 21:3,6,7,13,14 22:4,14,20 23:3,22 24:10 24:14,15,21,25 25:1,19,22 26:3,5,5,9,16 26:24 27:14,20 28:5,10,15,20 29:2,15,19,25 30:25 32:7 35:7 36:10 38:1 56:2 58:2 58:21 59:1,10 61:24 63:17 64:5,12,15 70:23 71:4 73:9 77:7 83:11 85:11 86:19,23 87:4 87:19,22 91:19 93:23,24 94:6 108:5 109:19 110:5 112:14 113:5 121:3 128:10 132:11 133:24 134:7 137:8 138:14 138:21 139:8 147:3,15 148:6 149:17 151:22 153:18,23 159:22 162:21 163:18 166:4 167:1,1 168:1 168:4,5
**pirzinger's** 108:9
**place** 19:12 63:22 114:16 121:1 166:10
**placed** 117:23 117:25 118:1

**plaintiff** 1:5 2:3 10:4 11:11 12:17 14:13 19:25 44:14,16 44:16 48:18 51:25
**plaintiff's** 3:21 44:19,20 52:7 53:6
**planes** 12:11
**planning** 116:9
**platform** 28:4,9
**platter** 120:16
**play** 149:13
**pleading** 87:8 100:5 101:3
**pleadings** 27:19 98:1,6
**please** 6:20 7:7 27:22 28:8,13 28:17,24 29:22 57:8 77:6 132:10 134:11 167:5,7
**plus** 125:17
**pmh** 1:2
**point** 67:17 111:22 112:24 122:3,5
**pointed** 75:17
**policies** 161:22 162:4
**policy** 11:9 12:20,23
**portals** 45:3
**position** 100:3 108:14
**possession** 56:22
**possibility** 48:10
**possible** 47:10 62:18 68:16,18 69:4 77:24 83:9 106:14,16 107:13,15,16 139:7 142:21
**post** 45:18
**postal** 45:25
**potential** 72:22 118:8
**potentially** 34:16 41:11 45:7 142:24 159:25
**power** 21:1,5
**prejudice** 7:11 8:12
**preparation** 38:2
**prepared** 48:19
**preparing** 42:23 44:7
**presentment** 58:5
**press** 26:10
**pressing** 120:17
**presumption** 74:14
**pretty** 69:23 115:23 141:24 143:25 150:11 162:10
**prevail** 101:10
**prevent** 60:14
**previous** 65:13
**previously** 57:14 59:14 79:22 87:3 88:12 91:11 97:2 104:13 118:18
**price** 52:3 139:19,21 140:9
**primarily** 126:1
**primary** 143:12
**principal** 19:7 19:25 56:11,12 56:19 81:15
**prior** 7:22 41:23 45:1 46:3,13,23 54:15 65:10 96:16 114:22 115:16,16,21 118:15 166:3
**privilege** 8:20 8:21 31:9,13 31:16
**privileged** 26:22 27:21 28:6,11,16,23 29:4 32:2 39:19 117:19
**privileges** 7:11
**prl** 90:3,4
**pro** 2:3 7:24 8:5,14,14 27:20 28:5,10 28:15,20 29:2 29:15,19,25 85:11 86:23 87:19 93:24 94:6 128:10 133:24 137:8
**probably** 37:19 51:6,16 110:1 113:11 115:2 115:14 116:25 119:24 122:18 122:18 123:20 123:21,23 128:6,8 140:15 140:23 154:7 154:19
**problem** 35:12
**procedure** 29:11 31:9 35:13 38:7,11
**procedures** 8:22 161:23

**proceed** 98:24 101:9
**proceeding** 9:15 14:16
**proceedings** 1:13 164:1
**process** 43:6 45:6 86:1 134:4 153:14
**produce** 31:3,5 31:14 35:10 39:5,13,24 40:12,15 65:15 78:7 115:3
**produced** 29:12 39:7,7 39:24 51:3,13 51:17 72:19 76:4 131:23
**product** 29:3,5 29:6,9,9 30:8,9
**production** 30:6 36:1 39:10 40:9 46:6 48:15 65:17,22 80:17 132:1
**profession** 124:2
**professional** 126:21 166:20
**profile** 59:22 60:1,12,15 144:6,15 158:9 159:17
**profiles** 59:20
**promise** 14:6,7
**prompted** 122:7
**promptly** 31:1
**prompts** 27:15 28:19 29:1
**proof** 73:1 75:9 80:23,25 81:2 81:5,6,9 114:25 135:14 142:1 148:4 154:13,22 163:10
**proper** 119:10
**properly** 80:20
**properties** 141:11,17
**property** 13:13 13:13,15,17,18 13:20,21 81:25 82:3,7 124:1,1 124:6 136:16 136:21 141:22
**proportion** 145:1 146:1,25 160:4,7,13,19
**proposals** 151:5
**prosecute** 12:22
**prosecutor** 10:21 12:23 13:5 14:25
**protected** 18:19 29:10 30:23 31:8 32:4 117:19
**protection** 30:9 30:10
**provable** 97:3
**prove** 34:24 71:25 72:10 84:23 99:9 100:24 101:9 161:15
**proved** 86:18
**proves** 147:14 155:17
**provide** 8:8,24 49:7 72:21 75:8 81:25 82:4,8 112:14 113:22 124:5,8 124:15,21,24 125:3 127:1 135:2 136:16 137:19 141:22 141:25 163:14
**provided** 9:7 11:8 50:19 51:24 75:10 87:3 102:22,25 113:13 117:15 129:20 130:18 143:20,23 153:13 154:13 161:12 163:4
**provides** 8:15
**providing** 141:21
**proving** 33:16 72:22 86:14
**prussia** 2:7
**public** 8:8 11:9 12:20,23 54:9 54:11,15 67:17 125:15,23 126:5 136:17 165:20
**publicly** 35:21
**published** 33:10
**punitive** 52:17
**purchase** 13:11 41:21 52:2,3,3 52:19
**purchased** 122:21
**purchases** 116:9
**purportedly** 33:25
**purpose** 49:11
**purposes** 74:19
**push** 21:7 149:19
**put** 16:20,20,20 16:21,23 17:1 45:15 63:6,23 73:15 76:22

85:25 97:22 98:11 108:12 109:6 112:21 113:3 129:8 143:3

**q**

**question** 6:20 6:21 12:12,14 25:20 26:15 32:20,22 48:1 48:4,5 65:11 65:12,14,25 66:15,18 71:3 71:11,16 76:10 77:2,15 83:2,5 86:20,25 98:15 98:17,22 99:24 105:22 114:5 125:19 133:24 141:14 142:11 146:15 147:21 152:12,14,24 160:25 162:24
**questioning** 85:12 87:20
**questions** 5:10 6:8,11 8:19 27:11,12 75:15 75:16 163:22
**quick** 6:9
**quickly** 53:19 151:2,3 162:16
**quite** 138:20
**quote** 25:11

**r**

**r** 117:9 139:15 165:1 166:1 167:4,4
**railroad** 113:12
**railroaded** 113:24
**raise** 35:1 71:22
**raised** 48:6
**rather** 87:6
**rating** 88:22 89:3,18,19 96:9
**ratio** 150:8
**reach** 70:16 71:13 133:19
**read** 8:14 25:6 54:4 112:25 129:2,3 154:3 165:3 168:9
**reading** 35:6 110:5 113:10 155:5,11 167:5
**real** 92:1 111:24 124:9 124:12 125:12 125:16 126:2,5 126:17,20 127:2,14 128:1 142:15
**realistic** 130:8
**really** 110:21 112:22 115:1 134:7 139:7
**realm** 15:22
**realtime** 166:21
**reason** 7:4 73:23,24 75:22 80:3 83:24 85:5 91:5 94:22 95:16 96:1,10 101:16 101:23 102:6 102:15 103:4 103:11,18 104:7 111:5,7 111:14,23,23 111:23,25 112:3,7,8 113:5 142:7 144:8 148:4,15 150:21 152:11 162:25 163:14 168:11
**reasonable** 17:6 33:4,22 34:10,11,13,17 34:21 50:21 77:9 99:1,6 100:16,17 112:24 114:10 114:12,13 128:11 145:14 146:10 147:13 147:24,25 148:24 149:4,6 149:7 150:13 161:20
**reasonableness** 114:16
**reasonably** 77:1 149:10 150:19,20
**reasoning** 144:14,14
**reasons** 111:12 128:16 130:23 131:4 144:16
**recall** 9:25 10:1 39:1 46:17,18 46:20 47:11 48:10 63:14 69:3,8 78:11 79:11 88:5,11 89:1,9 91:10 91:21 92:15 94:25,25 95:8 96:15 101:21 129:11 135:3 156:1
**receipt** 168:17
**receipts** 78:18
**receive** 51:8 61:9,17 153:1 161:11,25
**received** 12:1 15:5 17:16 28:3 33:17

43:15 51:2,13 51:14 53:8 56:3,16,18 61:25 62:19 64:13 69:13 73:6 109:20 121:8 129:21 133:2,2 153:19 156:15,24 161:22,24
**receiving** 63:2 109:11 112:15 162:13
**recent** 37:9 92:11 142:8 145:12 149:24 150:17 151:14 154:3
**recently** 79:7 162:1
**recess** 63:22 121:1
**recognize** 15:10 17:20 43:19 53:11 56:5 62:5 64:17 104:24 109:23 121:12 130:20 153:22
**recollection** 83:11 93:6
**record** 7:8 8:7 19:13,24,25 26:11 27:11,23 30:6 34:23 47:11 54:9,11 55:2,3 60:9 63:15 64:1 67:17 68:25 70:22 73:7 76:2,11,13,17 76:24,25 78:4 78:6,8,16 82:18,20 85:13 87:16,16 93:4 97:19,21 98:12 99:17 107:18 112:10,19 114:1 120:25 125:24 137:23 146:23 149:4 152:21 163:15 163:25
**recorded** 33:17
**recording** 63:25
**records** 21:2 44:8 67:1 68:11 75:6 115:10 125:15 126:2,4,4,5,5,6 136:13,17 163:17
**recover** 117:20
**reference** 62:8 70:14 154:9
**referenced** 56:8 168:6
**referencing** 52:7 58:4,20
**referring** 154:8
**reflect** 70:22
**refrain** 162:22
**refusal** 152:14 153:3,5
**refuse** 8:19 27:12
**refused** 152:18 163:21
**refusing** 8:9 86:25
**regarding** 26:19 90:23 110:8 156:5
**regardless** 24:19
**registered** 15:25 16:14 23:24 57:12,20 58:24 59:3,3 113:2 166:20
**registrant** 24:1
**registration** 22:17
**registry** 17:2
**regular** 141:6
**regularly** 115:19,22 127:20
**reign** 81:15
**reinvestigate** 150:20
**reinvestigated** 150:19
**reinvestigation** 17:7 33:5,8,23 33:24 34:9,17 34:21 49:8,10 49:14,16 50:22 51:23,25 63:13 77:10 99:1,6 100:16,17 109:5 114:10 114:13 128:12 145:14,22 146:11,13 147:13,24 148:1,12 149:2 149:3,7,8 150:13 163:12 163:17
**reinvestigatio...** 161:16
**relate** 48:7 67:19 143:10 159:25
**related** 27:16 47:22 93:8 111:16 126:20
**relates** 157:18 159:24
**relating** 44:19 117:11
**relation** 51:2 85:18

**relationship** 106:21
**relative** 130:25 134:4 139:6 142:13 143:1 166:13,15
**releasing** 126:19
**relevant** 7:25 8:6 49:1 134:1 134:2 137:10 156:19
**reliable** 163:2
**relied** 143:13 157:24 163:1
**relief** 3:19 43:14
**relies** 151:1
**rely** 85:13 158:10
**relying** 133:17 163:6
**remark** 156:15
**remarks** 90:3 102:14
**remember** 69:5 73:4,5 104:16 106:5 109:11 122:5 133:22 146:4
**remitted** 11:13 11:20,21
**remotely** 71:6
**remove** 105:8,9
**removes** 114:9
**renaissance** 2:6
**rendering** 141:13,15
**rendition** 97:18
**renovation** 126:14,16
**rent** 7:18
**rental** 52:19 116:5
**repair** 42:15,17 42:20 52:20
**repayment** 153:2
**repeat** 71:10
**repent** 101:13
**repercussions** 52:18
**repetitive** 73:18
**rephrase** 68:24 82:6
**replacement** 123:7
**replied** 31:1,2 41:13,15
**replies** 39:8,23
**report** 25:14,17 33:11 34:7 41:22 44:10 52:7 69:10,11 69:13,24 70:5 70:15 71:13,24 74:11 76:23 89:10,11,15 91:14 92:24 93:5,7 95:20 95:24 96:7 99:20 104:17 105:1,7,16,21 106:2,3,6 107:5,8,13,24 108:13,17 109:7,9 110:11 112:11 121:25 129:15 142:11 143:14 144:5 144:23 151:7 151:10,12,16 151:20,20 154:23 155:1 155:10,13,16 156:9,11,14,19 157:13 158:1,2 158:24 159:18 159:18 161:10
**reportable** 132:5 135:5
**reported** 34:15 68:3 69:7 70:3 70:17 71:15 106:22 132:6,7 132:12,13,22 132:23 134:8 134:15,20
**reporter** 6:10 63:19 166:20 166:20,21 167:8
**reporting** 18:10 32:8,16 34:20 35:3,8 35:21 38:15 41:8 47:9,15 48:7,14 49:6 66:5 71:25 72:3,5 84:7 100:20,24 108:5 110:12 113:22 114:22 120:2 150:18 161:7 163:1
**reportings** 144:23
**reports** 46:17 47:4 68:7 70:14 106:12 106:17 156:8 156:15 157:11
**represent** 110:6 127:25 128:3
**representation** 142:1
**represented** 151:22
**representing** 19:9
**represents** 6:6
**reps** 63:10

**request** 46:5 65:17 105:8 106:8,11 110:13,15,20 111:1,11 112:2 112:7,8 142:22 163:25
**requested** 130:25 134:5 142:13,20,21 143:1
**requesting** 106:6
**requests** 5:1 31:4,21 39:6 39:10 40:8 48:15 115:5 142:8 162:11
**require** 23:18 32:15 71:25 147:25 163:20
**required** 142:5 144:18 153:9 159:10,14,21
**requirements** 4:5 56:1
**requires** 99:8 147:25 148:3 153:6
**research** 84:6
**resend** 88:17
**reservations** 7:10
**reserve** 13:1,3
**reside** 20:24 23:9
**resolved** 100:15
**respect** 41:4 81:23 151:24 154:13
**respond** 27:17 65:13
**responded** 50:13
**response** 31:4 39:6,10 40:8 46:5 48:14 51:8 53:14 62:20 65:16 77:6 86:9,13 96:19,24,25 109:11,15 110:7 115:4
**responses** 3:21 39:21 53:6 116:16
**responsibility** 153:11
**responsible** 142:24
**responsive** 40:18 41:11
**result** 52:18 76:5 113:7 120:7,13 144:22
**resulting** 110:12 116:19
**results** 17:6 33:8,24 49:8 49:14 51:25 162:2
**retain** 41:6
**return** 49:20 131:15,18 132:19 137:23 167:8,21 168:13,16
**returned** 11:23
**returning** 12:20
**returns** 131:11 131:12 132:14 135:6,13 136:6
**review** 38:5,12 38:16,17 43:24 44:6 63:14 64:3 65:4 66:1 66:18 67:3 69:24 70:16 71:12,23 89:9 91:11 96:16 163:7,8,12,25 168:7
**reviewed** 38:6 38:10,20 44:1 66:5 70:5 161:21 163:13
**reviewing** 48:18 55:14
**revocation** 4:4 44:14 45:15 48:25 55:25 56:7 57:4,11 61:13
**revocations** 47:8
**revoke** 45:13 57:14 59:14
**revoked** 49:16
**revolving** 146:2 146:3 147:1,1
**rewind** 65:6
**ridiculous** 113:21
**right** 8:21 12:4 20:12 22:14 25:8,8,9 31:13 33:1,11,18,19 34:6,9,18 35:8 36:19 45:20 50:16 51:12,15 58:1,17,17 59:13 62:13,14 63:21 67:25 69:22 77:25 86:16,24,24 87:2,20 92:7 92:13 99:17 100:11 107:4 108:19 110:9 110:10 117:7 121:17 122:22 123:5 124:18

124:19 126:3 128:24 129:2 129:25 131:13 132:12,19 133:4,10 134:7 134:13,22 135:17 137:15 137:18 138:3,4 138:11 139:12 141:8 142:25 143:1,3,11,21 143:24 144:19 144:24 145:8 146:6 148:10 148:19,20 150:16 152:16 152:17 154:7 154:15,24 156:11 157:7 158:17,18,20 158:22,23 159:1,2,8 160:1,8,15,19 160:20,20 161:2 163:10
**rights** 7:10 45:8,9 125:12
**rochelle** 4:18 121:7 129:21
**rooney** 2:5
**rough** 138:9
**route** 113:18
**rpr** 1:14 166:2
**rule** 45:22 48:11 100:23
**rules** 29:10 31:9 38:6,10 38:13 76:7 148:5
**ruling** 5:10 106:15

**s**

**s** 4:1 117:9,9 167:4
**salary** 123:18 128:15 129:14
**santa** 123:1
**santander** 129:25
**satisfactory** 11:9
**satisfied** 14:9
**satisfy** 11:6 111:22
**save** 75:15 115:8
**saved** 29:1
**saw** 51:16,19 54:12 66:7,11 69:11 113:11 113:16 144:9
**saying** 12:5 25:22 38:22 78:3 91:12 112:2 143:6,9 147:15
**says** 15:15 18:1 18:12 21:24 22:3 24:9 25:6 34:20 35:3 44:13 48:17 49:20 52:5 56:10 57:5,12 58:12,23 62:15 73:23 101:1 105:13 110:10 110:25 112:6 123:15 128:24 130:19,24 131:21,22,22 146:24 149:11 156:13,18 157:13,14 162:3,4
**scheduled** 103:18,24
**scheduling** 99:15
**score** 114:6,20 114:23 115:12 115:18,22 116:8,11 123:16 129:15 144:5,21 145:17,24 157:22,23,25 158:9,14 159:20,25 160:9,11,12
**scoring** 160:15
**scratching** 163:16
**screen** 36:9 58:9 66:22 104:18
**screens** 36:4
**screenshot** 35:12
**scroll** 15:9 17:18 25:4 44:12 50:3 53:16 62:3 64:20 106:25 154:5
**scrolling** 53:19 105:11
**se** 2:3 7:24 8:5 8:14,14 27:20 28:5,10,15,20 29:2,15,19,25 80:13 85:11 86:23 87:19 93:24 94:6 128:10 133:24 137:8
**search** 40:7,10 40:11,17 41:10 46:4,14,21 48:12 65:15 115:3
**searched** 115:1 115:6

**searches** 40:25
**sec** 113:2
**second** 3:19 42:3 43:13 49:3 58:10,19 61:12 63:6,16 99:8 101:7 155:15,24
**secret** 42:18
**secretary** 16:1 23:2
**section** 29:3 35:13,16 38:7 38:11 59:17,19
**secured** 92:1,3
**security** 58:22 59:7,8 60:7 102:24 108:18 111:5
**see** 15:7,8 17:12,17 18:3 18:15 20:16,20 22:1,6 25:4 43:17,18 44:23 48:21 50:1,4,5 50:7 52:8 53:9 53:10 54:9,12 57:17 59:17 62:1,2,4 64:14 64:16 66:25 74:2 75:23 80:1,5 84:1 85:7 89:10 91:23 97:23 104:22 105:14 105:15 112:12 116:8 121:5 123:16 125:24 129:13,22 130:23,24 142:14 144:20 145:2,7 149:15 149:21,24 151:19 153:20 153:21 156:21 157:4 161:4,6 163:22
**seeing** 119:17
**seek** 97:13 119:9 125:12 125:15 126:1
**seeking** 14:14 14:23 26:21 27:21 28:21 29:16,20 30:1 30:25 39:2 93:25 116:23 117:20
**seemed** 36:24 66:10,12
**seen** 55:17 98:20
**self** 37:10,13
**sell** 82:11 126:18
**seller** 93:18
**sellers** 127:25
**send** 41:7 44:17 49:13 61:4 65:6,24 73:15 113:19 136:9 162:1
**sending** 46:19 61:18 67:10,13
**sense** 6:17,18 31:17 158:8
**sent** 44:20 45:17,19 46:10 46:13,16 62:20 64:19 76:6 88:16 91:11 96:16 100:12 104:13 106:24 107:1,16,19 109:15 110:6 112:22 144:11 149:9 168:14
**sentence** 18:12 21:11
**separate** 31:12 83:2 147:4
**served** 30:24 39:1 76:6 163:4
**servicelink** 140:15
**services** 25:12 81:12 124:5,7 124:15,17,18 126:9 136:15
**session** 12:12
**set** 25:19 53:15 145:24 148:5 166:10
**setting** 74:15
**settle** 11:1,12 14:3 107:23
**settled** 11:2 13:6
**settlement** 10:25 11:4,25 12:18,21 14:12 14:17,22 162:11
**seven** 22:10 112:25 150:8,9 150:10 162:2
**several** 32:11 116:22 144:1 151:5
**shame** 131:5
**share** 15:1 54:20 66:14 67:9,12 133:9 133:11,15
**shared** 76:24
**sharing** 60:15
**sheet** 167:6,7 168:11
**shopping** 122:2
**shortly** 37:17
**show** 17:11 33:22,23 43:1 53:4 55:22

58:9,15 64:5 75:3 76:11 82:18 85:15 89:16 93:5 109:14,16 121:3 149:1,4 153:9,15 161:23
**showed** 86:5 104:18 107:25
**showing** 26:13 74:22 84:25 99:18 150:7
**shown** 149:6 167:8
**shows** 121:25 155:1 158:3
**shut** 70:23
**sic** 80:16 88:14 111:24
**sidetracked** 66:1
**sign** 53:22 167:7 168:12
**signature** 21:24 78:19 166:19 167:20
**signatures** 78:19
**signed** 45:16 53:21 54:3 76:8 82:9,10 87:4,8 97:7 98:1,6 100:5 168:19
**signing** 45:7 76:17
**similar** 47:8 65:4,7 66:1 67:3 152:25
**simple** 113:24
**single** 139:9,10 154:11
**sins** 101:13
**site** 141:10
**sitting** 134:22
**situation** 41:23 113:25 116:5 119:25
**six** 7:16
**sixteen** 3:22 53:7
**skirt** 149:12
**skirted** 162:9
**small** 55:20 105:12
**smith** 24:4
**smiths** 24:4
**social** 58:22 59:7,8 60:7 108:18 111:4
**sold** 102:24
**sole** 143:16,18
**soledad** 117:8
**solely** 144:4,15
**solid** 78:5
**solidly** 99:19
**solutions** 168:23
**somewhat** 73:18
**soon** 121:19
**soriano** 117:9 117:10 119:17 120:10
**sorry** 7:20 10:2 10:18 11:10 12:10 21:20 22:5 36:22 38:9 47:2,25 52:1 57:7,9,24 66:12 68:21 70:20,25 72:25 73:23 76:19 77:7 98:14 100:23 103:4 108:3,24 112:5 114:19 137:17 150:4
**sort** 97:15 124:15 127:1
**sought** 31:6,6 116:20 118:18
**sounds** 66:19
**source** 137:4,14 137:19 140:21 141:23
**sources** 43:3 138:18 163:2
**southern** 1:1
**speak** 6:16 19:23 20:1 38:1 42:10,12 42:13 73:13
**speaking** 19:3 23:13 66:13
**speaks** 26:11 78:8 99:20
**specific** 33:3 49:2 54:24 59:12 93:2 97:20 110:22 111:7,16 137:4 137:5,14,19
**specifically** 93:4 106:5 116:12 119:22 119:24 140:6
**spend** 130:13
**spent** 144:13
**spoken** 42:19 120:10
**spontaneously** 116:13
**sporadic** 141:5
**sporadically** 127:17,18
**spot** 119:6
**squares** 135:5
**ss** 59:10
**ssn** 58:3
**st** 167:22
**stand** 86:6 87:17

**standing** 43:23
**stands** 86:14
**start** 124:14
**started** 6:10 47:20 50:23 58:25 71:17 111:20
**starting** 50:6
**state** 7:7 15:24 16:1,15 17:1 19:18 22:13 23:3,5,7,13,15 23:16 59:2 75:20 79:23 83:22 85:3 88:21 89:17 90:2 91:5 95:14 116:16 162:8 165:20
**stated** 44:16 46:1 52:15 79:22 83:25 85:5 152:21
**statement** 21:12 65:14 96:21 109:4 154:10 160:16
**statements** 44:8 76:6 152:25 163:5,7 163:9
**states** 1:1 18:18 20:13 23:18 107:21 156:23
**stating** 50:14 87:5 156:16,25
**status** 34:23 62:15 73:24 81:16 85:4 94:21 101:15 141:6
**statutory** 116:18
**stay** 158:15
**stealing** 26:2 61:2
**stenographer** 9:2 12:2 13:2 14:1 25:15 29:18 35:15 38:8 47:19 58:7 74:9 77:5 109:2 110:24 112:4 124:11 126:15 128:21 132:9 133:14 139:14 143:7 146:21 148:2 150:3 155:14 157:12 159:12 159:15
**stenographic** 1:12
**stenographic...** 166:9
**step** 98:24 119:2,9
**stint** 37:19
**stock** 113:2
**stop** 110:11
**stopped** 138:19
**straight** 12:9
**straightforward** 14:8
**strategies** 31:8 32:3
**strategy** 26:23 28:12,22 29:17 29:21 30:2,13
**stream** 127:13 135:25 139:9
**streams** 138:17
**street** 56:18 136:24,25
**stress** 116:17 118:14 120:6 120:11
**stuff** 41:22 48:2 66:14 97:3 114:9 117:19 119:14 125:12 145:13 146:12 146:13 150:18
**stv** 82:11
**subject** 31:15 163:20
**submission** 98:10
**submissions** 27:19 29:8
**submit** 8:24 17:22 46:25 47:8 105:6
**submitted** 42:5 59:10 73:5,8 82:24 83:4,12 83:16 88:12 98:8 104:19 105:2 148:12 158:23
**submitting** 33:5 82:22 104:16
**subpar** 52:21
**subpoena** 76:5 163:3
**subpoenas** 163:15
**subscribed** 165:16
**subsection** 49:4 49:5,9
**subsequent** 42:2
**subsequently** 158:13
**substance** 17:8 154:12
**substantiate** 72:14,17
**succeeded** 99:11
**sue** 41:17 42:11

**sued** 14:19
**sufficiently** 68:25
**suing** 19:14 20:5
**suit** 41:19 72:9 72:13
**suite** 2:6 167:22
**sum** 154:12
**super** 83:8
**supersede** 85:24
**support** 89:12 98:19 135:5 158:24
**supposed** 145:15 147:23 161:23
**sure** 6:24 12:14 13:4 20:4 34:5 36:10 38:21,23 39:9 54:14 69:23 73:20 76:19 92:20 106:9 110:14 113:15 115:1 130:17,22 131:6 143:22 158:8,14
**surety** 19:7
**surface** 115:6
**surname** 24:15
**susquehanna** 36:17
**svcs** 20:15
**sworn** 6:2 165:16 166:4
**system** 21:10 22:18,20 25:24 108:7
**systems** 21:16

**t**

**t** 2:3 4:1 139:15 165:1 166:1,1 167:4,4
**take** 23:19 63:20 66:24 69:22 96:23 99:24 100:4 109:22 110:3,4 117:5 118:11 119:8,9 120:23 122:19 129:16 135:14 149:16 151:24 152:25 163:22
**taken** 1:14 166:9 167:3
**takes** 63:22 121:1
**talk** 6:14 12:8 21:19 39:25 47:1,18 55:5,8 55:11,16 57:6 66:16 68:9 70:9 72:23 74:8 77:4 82:5 86:7 90:18 97:12 100:22 105:25 108:11 108:22 109:1 114:18 118:21 118:22 120:5 124:20,22 125:20 128:20 131:8 132:8 133:13 134:10 134:12 139:4 143:5 145:10 146:18,20 157:10,22 158:19,21,21 158:22 159:11
**talked** 97:5 119:22 120:1 160:14
**talking** 126:18 158:20
**target** 67:23 70:3
**targeted** 32:20
**task** 6:13 113:24
**tax** 74:19 126:19 131:11 131:12,15,18 132:14,19 135:6,13 136:5 137:23 138:2
**taxable** 133:6 133:10
**taxes** 151:23
**tbom** 67:22 69:7 91:3,16 91:20 94:19 155:22
**td** 10:8 14:3,23 67:23 70:2 92:12,19 93:3 155:23 156:5
**technically** 81:20
**tedious** 65:1
**telephone** 8:2 63:5
**tell** 86:4 87:14 124:4 130:1 131:19 134:23 135:12,24 138:11
**telling** 32:1 113:1 134:9 148:14
**tells** 128:19
**template** 66:24
**templates** 65:5 66:2,7,13,19 67:4
**ten** 63:20 120:24 150:1,6 150:8
**term** 42:14,17

**terms** 52:13 95:3,7 101:23 129:9
**testified** 6:3 9:13 14:21
**testify** 7:1,5 14:15,20 159:23 166:5
**testifying** 90:21 100:8 133:1
**testimony** 9:18 36:6 67:2 76:20,21 77:14 87:17 90:11 99:21 103:1 165:4 166:8 167:5 168:9,17
**text** 24:21 113:3
**thank** 32:5 49:18 77:14 163:18
**thankfully** 27:1
**theft** 25:3,14,17 61:2 104:17 105:1,6,19 106:18 108:1 110:8 111:15 111:17 113:7 113:17
**theoretically** 68:8
**theories** 26:23 28:22 29:17,21 30:2,12 31:7 32:3
**theory** 26:1 28:12 108:8,21
**therapist** 117:3 117:4,6
**therapy** 118:18 118:24 119:18
**thief** 108:3
**thing** 46:16 59:11 118:25 129:18 134:2 159:6
**things** 6:9 13:12 26:13 120:15,18 124:3 142:6 144:2,12
**think** 8:12 9:16 23:8 38:18 39:12,15 40:12 41:13 48:11 52:15 58:4,4 63:7 65:18 66:25 69:16 72:20 78:8 84:22 87:23 91:23 93:16 97:5,19 112:17 112:18 115:23 122:4 142:17 144:9 155:12 155:20,24 156:5,6,8 162:24
**third** 60:15 97:18 99:22 155:24
**thirty** 49:22
**thomas** 1:4 3:4 3:13 4:20 6:1 7:9 15:3,16,16 15:23 19:17 20:1 21:24 22:19 24:9,10 24:14 25:19,22 26:2,4 58:2,21 59:1,9 153:17 166:4 168:4,5
**thought** 116:3
**thousand** 103:3 142:18,19
**three** 37:19 59:13 60:9 67:19 71:14 72:21 73:3 75:17,18 79:3 84:22 85:14 86:13 87:12 97:20 99:11,19 119:21 146:4 147:3 150:2,7 157:8
**threshold** 98:24
**tied** 107:10 127:14
**till** 162:15
**time** 16:5 25:13 36:24 51:16,24 54:2 63:3 69:14,17,19 72:1 76:23 79:8 83:8 84:4 92:17 93:21 97:17 98:9,9 99:14 101:12 106:8 110:3,4 113:9,11,15 114:21 115:14 115:15 116:10 119:2,8 123:5 130:4 133:7 135:18,19 144:13 145:12 149:23 150:17 151:14 154:19 155:4 161:2 163:19 166:9 168:18
**timeframe** 168:8
**timeline** 70:12
**times** 44:2 99:11 122:15 125:24
**today** 6:8 7:2,5 15:2 19:2,3 20:10 23:14 35:24 36:6 38:3 79:13,16

90:12 100:8 119:12,15 123:2 132:2 133:1 139:8 151:22 152:8,9 163:19
**together** 45:15 58:16 73:15 84:21
**told** 63:13 84:20 86:5 87:12 138:8 146:9
**tomorrow** 119:13,16 162:16
**took** 56:22 100:6 113:18 115:23 119:2,8 144:10
**top** 25:4 56:10 57:25 62:3 109:24 136:12
**topic** 28:18 35:16 158:15
**total** 52:2 140:6
**totally** 113:24
**touched** 56:25
**town** 122:10
**track** 136:2 138:4,5,10,19 138:20
**tracking** 45:19
**trade** 25:16 110:25
**traffic** 9:19,20 9:21,23
**trans** 1:7 2:8 3:16,21 4:8,11 4:15 6:7 9:7 17:5,14,23 19:15,19,24 20:6 25:10,13 25:20,21 26:3 26:7,19 27:18 27:24 28:3 29:14 30:15 31:21 32:24 33:7,9,15 34:7 34:15,24 39:1 39:10 40:8 41:17,22 42:6 42:11,21 44:10 44:15,17 45:2 46:2,5,13,22 47:12,20,23 48:8,14 50:13 50:21 51:2,8 51:22,24 52:7 53:7 54:22 55:12 56:17,20 56:22,24 57:1 57:2,3 59:23 60:6,11,14,19 61:22 62:8 63:1 64:9,19 65:16 67:1,10 67:13 68:6,17 69:10,19 71:13 71:18,20 75:8 75:11 76:21 77:9 80:17 83:20 84:6 90:19,19 92:23 98:25 100:12 100:18 105:8 105:17 106:2,3 106:6,9,20,22 106:23,24 107:1,3,5,8,24 108:7,17,23,25 109:3,9,18 112:15 113:23 114:9,22 115:4 115:22 116:18 117:16 118:16 119:23,24 120:4,8,13 121:24 128:24 129:14 143:11 143:13 144:4 144:15 150:15 150:23 153:10 156:13 157:22 161:16,21 162:25 168:4
**transcribe** 6:11
**transcript** 1:12 27:10,22 28:8 28:13,17,24 29:22 63:25 163:25 165:4 166:8 167:5,6 168:6,19
**transcripts** 63:5,15
**transferred** 13:4
**transunion** 3:14,17 4:6,9 4:13,16 15:5 17:15 56:2 61:24 64:12 109:19 167:1
**treatment** 116:20,23
**trial** 162:15
**tried** 66:5 122:12
**true** 68:14 86:11 98:21 100:2 105:5 109:6,8 134:6 152:23 156:18 157:1 165:5 166:8
**trustco** 94:12
**truth** 41:16 86:10 97:25 98:5 166:5,5,6
**truthful** 98:9
**truthfully** 7:2,5
**try** 6:20
**trying** 24:7 34:3 41:20,23

64:7 72:4 74:15 112:21 134:17 148:6 161:5
**turn** 77:13
**turning** 141:7
**twice** 83:21 98:18
**two** 8:18 12:10 37:19 61:3 63:7,10 79:3 80:6,9 88:15 99:20 107:17 111:12 119:21 122:15 154:17 154:18,25 155:2,3,18,21 156:7
**type** 9:14 116:4
**types** 124:7

**u**

**u** 139:15 165:1
**u.s.** 11:15 44:20 45:25
**uh** 144:22
**umbrella** 57:1 81:15
**under** 4:5 9:13 18:8 25:17 29:10 31:9 32:4,25 40:3 49:3,8,13 56:1 56:15,25 57:4 57:11 60:6 74:24 76:7 81:14,16 87:5 90:11 100:23 123:7 132:2 134:23 138:15 139:8 150:14
**underlying** 26:19
**understand** 8:18 13:8,9 24:7 47:25 73:20 76:20 133:8 135:4 142:23
**understandable** 12:11
**understanding** 33:14 54:2,14 74:22 81:19 82:15
**understood** 6:22 48:5 49:18 62:18 67:2 71:2,4 116:15
**undeterminable** 50:15
**undue** 101:12
**unfolds** 116:13
**unfortunately** 40:23 43:7
**ungodly** 144:13
**union** 1:7 2:8 3:16,21 4:8,11 4:15 6:7 9:7 17:5,14,23 19:15,20,24 20:6 23:18 25:10,13,21,21 26:4,7,20 27:18 28:3 29:14 30:16 31:21 32:25 33:9,15 34:7 34:16,25 39:1 41:17,22 42:6 42:11,21 44:11 44:15,17 45:2 46:2,13,23 47:12,21,24 48:8 50:13,21 51:2,8,24 52:7 53:7 54:23 55:12 56:17,20 56:22,24 57:1 57:2,3 59:23 60:6,11,15,19 61:22 62:8 63:2 64:9,19 67:10,13 68:17 69:10,20 71:13 71:18,20 75:8 75:11 76:21 77:9 83:20 84:6 90:19,19 92:24 98:25 100:12,18 105:8,17 106:2 106:3,6,9,20,22 106:23,24 107:1,3,5,8,24 108:7,18,23,25 109:3,9,18 112:15 113:23 114:9,22 115:22 117:16 118:16 119:23 119:25 120:4,8 120:13 128:24 129:14 143:11 144:4 153:10 156:13 157:22 161:21 162:25 168:4
**union's** 27:24 33:7 39:10 40:8 46:5 48:14 51:22 65:17 67:1 68:6 80:17 115:4 116:18 121:24 143:14 144:15 150:16 150:23 161:16
**unique** 66:25
**united** 1:1
**university** 36:17
**unknown** 145:13 149:24

150:18
**unpack** 145:23
**unpaid** 90:5,24
**unpredictably** 116:13
**unreasonable** 161:17
**updating** 51:9
**upload** 28:2,14
**usc** 35:14,16 49:4
**use** 9:8 11:6 13:25 14:2 28:9 45:22 59:4,5,9,12 66:6 67:4 78:25 108:19
**used** 14:4 42:17 66:8 134:3 168:19
**using** 130:16
**usually** 13:11 126:10,10
**utilized** 27:17

**v**

**v** 1:6 139:15 168:4
**vague** 83:15 111:15
**valuation** 126:13
**valuations** 136:21
**value** 11:25 82:1,3,7,12 139:19 142:12 142:19,25 143:1
**various** 1:15 138:18
**vehicle** 41:20 52:2,19,20 123:6,8,8 129:10 130:13 142:12,18,25
**vehicle's** 142:19
**vehicles** 123:10
**verb** 81:23
**verbally** 85:24
**verbatim** 35:4 49:6 50:11
**verbiage** 104:19
**verifiable** 135:8
**verification** 53:22 135:20 135:22 153:13
**verified** 25:11 26:9 76:22 83:21 153:11
**verify** 149:10 150:14 168:9
**verifying** 51:9
**veritext** 168:14 168:23
**veritext.com** 167:21
**veritext.com.** 168:15
**version** 35:20
**versus** 10:8 158:6
**videoconfere...** 1:15
**view** 34:8 133:9 151:24
**views** 133:11 133:15
**violation** 32:25 33:7
**violations** 52:16 116:19
**visit** 23:9
**visits** 141:10
**vocalized** 87:18
**volumes** 78:8
**voluntary** 151:24 152:1 152:17,22 153:2
**volunteer** 132:25 158:4
**volunteering** 132:24 152:4
**voxtur** 139:13 139:13,15
**vs** 167:1

**w**

**w** 132:23
**wait** 45:14 61:12 141:14
**waiting** 158:9
**waits** 6:15
**waive** 45:9
**waived** 45:7
**waiving** 7:11 29:3 30:8,10 85:25
**walk** 135:11
**want** 8:7,24 9:4 20:3 34:5 39:21 40:3 45:9,22 63:23 65:20 72:14 73:19 76:19 86:9,17 87:21 101:2 116:8 126:17 131:3,8 132:3 133:19 138:15 139:1 142:24 143:22 145:21 149:12 149:16 150:24 150:25 159:22 162:16,17
**wanted** 38:21 66:24 122:11 129:7 130:13 130:14

**wants** 116:6 125:1 162:18
**way** 8:16 13:18 40:6 59:25 60:24 100:25 119:14 125:18 125:18
**we've** 26:13 60:21 63:17 79:15 120:22 160:12,14
**website** 45:3 47:6,7 60:1 125:5
**websites** 46:18 59:24 66:22 125:7
**week** 127:24
**weeks** 119:21 163:14
**weigh** 134:12
**weight** 120:17 158:14
**welcome** 32:6
**wells** 94:15
**went** 111:19 122:12 130:2 130:11,12
**west** 56:17
**white** 35:4 112:23 148:22
**widely** 12:22 42:17
**withdraw** 97:14 98:20 99:16
**withheld** 29:23 30:19
**withhold** 30:5
**withholding** 30:14,17 39:18
**witness** 1:16 9:3 38:9 58:8 63:23 64:2 112:5 150:4 159:13 163:24 168:8,10,12,18
**woman** 19:23
**word** 29:8 32:18,18 34:12 125:14 135:15 154:4,4
**words** 66:6 117:15 118:2 129:7
**work** 29:3,5,6,9 29:9 30:8,9 37:10 80:10 86:12 127:14 136:23 139:16 139:18 141:20
**working** 37:20 37:21 82:15 125:16
**works** 73:16 152:3
**world** 22:13 55:20 73:16 125:17,23 152:2
**wringer** 112:22
**write** 15:18 73:15 139:24 140:12,25
**writes** 74:18
**writing** 31:2,22 31:25 45:18 65:5 66:2,9 85:22,25 86:4 86:12 88:12 90:11 91:11 96:19,23 97:22 98:13 113:4
**written** 48:19 49:7 51:1,24 87:16,16 112:1
**wrong** 40:2,3 124:18 130:15 148:21 159:6
**wrote** 22:22 140:8

**x**

**x** 1:10 3:1 4:1 139:15

**y**

**yeah** 9:16 26:10 40:11 41:12 54:1,20 58:8,8,17 62:10 69:16,21 72:13 93:16 96:25 98:7 100:4 104:18 110:4 116:22 117:8 120:14 122:4,23 126:4 140:2,6 141:9 142:15 144:10 145:9 153:7 154:9 155:24 156:9 157:8 163:10
**year** 37:19 78:1 115:17 117:1 123:22 131:18 135:12,16 141:2
**years** 7:16 15:19 32:11 36:20,24 37:14 45:5 115:10,12 125:17 126:24 138:20
**yep** 93:14 145:3 149:9
**yonkers** 8:1
**york** 1:1,17 6:2 7:14 15:24 16:16 19:18 22:14 23:5 44:21 59:2 113:2 127:5 141:18

**youtube** 27:8 32:14 42:13 43:4 55:15,17 66:4,8

**z**

**z** 32:19
**zero** 96:4 129:8
**zoom** 1:15 6:12 36:9 57:8,9 105:12 121:9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.